## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Northern Division)

**Baltimore County Branch of the**
**National Association for the**
**Advancement of Colored People**
300 Lennox Avenue
Towson, MD 21286

**League of Women Voters**
**of Baltimore County**
66 York Road, Suite 211
Baltimore, MD 21212

**Common Cause Maryland**
121 Cathedral St., Suite 2a
Annapolis, MD 21401

**Charles Sydnor**
2 Helms Pick Court
Baltimore, MD 21228

**Anthony Fugett**
6 Supreme Court
Owings Mills, MD 21117

**Dana Vickers Shelley**
8508 Bridalwreath Way
Pikesville, MD 21208

**Danita Tolson**
5 Pine Hill Court
Woodstock, MD 21163

**Sharon Blake**
7519 Ashton Valley Way
Catonsville, MD 21228

**Gerald Morrison**
7 First Light Court
Rosedale, MD 21237

**Niesha McCoy**
3441 Carriage Hill Circle
Apartment G2
Randallstown, MD 21133

**COMPLAINT FOR**
**DECLARATORY AND**
**INJUNCTIVE RELIEF**

**Civil Action No.:**

*Plaintiffs,*

v.

**Baltimore County, Maryland**,
Serve on:
James R. Benjamin, Jr., Esq.
400 Washington Street
Towson, Maryland 21204

**Julian E. Jones, Jr.,** *in his official*
*capacity as Chairman of the*
*Baltimore County Council*,
400 Washington Street
Towson, Maryland 21204

**Tom Quirk**, *in his official*
*capacity as Member of the*
*Baltimore County Council*,
400 Washington Street
Towson, Maryland 21204

**Izzy Patoka**, *in his official*
*capacity as Member of the*
*Baltimore County Council*,
400 Washington Street
Towson, Maryland 21204

**Wade Kach**, *in his official*
*capacity as Member of the*
*Baltimore County Council*,
400 Washington Street
Towson, Maryland 21204

**David Marks**, *in his official*
*capacity as Member of the*
*Baltimore County Council*,
400 Washington Street
Towson, Maryland 21204

**Cathy Bevins**, *in her official*
*capacity as Member of the*
*Baltimore County Council*,
400 Washington Street
Towson, Maryland 21204

2

**Todd K. Crandell**, *in his official capacity as Member of the Baltimore County Council*,
400 Washington Street
Towson, Maryland 21204

**Baltimore County Board of Elections,**
Serve on:
Katie Brown
1112 Gilroy Road
Suite 104
Hunt Valley, Maryland 21031

*Defendants*.

# COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## NATURE OF THE CASE

1.      This is an action, filed by Black citizens of Baltimore County and organizations promoting civil rights and election fairness, challenging as racially discriminatory and unlawful the 2021 Redistricting Plan ("the Plan") enacted by the Baltimore County Council to elect its members.[1]  If allowed to take effect, this Plan will abridge and dilute the rights of Black voters and candidates in violation of Section 2 of the federal Voting Rights Act, 52 U.S.C. § 10301.

2.      Baltimore County has a long and disgraceful history of discrimination against Black and BIPOC residents, evident in pervasive segregation and unequal access to education, employment, and housing.  This history of discrimination has gone hand in hand with Baltimore County's exclusion of Black and BIPOC residents from participating fully in electoral politics.  No

---

[1]      Seven of the 12 Baltimore County Board of Education members will also be elected using this plan, while others are appointed.

3

Black official has ever been elected to countywide office.  No Black official had been elected to the County Council before 2002; since then, there has never been more than one Black councilmember at a time.

3.     While the Black population of Baltimore County has grown tremendously over the last two decades, from 20 to 30 percent of the County's population, this population growth has not translated to election of Black officials in Baltimore County's government.

4.     The Plan perpetuates this discrimination.  Under the Plan, Black voters will be denied a fair opportunity to elect representatives of their choice.  In only one of seven County Council districts -- proposed District 4 -- will Black voters make up more than half of the voting age population. The Plan packs Black voters into District 4, where they will make up almost 72 percent of the voters.

5.     Conversely, the Plan divides Black communities, including Randallstown, Milford Mill, Lochearn, and Owings Mills, as well as communities such as Reisterstown, such that in no district except District 4 will Black voters make up more than 30 percent of the voting age population.

6.     In other words, instead of affording Black voters election opportunities commensurate with their significant share of the population, the Plan perpetuates a legacy of discrimination in the County by packing an excessively high Black population into the County's one majority-Black district while also cracking politically cohesive Black communities into other Council districts, thereby diluting the voting influence of all Black voters.

7.     Plaintiffs seek a declaration from this Court that the Plan violates the Voting Rights Act, an injunction prohibiting Baltimore County from holding elections under this unlawful system, and an order mandating a redistricting plan for the election of members of the County

Council and Board of Education that comports with the Voting Rights Act, 52 U.S.C § 10301, as well as with all other relevant constitutional and statutory requirements.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343 because Plaintiffs seek relief under the Voting Rights Act, 52 U.S.C § 10301.  Jurisdiction for Plaintiffs' claim for attorneys' fees, costs, expert witness fees and associated costs, and related non-taxable costs is based on 52 U.S.C § 10310(e) and 28 U.S.C. § 1920.

9.      Venue is proper in this District under 28 U.S.C. § 1391(b) because relevant and substantial acts occurred and will continue to occur within the District of Maryland.

## PARTIES

10.      The National Association for the Advancement of Colored People ("NAACP") is a non-profit, non-partisan corporation with over 300,000 members, including hundreds residing in Baltimore County, many of whom reside in the affected County Council districts.  The NAACP is the nation's largest and oldest grassroots-based civil rights organization.  The NAACP's mission includes "eliminat[ing] racial hatred and racial discrimination," and removing "all barriers of racial discrimination through democratic processes."  Protection of the franchise and promotion of fair elections have been hallmarks of the NAACP's work throughout its history.  Plaintiff Baltimore County Branch of the NAACP brings this action on behalf of itself and its members, who reside and exercise their rights to vote in Baltimore County.  Dr. Danita Tolson is the current President of the Baltimore County Branch of the NAACP.

11.      The League of Women Voters of Baltimore County ("LWVBC") is a local League with League of Women Voters of Maryland ("LWVMD") and is a nonpartisan, nonprofit corporation organized under the laws of the State of Maryland. LWVMD works with and through

5

16 local leagues around the state and is part of the League of Women Voters of the United States, which has 700 state and local leagues in all 50 states, the District of Columbia, Puerto Rico, the Virgin Islands, and Hong Kong. LWVMD reaches more than 375,000 residents, including hundreds of residents of Baltimore County, and works to expand informed, active participation in state and local government, giving a voice to all Marylanders. LWV is a century seasoned grassroots organization that has worked to encourage informed and active participation in government, works to increase understanding of major public policy issues, and influences public policy through education and advocacy. LWV is an organization fully committed to diversity, equity, and inclusion in principle and in practice, believing that equity is central to the organization's mission of engaging all people, communities, and policymakers in creating a more perfect democracy.  Plaintiff League of Women Voters of Baltimore County is headed by Co-Presidents Ericka McDonald and Tana Hamilton.

12.     Common Cause is a non-profit nonpartisan democracy organization with over 1.5 million members and local organizations in 30 states, including 23,284 members and supporters in Maryland.  Plaintiff Common Cause Maryland has 1,641 members and supporters in Baltimore County, including a member of Common Cause Maryland's Advisory Board.  Since its founding by John Gardner in 1970, Common Cause has been dedicated to fair elections and making government at all levels more representative, open, and responsive to the interests of ordinary people.  Common Cause also assists voters in navigating the elections process, provides resources for voters to determine their districts and their polling locations, and mobilizes voters to engage in political advocacy.  Unfair and racially discriminatory redistricting directly frustrates and impedes Common Cause's core mission of making government more responsive to the interests of communities by diminishing the voices of the voters Common Cause works to engage and forces

6

Common Cause to divert resources toward directly combatting the ill effects of unlawful redistricting.  Common Cause brings this action on its own behalf and on behalf of its members and supporters who are registered voters in Maryland, including registered voters in Baltimore County.

13.     Plaintiff Charles Sydnor is a Black citizen of the United States and a resident and registered voter of Baltimore County, currently serving as a Maryland State Senator.  Under the Plan, Mr. Sydnor resides in Council District 1.

14.     Plaintiff Anthony Fugett is a Black citizen of the United States and a resident and registered voter of Baltimore County.  Under the Plan, Mr. Fugett resides in Council District 2.

15.     Plaintiff Dana Vickers Shelley is a Black citizen of the United States and a resident and registered voter of Baltimore County.  Under the Plan, Ms. Shelley resides in Council District 2.

16.     Plaintiff Danita Tolson is a Black citizen of the United States and a resident and registered voter of Baltimore County.  Under the Plan, Dr. Tolson resides in Council District 4.

17.     Plaintiff Sharon Blake is a Black citizen of the United States and a resident and registered voter of Baltimore County.  Under the Plan, Ms. Blake resides in Council District 1.

18.     Plaintiff Gerald Morrison is a Black citizen of the United States and a resident and registered voter of Baltimore County.  Under the Plan, Mr. Morrison resides in Council District 6.

19.     Plaintiff Niesha McCoy is a Black citizen of the United States and a resident and registered voter of Baltimore County.  Under the Plan, Ms. McCoy resides in Council District 4.

20.     Defendant Baltimore County is a political and geographical subdivision of the State of Maryland created for the provision of government services and operating under Maryland law.

21.     Defendants Julian E. Jones, Jr., Tom Quirk, Izzy Patoka, Wade Kach, David Marks, Cathy Bevins, and Todd K. Crandell are members of the Baltimore County Council, the County's legislative body and the entity responsible for establishing county policies for Baltimore County, including redistricting.  Each Councilmember is sued in his or her official capacity only.

22.     Defendant Baltimore County Board of Elections oversees elections for the County and is charged with guaranteeing "that every eligible citizen in Baltimore County is given the opportunity to register and vote to ensure a democratic process."

## FACTS GIVING RISE TO THIS ACTION

### Demographics and Population of Baltimore County

23.     According to the 2020 United States Census, Baltimore County had a total population of 827,370, of whom nearly 47 percent were Black, Indigenous, and People of Color (BIPOC), with 29.9% being Black.  Over the period from 2000 to 2020, the County's BIPOC population grew from 25.6 percent to 47 percent, with the Black population increasing from 20 percent to nearly 30 percent of the population.[2]  Whereas the County's non-Hispanic white population was 74.4 percent in 2000 and 68.2 percent in 2010, by 2020 it had declined to 53 percent.

24.     The growth of Baltimore County's Black population is also reflected in its share of the eligible voting population, i.e., citizens over 18 years of age.  The U.S. Census Bureau's 2020 data shows that Baltimore County had a total Black voting age population of 30.4 percent, while the non-Hispanic white voting age population was 55.2 percent.  As with the County's general population, the County's voting age population also diversified significantly in the two decades since 2000, growing to just over 30 percent in 2020.

---

[2]     http://censusviewer.com/county/MD/Baltimore

8

25.     Baltimore County is divided into seven single-member districts, each electing one member to the County Council.  For decades, the County's Black residents have been severely underrepresented on the County Council.

26.     No Black candidate had been elected to the County Council prior to 2002.  During the 2001 redistricting process, District 4 was created as a majority-Black district, leading to the election of the first Black councilmember in Baltimore County history in 2002.   In each election since 2002, one, and only one, Black member has been elected to the County Council.  The only Council district in Baltimore County ever to elect a Black candidate is District 4, and no Black (or any non-white) candidate has ever been elected to the Council from any of the other six districts. District 4 is currently represented by Julian E. Jones, Jr., the only Black member of the Council.

<u>The 2021 Redistricting Plan</u>

27.     Applicable state and federal laws require Baltimore County to redistrict its seven Council districts every 10 years in conjunction with the decennial census.  The County Executive has no formal role in the redistricting process and no veto power over the plan enacted.  Following public outcry about the lack of transparency in the County Council's redistricting process in 2001, the County Charter was amended in 2002 to require the Council to appoint a five-member bipartisan Redistricting Commission to conduct public hearings and work with data specialists to recommend a redistricting plan to the County Council.  The Council, however, retains sole authority to enact the recommended plan or any other plan of its choice.

28.     The 2021 Baltimore County Redistricting Commission was appointed by the County Council in March 2021 and began its work in the spring.  The Commission included four white officials and one Black official.  The Commission's Chair was Robert E. Latshaw, Jr., a white man who had also been a member of the 2011 Redistricting Commission.  The Commission

held a series of public hearings and meetings open to the public, although the process was largely virtual due to the COVID-19 pandemic.  The Commission also accepted written submissions.

29.     One notable feature of the Commission's process was its focus on the declining white population of the County.  Commission Chair Latshaw focused racially-charged questioning and comments on reasons the County's white population is dropping in proportion to its Black population, where white people might be going, and where new Black residents are coming from.[3] At the same time, from the beginning of its deliberations, the Commission was dismissive of the need for the County Council to better reflect the racial diversification of the County's population and government, and appeared to be ignorant of the requirements of the Voting Rights Act.

30.     For example, in the Commission's June 3, 2021 meeting -- ten weeks before the Census Bureau released data for redistricting purposes -- Mr. Latshaw related to Commission members that a member of the public had suggested that the County's increasing Black population warranted the Commission's creation of a second majority-Black district.  Chairman Latshaw inquired of County Council Chairman Julian Jones, who was calling into the meeting by phone, to confirm his erroneous response that this was not possible.  Latshaw reminded Jones that the two of them had "discussed personally" that there "is a heavy concentration in your district of African American citizens and yet the rest seemed to be scattered throughout the County."  Jones responded circularly (and erroneously with respect to the ability to create a second majority-Black district):

> You're absolutely correct.  It's not as simple as looking at the percentages of a group of people and then try to somehow extract exactly how many council members they should have because the condition is done by law, which states, as

---

[3]     *See* August 24, 2021, Redistricting Commission Meeting, video *available at* http://baltimorecountymd.iqm2.com/Citizens/Calendar.aspx?View=List, starting at 24:50 minute mark (*e.g.*, querying about "outflow of white citizens";  "Where did they go?"; "In my almost century of living here, I have never seen such an outflow of white citizens to other subdivisions."; "It doesn't surprise me that there's an outflow, but 70,000 people?  Wow."; "Baltimore City lost a lot of African Americans.  Did most of them come here?").

everyone knows, the districts must be continuous.  It must be compact.  You can't, unless there's a large group of people, whether African American or otherwise in a particular area.  You can't somehow try to make it into one district. Because African Americans are heavily concentrated in the fourth district.  But they have other pockets of communities throughout Baltimore County.  But none of them would make up a particular district if you will.  That's why you only have …. one African American Councilman.[4]

Of course, Councilman Jones had no idea whether it was possible to create a second district -- he made this statement ten weeks before the 2020 Census data for redistricting was released. Councilman Jones concluded by saying "All is not lost" because "I don't think it's all about race. I think it's about qualified candidates, having the people choose who they want to represent."

31.     Submissions from County residents -- including a written submission dated June 19, 2021 by Baltimore County data scientist Fergal Mullally, specifically disputing the Jones-Latshaw remarks regarding the alleged impossibility of creating a second majority-Black district and demonstrating using a map how such a district could be created -- were ignored.

32.     Later in the Commission's process, certain Plaintiffs in this case wrote to the Commission that its proposed Plan violated the Voting Rights Act by diluting minority voting power.  The Plaintiffs submitted a geographically compact, equipopulous, and representative plan to the Commission that increased the number of districts in which Black County residents would constitute a majority of the voting age population from one district to two districts (both West of Baltimore City, one inside and one outside the Beltway), in addition to a third "opportunity" district (Northeast of Baltimore City) with about 50 percent each of white and BIPOC populations.

33.     Despite dramatic Black and BIPOC population growth in the last two decades, and the demonstrable ability to add a second district with a Black majority of the voting age population

---

[4]     *See* June 3, 2021, Redistricting Commission Meeting, video *available at* http://baltimorecountymd.iqm2.com/Citizens/Detail_Meeting.aspx?ID=1610, starting at 23:45 minute mark.

to reflect that growth, the Redistricting Commission on September 29, 2021, recommended to the County Council a plan that would maintain only one Black majority district (District 4.)  The Commission proposal packed Black population into District 4 while fracturing large and geographically compact majority Black communities (including Lochearn, Owings Mills, and Randallstown) between Districts 1, 2, and 4.

34.     Following recommendation of the Commission's plan to the County Council, the Council scheduled a public hearing for October 26, 2021.  In advance of this hearing, the Plaintiffs prepared and sent to the Council a comprehensive legal analysis highlighting that the Commission plan violated the Voting Rights Act and urging its rejection.  Along with their legal analysis, Plaintiffs submitted *three additional* geographically compact, representative, and equipopulous maps demonstrating alternative ways that the Council could increase from one to two the number of districts in which Black Baltimore County residents would constitute a majority of the voting age population (all on the West side of the City).

35.     Approximately 40 people spoke at the October 26 Council hearing.  The only person who spoke favorably about the Commission plan at the October 26 Council hearing was Redistricting Commission Chair Latshaw, who contended that public criticism against the plan was unjustified because the Commission members worked hard and were "fine upstanding citizens of Baltimore County."[5]  Latshaw praised the Commission's work and emphasized that its Plan had "very little change" from the plan that had been in place since 2011, a goal of the Commission was that it "did not want to change much of the districts that we have now,"  and "communities have been maintained," seemingly not recognizing that the law requires changes to the election

---

[5]     October 26, 2021, Baltimore County Council Public Hearing, available at http://baltimorecountymd.iqm2.com/Citizens/Calendar.aspx?View=List.

12

boundaries corresponding to the dramatic population changes over the same period, and that the Commission Plan cracked Black communities such as Lochearn, Owings Mills, and Randallstown. Regarding the Plaintiffs' claim that demographic changes in the County's population could easily accommodate a second majority-Black district under the Voting Rights Act, Latshaw said the Commission was "well aware" of the issue, but declared -- notwithstanding Plaintiffs' four proposed maps that would establish such a district -- that as a matter of "Politics 101" it was not "practically" possible to create a second majority-Black district,. Latshaw contended that creation of two majority-Black districts would "break up some communities" and that creating Districts with Black voting age populations of 50 percent or more could lead to multiple Black candidates running for the position along with a white candidate, thus potentially splitting the Black vote and allowing a white candidate to win. Latshaw cited this concern as the reason the Commission intentionally "maintained" District 4 by packing it with a "very solid" share of Black voters at 70 percent of the District's overall population. Latshaw also stated on "the question: do people vote color? I don't think so. Not anymore. . . . the color of your County Councilperson is not the same as it is in Congress."

36. Following Latshaw's statement at the start of the October 26 hearing, approximately 40 members of the public spoke out against the Commission's proposed plan, including certain Plaintiffs and others submitting testimony on behalf of themselves or election fairness organizations. Not a single member of the public spoke in favor of the Commission's plan or any plan with only a single majority-Black district. Rather, numerous speakers refuted Latshaw's comments as a façade for discrimination. In addition to input from many Black community members urging the Council to create a second majority-Black district, several members of the Towson community, most of whom are white, urged the Council to consider

changes to the Commission plan to unite Towson in a single district, rather than splitting it between districts as done by the Commission's plan.

37.    At the hearing's conclusion, Council President Julian Jones said the feedback opposing the Commission's recommended plan had been heard by the Council loudly and clearly. Jones said he and the other Council members would review all the written submissions and maps, and that they would "work hard to see if there is a way to fulfill the request of many of the callers" to create a second majority-Black district.[6]  Directly contradicting his June 3, 2021 statements to the Redistricting Commission that a second majority Black district is not justified because "[i]t's not as simple as looking at the percentages of a group of people and then try to somehow extract exactly how many council members they should have," Jones said he had "always believed that 30 percent would justify two districts.  The question has always been how can you do it."

38.    Immediately following the October 26, 2021 hearing, having heard testimony from Towson residents about their strong view that Towson should be united in a single district, the Plaintiffs submitted to the Council a *fifth* alternative redistricting plan, this one both uniting Towson in one district and creating two districts that are majority-Black in voting age population. Both of the majority-Black districts in this plan were more than 55 percent in Black voting age population and had Black populations at least 20 percentage points higher than white population, thus providing Black voters a strong and realistic opportunity to elect candidates of their choice.

39.    On November 15, 2021, notwithstanding representations made publicly that they would endeavor to create a redistricting plan with two majority-Black districts and without explaining why it was passing over all five options proposed by the Plaintiffs to accomplish this goal, the Baltimore County Council introduced Bill 103-21.  This map was similar to the

---

[6] *Id.*

Commission's proposed plan in that it also failed to add a second majority-Black district, but it exacerbated the minority vote dilution in the Commission's plan by *increasing* the packing of Black voters in District 4 to nearly 73 percent, leaving a white voting age population in the District of just 16 percent, and cracked majority Black communities including Lochearn, Milford Mill, Randallstown, and Owings Mills. Every other district in the Council plan is crafted to include a white voting age population over 21 percentage points higher than its Black voting age population, thus ensuring that Black voters have no realistic chance of electing their candidate of choice in any of these six districts. Upon releasing this plan on November 15, the Council announced that all seven Council members had already endorsed the plan, leaving little doubt that its adoption was a foregone conclusion.

40.     While the Council continued to refuse requests from the Black community to prioritize Voting Rights Act compliance by adding a second majority-Black district to the plan, the one significant change the Council made to its map was to unify Towson in a single district, as requested by community members from Towson, who were overwhelmingly white. At the same time, Bill 103-21 split majority Black communities.

41.     Following Bill 103-21's introduction, Plaintiffs again provided the County with a detailed legal analysis explaining that Bill 103-21 violated the Voting Rights Act because of the unlawful vote dilution. Plaintiffs also advised County leaders that Plaintiffs would file this lawsuit if the plan was adopted.

42.     Over the weekend preceding the Council's scheduled hearing on the Plan, Council Chair Jones sent his constituents by email and posted on his Facebook page a video presentation of himself explaining why he does not support creation of a second majority Black district and urging residents to speak in favor of the Council plan at the December 14, 2021 hearing.

15

Displaying various slides, the video warns that a plan with two majority Black districts is "too **risky and Dangerous.  You could end up with NO Blacks on the county council**." (emphasis in original.) Throughout the video, Jones never mentions compliance with the Voting Rights Act as necessary, but instead emphasizes other traditional redistricting principles and repeatedly notes the "rule" that the redistricting plan "Must have five votes." In response to the contention raised by Plaintiffs and others that the Council plan unlawfully packs Black voters into a single majority-Black district, Jones disregards population changes and states:  "The County is not packing because this district has been in place for close to 20 years."

43.      On December 14, 2021, the Council held a final hearing on the Plan, at which Plaintiffs and many members of the community testified in opposition, specifically identifying the Council's willful refusal to include a second majority-Black district in its plan as objectionable and unlawful.  Notwithstanding Council Chair Jones' plea to his constituents to support a plan with a single majority-Black district, County records show that 57 speakers registered to speak against the plan, with the majority addressing its unfairness to BIPOC residents and its violation of the Voting Rights Act.[7]   Only nine residents spoke in favor of the Plan at the meeting, and of those, only three supported the plan for reasons related to its creation of a single majority Black district, with most favoring it for other reasons, such as its unification of Towson or majority-white communities in which they live.[8]  Meanwhile, dozens of speakers opposed to the Plan – including

---

[7]      Because the Council delayed discussion of the redistricting matter until more than two hours into the meeting and so many people had registered to speak, the meeting lasted over five-and-a-half hours, and not all of those registered were able to stay on the line until it was their turn to speak.

[8]      For example, speakers Lorrie Geiss, Dolores Berger, Joe Goodman and Bryan Fischer spoke in favor of the plan because it unites Towson in one district,  and speaker Mary Molinaro supported the plan because it reunites Reisterstown Main Street into District 2.  Joe Thuman, speaking on behalf of Baltimore County Young Republicans, supported the Plan as a non-partisan plan.

several of the Plaintiffs – implored the Council to reject the Plan as racially discriminatory and unlawful.

44.     On December 20, 2021, in advance of the Council's scheduled vote that evening on the Plan, residents working with the Baltimore County Coalition for Fair Maps, hand delivered to each Council member hundreds of letters, emails, testimonies and statements opposing the Plan as undemocratic, racially discriminatory and unlawful.

45.      Notwithstanding the enormous opposition to Bill 103-21, the Council unanimously adopted the Plan as its final redistricting plan on December 20, 2021. As passed, Bill 103-21 continues to preserves a majority of white residents in six Districts, and does so by packing Black residents into District 4 and cracking majority Black communities, including Lochearn, Milford Mill, Randallstown, and Owings Mills.   In passing the bill, several white Councilmembers complained about the outspoken opposition to the Plan as "racially divisive."

46.     The Plan violates Section 2 of the Voting Rights Act, 52 U.S.C § 10301, because it will impermissibly dilute the Black vote in Baltimore County, allowing the white majority's bloc voting to defeat candidates preferred by Black voters and depriving Black voters of an equal opportunity to participate in the political process and to elect candidates of their choice.

<u>Racially Polarized Voting in Baltimore County</u>

47.     Elections in Baltimore County have been and continue to be polarized along racial lines.  Polarized voting occurs when members of a protected class prefer candidate choices that are different from the rest of the electorate.  Polarized voting occurs in Baltimore County elections because there is a significant difference between the candidates preferred by Black voters and those preferred by white voters.

48.     Black voters in Baltimore County vote in a politically cohesive manner, manifested

by the higher rates at which Black voters express their preference for Black candidates in racially contested elections and for Democrats when candidates are the same race.

49.     White voters in Baltimore County also typically vote in a cohesive manner, preferring white candidates over Black and Republicans over Democrats.  White voters vote sufficiently as a bloc to defeat Black voters' candidates of choice, particularly in racially contested elections.

50.     Racially polarized voting by Baltimore County voters also occurs in elections for countywide and statewide elected offices.

51.     Because Black voters and white voters express different preferences, Black voters are unable to elect candidates of their choice in Council districts where Blacks do not comprise a majority of the voting age population.

52.     Since the creation of District 4 as a majority-Black district in 2001, the District's voters have consistently elected Black candidates to the County Council, namely Kenneth Oliver (2002-2014) and Julian E. Jones, Jr. (2014-present).

53.     Meanwhile, no Black candidate, nor any non-white candidate, has been elected to the Council from any of the remaining six districts over the past two decades or at any time in history.  Each of these districts has always had a majority of white voters and has always voted for white County Council candidates.

<u>History and Continuing Effects of Race Discrimination in Baltimore County</u>

54.     The Plan for election of the Baltimore County Council will interact with social and historical conditions to cause inequality in the opportunity of Black voters to elect representatives of their choice as compared to white voters.

55.     Historically, Black residents of Baltimore County have been subjected to official

voting-related discrimination that includes voting practices or procedures that enhance the opportunity for discrimination against Black voters, including, among other practices, maintenance of a system of seven majority-white Council districts until 2001, an all-white County Council until 2002, large Council election districts, and lack of incorporated municipalities.

56.     No Black candidate in history has won a seat on the County Council outside of the only Black majority district, District 4.

57.     Blacks in Baltimore County bear the effects of longstanding societal, economic, and educational discrimination, effects that are apparent in the areas of education, employment, housing, and health.  Such discriminatory effects reflect the County's continuing failure to address its long history of public and private racism and discrimination, and they hinder Black voters' ability to participate effectively in the political process.

58.     For example, until the 1940s, the County refused to provide Black students with a high school education in the County.  That is, there was no high school at all that allowed enrollment of Black students.  Black students were educated only to seventh grade by County schools.  Black County students who passed a special Blacks-only test qualifying them to attend high school could only attend a segregated Black high school in Baltimore City, if they were able to travel there. *Williams v. Zimmerman*, 192 A.2d 353 (Md. 1937).

59.     According to a 2015 study by the University of Maryland, Baltimore County continues to have among the most segregated schools in the State. And when school boundaries have been redrawn, efforts at desegregation have been resisted. *See* Editorial, *Baltimore County's long legacy of segregation*, Baltimore Sun, Mar. 20, 2017; Liz Bowie & Erica Green, *Bridging the Divide*, Baltimore Sun, Mar. 17, 22, 25, & 28, 2017.

60.     Through the use of exclusionary zoning and openly discriminatory housing and

development policies, Baltimore County contained its Black population within a small number of enclaves by the mid-1960s.  Between 1950 and 1970, rapid suburbanization supported by public policies more than doubled the population of Baltimore County and jobs increased 182 percent, yet the County's share of Black population declined from 6.7 percent in 1950 to just 3 percent in 1970.

61.     Throughout the 1960s, Baltimore County officials and residents were outspoken and consistent in refusing to create a public housing authority or to develop a workable program that would have allowed the County to receive federal funds to address the housing needs of low-income individuals and families, making clear that these refusals were intended to keep Black people out of the County.  Baltimore County residents organized statewide referenda to fight state fair housing laws and creation of a state housing agency.

62.     Despite passage of the Fair Housing Act in 1968, the County continued its use of exclusionary zoning, continued to resist building public housing, and openly opposed any attempt to assist low-income families in moving to the County.

63.     As a result of these racist practices and policies, a 1974 report by the U.S. Commission on Civil Rights famously described the County as a "white noose" around the City of Baltimore.  The report chronicled how Baltimore County used its zoning powers to eliminate Black-suburban enclaves while purposefully failing to support construction of moderately-priced housing as a means of preventing Black individuals from settling in the County.   The Commission's investigation found that most County apartment complexes refused to rent to Blacks and that Baltimore County used commercial rezoning, highway construction, and public works projects to eliminate Black enclaves or limit their growth, forcing even long-time Black residents of the County to find substitute housing in Baltimore City.

64.     During the 1970s, the Baltimore County Executive made keeping Black individuals out of the County a central policy goal of his administration.  Real estate agents at one point were instructed to inform the police chief if they sold Baltimore County homes to Black people.

65.     Due to the County's record of race discrimination, in the 1970s the federal Department of Housing and Urban Development (HUD) froze its funding to the County, citing official failures to develop and implement housing and fair housing plans required to obtain federal funds.  By 1979, the League of Women Voters estimated that the County had lost $20 million in potential Community Development Block Grants ("CDBG") because Baltimore County officials refused to sign non-discrimination promises required for an "Urban County" to receive CDBG funds.

66.     During the 1980s, Baltimore County designated Owings Mills and White Marsh as growth areas.  In order to begin receiving CDBG funds, the County filed Housing Assistance Plans with HUD promising to locate affordable housing in those areas.  Nevertheless, County officials failed to follow through on these commitments; little affordable housing was built in Owings Mills, and even less in White Marsh.  In the 1990s, Baltimore County downzoned the Honeygo growth area of White Marsh to reduce the construction of multifamily housing.  Multifamily housing that was constructed consisted of condominiums rather than rental apartments, again favoring white residents.

67.     In 1992, Baltimore County's Consolidated Plan admitted that the County's land use policies and procedures have limited the amount of land available for residential development and have inflated land costs in both growth areas and existing communities.

68.     In 1994, racist demagoguery by white Baltimore County politicians and white community leaders in opposition to the "Moving to Opportunity" demonstration program that

provided housing vouchers to 285 families, a minority of whom moved to the County, received national attention, including a segment on Sixty Minutes, and resulted in an end to funding for the MTO program. Ed Brandt, *Scare tactics bring down federal housing program*, Baltimore Sun, Oct. 30, 1994.

69.     Over the period from the 1990s through the early 2000s, Baltimore County continued efforts to keep Black people out of the County by demolishing 4,100 apartment units, including a substantial portion of its supply of federally-assisted units occupied by families.  These sites were redeveloped as parks or used to build housing solely for homeownership or elderly renters, most of whom are white.  No replacement multi-family housing was built elsewhere in the County.

70.     Today, Baltimore County does not own or operate any public housing or low-income housing.  As a result, Baltimore County's performance in meeting the fair, affordable housing needs of low-income family households, most of whom are African American and/or Latinx, is worse than similar suburban counties in Maryland.  While ignoring the housing needs of BIPOC family households, the County leads its suburban neighbors in aggressively collecting federal and state rental housing subsidies for senior housing, which in Baltimore County serves mostly whites.

71.     Because of these and other racially discriminatory Baltimore County policies, as well as private actions, Baltimore County is the most segregated major jurisdiction in Maryland and one of the most segregated metropolitan areas in the country.

72.     Due to the County's record of race discrimination, in 2011 civil rights organizations, including Plaintiff Baltimore County NAACP, and individual BIPOC residents, filed an administrative action against the County with HUD, alleging extensive violations of the

Fair Housing Act, Title VI of the Civil Rights Act, the Rehabilitation Act, and the Americans with Disabilities Act.  In March 2012, HUD entered into a binding agreement with the complainants and the County, requiring the County to undertake a myriad of actions, monitored by HUD, to address the race discrimination and segregation its policies perpetuated.

73.     According to the County's own analysis in conjunction with the HUD challenge, Black people in Baltimore County have significantly lower median income and almost twice the poverty rate of whites.  Blacks are also much more likely to rent rather than own their homes compared to whites, and they are significantly overrepresented on the County's housing voucher waiting list, which, at the time of the agreement, consisted of over 12,000 households waiting an average of nine years.

74.     Present-day race discrimination in Baltimore County is in no way limited to housing.  In 2017, for example, a Black church sued Baltimore County asserting that officials unlawfully used their zoning powers to prevent the location of a house of worship on Old Court Road, after white neighbors opposed the church, made openly racist remarks about the pastor and congregants, and vandalized the church.  After the United States Court of Appeals for the Fourth Circuit ruled in favor of the plaintiffs, Baltimore County settled the litigation in 2019, paying $375,000 in damages and allowing the church to locate on its chosen site.

75.     In 2019, the United States Department of Justice took the extraordinary step of suing Baltimore County for race discrimination in its employment policies, asserting that the County's police department engaged for years in a "pattern and practice of discrimination" that kept its ranks white by disqualifying Black applicants through use of a racially discriminatory test. In November 2020, the County entered into a court-supervised agreement with the Department of Justice requiring the County to revamp its hiring procedures to root out discrimination, meet hiring

23

goals, and pay $2 million in damages to Black employment applicants who had been discriminated against.

76.     Meanwhile, police violence against Black community members has also plagued Baltimore County.  In a 2015 study by the ACLU of Maryland examining civilian deaths at the hands of police, Baltimore County ranked third among Maryland jurisdictions for police violence over the years 2010-2014.  Among those killed, 70 percent were Black.  Since this study, the pattern has continued.  In 2016, for example, County police officers killed Korryn Gaines in her home and badly injured her five-year-old son Kodi.  Although County officials declined to bring criminal charges over the racially-charged killing, a civil jury awarded the family $38 million in damages.

77.     There is, and historically has been, a lack of responsiveness on the part of County Council to the particularized needs of the Black residents of Baltimore County.

78.     The policies underlying Defendants' rejection of numerous redistricting options that would comply with the Voting Rights Act and the County's failure to enact a 2021 redistricting plan that fairly reflects the Black population growth during the prior decade are unlawful.

## FIRST CAUSE OF ACTION
### Violation of Section 2 of the Voting Rights Act of 1965
### (All Plaintiffs against All Defendants)

79.     Plaintiffs re-allege and incorporate by reference the allegations set forth in all prior paragraphs of this Complaint.

80.     Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, applies to Baltimore County.

81.     The Black population in Baltimore County is sufficiently numerous and geographically compact such that two properly apportioned electoral districts can be drawn in

which Blacks would constitute a majority of the voting-age population.

82.     Racially polarized voting persists in elections of members to the County Council. White voters typically vote as a bloc to defeat Black voters' candidates of choice.

83.     The Plan will result in a denial or abridgment of the right to vote of Plaintiffs on account of their race, color, or ethnicity, by having the effect of canceling out or minimizing their individual voting strength in County Council elections.  The Plan does not afford Plaintiffs an equal opportunity to participate in the political process and elect candidates of their choice equal to that afforded other members of the electorate, diluting Black voting strength in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray that this Court enter Judgment granting Plaintiffs:

A.  A declaratory judgment that the Plan violates the rights of Plaintiffs as secured by the Voting Rights Act, 52 U.S.C. § 10301;

A.  Permanent injunctive relief preventing the Defendants and their officers, agents, and employees, successors in office, and all other persons in active concert and participation with them, from conducting future elections for Baltimore County Council under the unlawful redistricting plan enacted December 20, 2021;

B.  An Order of this Court adopting a redistricting plan for the election of members to the Baltimore County Council that comports with the Voting Rights Act, 52 U.S.C. § 10301, as well as all other relevant constitutional and statutory requirements;

C.  The costs of this suit, including reasonable attorneys' fees and reimbursement of expert witness expenses and all other litigation costs, under 52 U.S.C § 10310 (e) and 28 U.S.C. 1920; and

D.  Such other and further relief as the Court may deem just and proper.


Dated: December 21, 2021


/s/ *Deborah A. Jeon*          /s/ *John A. Freedman*

| | |
|---|---|
| Deborah A. Jeon (Bar #6905) | John A. Freedman (Bar #20276) |
| AMERICAN CIVIL LIBERTIES UNION | Mark D. Colley (Bar #16281) |
| OF MARYLAND | ARNOLD & PORTER KAYE SCHOLER LLP |
| 3600 Clipper Mill Road Suite 350 | 601 Massachusetts Ave, N.W. |
| Baltimore, MD  21211 | Washington, D.C.  20001 |
| (410) 889-8555 | (202) 942-5000 |

/s/ *Andrew Freeman*         Michael Mazzullo (pro hac vice forthcoming)

| | |
|---|---|
| Andrew D. Freeman (Bar #3867) | ARNOLD & PORTER KAYE SCHOLER LLP |
| BROWN GOLDSTEIN & LEVY LLP | 250 W. 55th Street |
| 120 E. Baltimore St. Suite 2500 | New York, NY 10019 |
| Baltimore, MD  21202-6701 | (212) 836-8000 |
| (410) 962-1030 | |

*Counsel for Plaintiffs*