# UNITED STATES DISTRICT COURT
# DISTRICT OF MARYLAND
### (Northern Division)

BALTIMORE COUNTY BRANCH OF THE
NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE, *et al.*,

                Plaintiffs,

v.

BALTIMORE COUNTY, MARYLAND, *et al.*,

                  Defendants.

Civil Action No. LKG-21-03232

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
## <u>MOTION FOR PRELIMINARY INJUNCTION</u>

## TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................................ 1

II.   FACTUAL BACKGROUND....................................................................................... 2

    A.    The Changing Demographics of Baltimore County ..................................... 2

    B.    Baltimore County Council Election System .................................................. 3

    C.    Bill 103-21, The Challenged Baltimore County Council Redistricting Law............... 5

III.  LEGAL STANDARD................................................................................................ 10

IV.   ARGUMENT ............................................................................................................ 11

    A.    Legal Framework ........................................................................................ 11

    B.    Plaintiffs are substantially likely to succeed in showing the 2021 Redistricting Plan violates Section 2. ..................................................................... 12

        i.    *Gingles* Precondition One: An additional, reasonably compact majority-Black district can be drawn. ...................................................... 12

        ii.   *Gingles* Precondition Two: The relevant communities are cohesive................ 14

        iii.  *Gingles* Precondition Three: White voters vote sufficiently as a bloc to usually defeat Black voters' preferred candidates.......................................... 18

        iv.   Totality of the Circumstances and the Senate Factors ....................... 19

    C.    Black Baltimore County voters, including Plaintiffs, will suffer irreparable harm absent an injunction. .................................................................. 30

    D.    The balance of equities and the public interest favor relief. ....................... 32

V.    Conclusion ............................................................................................................... 34

i

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Ala. State Conf. of NAACP v. Ala.*,
  2020 WL 583803 (M.D. Ala. Feb. 5, 2020) .......................................................................... 14

*Bartlett v. Strickland*,
  556 U.S. 1 (2009) ...................................................................................................................... 12

*Brown v. Bd. of Sch. Comm'rs of Mobile Cnty.*,
  542 F. Supp. 1078 (S.D. Ala. 1982) ......................................................................................... 23

*Burdick v. Takushi*,
  504 U.S. 428 (1992) .................................................................................................................. 30

*Cane v. Worcester Cnty., Md.*,
  840 F. Supp. 1081 (D. Md. 1994) ....................................................................................... 14, 18

*Centro Tepeyac v. Montgomery Cnty.*,
  722 F.3d 184 (4th Cir. 2013) .................................................................................................... 10

*Citizens for a Better Gretna v. City of Gretna, La.*,
  834 F.2d 496 (5th Cir. 1987) .................................................................................................... 14

*Clark v. Calhoun County*,
  88 F.3d 1393 (5th Cir. 1996) .................................................................................................... 19

*Georgia State Conf. of NAACP v. Fayette Cnty. Bd.*,
  775 F.3d 1336 (11th Cir. 2015) ................................................................................................ 19

*Giovani Carandola, Ltd. v. Bason*,
  303 F.3d 507 (4th Cir. 2002) .................................................................................................... 32

*Ill. Bd. of Elections v. Socialist Workers Party*,
  440 U.S. 173 (1979) .................................................................................................................. 30

*Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*,
  4 F.3d 1103 (3d Cir. 1993) ....................................................................................................... 19

*Johnson v. De Grandy*,
  512 U.S. 997 (1994) ................................................................................................ 10, 11, 12, 19

*LULAC v. Perry*,
  548 U.S. 399 (2006) .................................................................................................................. 11

*Marylanders for Fair Representation v. Schaefer*,
  849 F. Supp. 1022 (D. Md. 1994) ................................................................................. 12, 14, 18

*Mo. State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.*,
  894 F.3d 924 (8th Cir. 2018) .................................................................................................... 19

*NAACP v. City of Niagara Falls*,
    65 F.3d 1002, 1019-20 n.21 (2d Cir. 1995) ............................................................. 19

*NAACP-Greensboro Branch v. Guilford Cnty. Bd. of Elections*,
    858 F. Supp. 2d 516 (M.D.N.C. 2012) ............................................................. 31, 32

*Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd.*,
    354 F.3d 249 (4th Cir. 2003) ............................................................. 32

*Nken v. Holder*,
    556 U.S. 418 (2009) ............................................................. 31

*Obama for Am. v. Husted*,
    697 F.3d 423 (6th Cir. 2012) ............................................................. 30

*Republican Party of N.C. v. Hunt*,
    841 F. Supp. 722 (E.D.N.C. 1994) ............................................................. 30, 31

*Roe v. Dep't of Defense*,
    947 F.3d 207 (4th Cir. 2020) ............................................................. 31

*Sanchez v. Colorado*,
    97 F.3d 1303 (10th Cir. 1996) ............................................................. 19

*Taliaferro v. N.C. State Bd. of Elections*,
    489 F. Supp. 3d 433 (E.D.N.C. 2020) ............................................................. 31

*Thornburg v. Gingles*,
    478 U.S. 30 (1986) ............................................................. *passim*

*United States v. Charleston Cnty.*,
    316 F. Supp. 2d 268 (D.S.C. 2003) ............................................................. 11

*United States v. Charleston Cnty., S.C.*,
    365 F.3d 341 (4th Cir. 2004) ............................................................. 17

*United States v. City of Cambridge*,
    799 F.2d 137 (4th Cir. 1986) ............................................................. 30

*United States v. South Carolina*,
    720 F.3d 518 (4th Cir. 2013) ............................................................. 10

*Uno v. City of Holyoke*,
    72 F.3d 973 (1st Cir. 1995) ............................................................. 19

*Williams v. Salerno*,
    792 F.2d 323 (2d Cir. 1986) ............................................................. 30

*Williams v. Zimmerman*,
    192 A.2d 353 (Md. 1937) ............................................................. 26

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ............................................................. 10

**Statutes**

52 U.S.C. § 10301 ........................................................................................... 10, 11

Md. Election Law Code Ann. § 5-303 ..................................................................... 32

Md. Election Law Code Ann. § 8-201 ..................................................................... 32

**Other Authorities**

B. Leckrone, "Analysis: The Consequential Changes in General Assembly's Redistricting
    Proposal" *Maryland Matters*, January 17, 2022, *available
    at* https://www.marylandmatters.org/2022/01/17/analysis-the-consequential-changes-in-
    general-assemblys-redistricting-proposal/ ................................................................. 29

Editorial, *Baltimore County's long legacy of segregation*, Baltimore Sun, Mar. 20, 2017 ......... 26

Final Report of the Councilmanic Redistricting Commission at pp. 4-7, available at
    https://resources.baltimorecountymd.gov/Documents/CountyCouncil/Redistricting/Redistricti
    ng_Commission_Final_Rpt_2021_Signed.pdf ......................................................... 29

Liz Bowie & Erica Green, *Bridging the Divide*, Baltimore Sun, Mar. 17, 22, 25, & 28, 2017.... 26

## I.    INTRODUCTION

This case calls for a straightforward, yet urgent and critically important, application of Section 2 of the Voting Rights Act. Baltimore County's burgeoning Black population (now 32 percent of the County's overall population) and its Black, Indigenous, and People of Color (BIPOC) population (now 48 percent of the total) are sufficiently large and geographically compact to easily establish two majority-Black districts among the seven County Council districts, as well as a third "influence" district with population divided equally between white and BIPOC voters. Absent creation of these districts, racial polarization among voters will enable the white majority to override the will of minority voters and maintain Baltimore County's nearly all-white government by diluting the influence of Black and BIPOC voters, discouraging Black candidacies, and preventing residents of color from electing their chosen representatives. The combination of the Council's adopted plan and severe socioeconomic disparities between Black and white residents—a direct result of the County's disgraceful history of racial discrimination and segregation—ensures that Baltimore Countians of color lack equal access to the political process and to fair representation in their government. This is precisely the scenario Section 2 was intended to remedy.

Ignoring both the County's dramatic population diversification and enormous public outcry about its redistricting proposals, Baltimore County has refused to draw districts fairly, instead enacting a plan, Bill 103-21, that will lock in for the next decade a system that preserves white domination in six of the Council's seven districts. Rather than create political opportunities commensurate with its diversified population, the map simultaneously cracks Black communities while packing Black voters into a single district, ensuring their influence is limited. Bill 103-21 thus dilutes Baltimore County's Black vote in violation of Section 2. Without this Court's intervention prior to the 2022 election season, which begins with a candidate filing deadline on

February 22, Baltimore County will subject its Black citizens, including Plaintiffs, to irreparable violation of their fundamental right to vote.

Because all relevant factors counsel in favor of relief, Plaintiffs request that the Court enjoin Baltimore County's implementation of Bill 103-21 and require it to adopt a map with two majority-Black districts.

## II.    FACTUAL BACKGROUND

### A.    The Changing Demographics of Baltimore County

As expert demographer William Cooper explains in his declaration, Baltimore County is large, densely populated, and rapidly diversifying.  *See* Exhibit A, Decl. of William S. Cooper ¶¶ 21, 25.   Census data shows dramatic growth and diversification in the County over the past 20 years, with the Black, Indigenous, People of Color (BIPOC) population increasing from 27% in 2000 to 48% in 2020, and the Black population increasing from 20% to 32% over the same period. *Id.* ¶ 25.

Although Baltimore County's overall population grew by more than 100,000 during this period, from 754,292 to 854,535 persons, the County's non-Hispanic white population fell by even more—110,627 persons—representing a *decline* of 20%.  *Id.* ¶ 26.   Meanwhile, the Black population *grew* over the same period, adding 118,814 persons, or an increase of 75.9%.  *Id.*   The total BIPOC population (including Black, Latinx, Asian, and multi-racial populations) grew from 200,402 persons in 2000 to 411,272 persons in 2020, an increase of 210,870 persons or 105%.  *Id.* The following table (Figure 2 in Mr. Cooper's Declaration) summarizes these demographic changes over the past 20 years:

**Baltimore County – 2000 Census to 2020 Census
Population by Race and Ethnicity**

| | 2000 Population | Percent | 2010 Population | Percent | 2020 Population | Percent | 2000 - 2020 Change | % 2000 - 2020 Change |
|---|---|---|---|---|---|---|---|---|
| **Total Population** | 754,292 | 100.00% | 805,029 | 100.00 | **854,535** | **100.00%** | 100,243 | **13.29%** |
| **NH White*** | 553,890 | 73.43% | 504,556 | 62.68% | **443,263** | **51.87%** | -110,627 | **-19.97%** |
| **Total Minority (BIPOC)** | 200,402 | 26.57% | 300,473 | 37.32% | **411,272** | **48.13%** | 210,870 | **105.22%** |
| Latino | 13,774 | 1.83% | 33,735 | 4.19% | 61,492 | 7.20% | 47,718 | 346.44% |
| NH Black* | 150,456 | 19.95% | 206,913 | 25.70% | 252,724 | 29.57% | 102,268 | 67.97% |
| NH Asian* | 23,845 | 3.16% | 39,865 | 4.95% | 54,701 | 6.40% | 30,856 | 129.40% |
| NH Hawaiian and PI* | 195 | 0.03% | 255 | 0.03% | 252 | 0.03% | 57 | 29.23% |
| NH Indigenous* | 1,769 | 0.23% | 2,107 | 0.26% | 1,942 | 0.23% | 173 | 9.78% |
| NH Other* | 1,016 | 0.13% | 1,445 | 0.18% | 4,461 | 0.52% | 3,445 | 339.07% |
| NH Two or More Races* | 9,347 | 1.24% | 16,153 | 2.01% | 35,700 | 4.18% | 26,353 | 281.94% |
| SR Black (Single-race Black ) | 151,600 | 20.10% | 209,738 | 26.05% | 255,793 | 29.93% | 104,193 | 68.73% |
| **AP Black (Any Part Black)** | 156,546 | 20.75% | 220,378 | 27.38% | **275,360** | **32.22%** | 118,814 | **75.90%** |

*Single-race, non-Hispanic

The Black population in Baltimore County is concentrated in the western areas of the County, with some significant BIPOC population also to the northeast of the border with the City. Cooper Decl. ¶ 27.  The bulk of the County's Black population lives in geographically compact areas running throughout western Baltimore County.  *Id.*

## B.    Baltimore County Council Election System

Baltimore County is divided into seven single-member districts, each electing one County Councilmember.  Cooper Decl. ¶ 32.  No Black candidate had been elected to the County Council prior to 2002, a rarity among Maryland counties with significant Black population.  Ex. C, Decl. of Anthony S. Fugett ¶ 9.  During the 2001 redistricting process, Plaintiff Baltimore County NAACP took a leading role in advocating for change in the County's election system to advance representation for the County's Black residents and bring the system into compliance with the

Voting Rights Act. [1]  *Id.* ¶ 18.  As a result, District 4 was created as a majority-Black district, leading to the election of the first Black councilmember in Baltimore County history in 2002.  *Id.* ¶ 19. Over the intervening 20-year period, through five election cycles, District 4 voters have elected a Black Council member to represent them.  The remaining six majority-white Council districts have only ever elected white Council members.  *Id.* ¶ 20.

These results demonstrate how elections in Baltimore County have been and continue to be polarized along racial lines.  Polarized voting occurs when members of a protected class prefer candidate choices that are different from the rest of the electorate.  The elections in which Black and white candidates compete against each other are especially probative in demonstrating how racially polarized voting can lead to minority vote dilution.  As explained in greater detail by political scientist Matthew Barreto, Black voters in Baltimore County have demonstrated "strong cohesion" over a decade of elections.  *See* Ex. B, Decl. of Matthew A. Barreto ¶ 11.  This trend was apparent in both primary and general election contests among voters in Baltimore County.  *Id.* Moreover, Dr. Barreto's analysis shows that white voters in Baltimore County have divergent voting patterns, generally opposing election of Black candidates and voting as a bloc *against* Black preferred candidates.  *Id.*  Because Black voters and white voters express different preferences, Black voters have not been able to elect candidates of their choice in Council districts where Black people do not comprise a majority of the voting age population.  Fugett Decl. ¶¶ 9-14, 16-17.  Since the creation of District 4 as a majority-Black district in 2001, numerous Black candidates have

---

[1] The NAACP advocated for adoption of the 2001 map because it brought never-before-held electoral opportunity for Black citizens.  Since then, Baltimore County has continued to dramatically diversify, but the map has barely changed.  Cooper Decl. ¶ 25-26.  There is no reason why BIPOC residents should have to wait another ten years for a chance to bring electoral opportunity in line with their current share of the population.

stepped forward to run in that district, resulting in the uninterrupted election of Black Council members in the District since its creation in 2001. *Id.* ¶ 20.

Meanwhile, no Black candidate, nor any non-white candidate, has been elected to the Council from any of the remaining six districts over the past two decades or at any time in history. Fugett Decl. ¶ 20. Each of these districts has always had a majority of white voters and has always voted for white County Council candidates. *Id.* The one time that a Black candidate challenged a white candidate for County Council – in the 1990 Democratic primary – the white candidate won easily, with white voters voting as a bloc against the Black voters' candidate of choice. *Id.* ¶ 9. Dr. Barreto found high levels of white bloc voting for candidates running against the candidates whom Black voters cohesively supported. Barreto Decl. ¶ 11. Dr. Barreto's analysis supports the conclusion that Black candidates of choice will lose elections in districts that do not have a majority of Black voters. Indeed, other than the one losing candidate in 1990, the specter of white bloc voting has discouraged Black candidates from even running outside of District 4 in the first instance. *See* Fugett Decl. ¶ 17.

### C.    Bill 103-21, The Challenged Baltimore County Council Redistricting Law

Throughout the redistricting process, there was enormous opposition to the Council's intent on passing a plan that denied the voters a second majority-Black district. Fugett Decl. ¶¶ 23-24. Public outcry, heightened by the Council's unwillingness to consider seriously a map with two majority-Black districts, culminated in the Council's final hearing on Bill 103-21 on December 14, 2021. *Id.* ¶ 24. Plaintiffs and many members of the community testified in opposition, specifically identifying the Council's willful refusal to include a second majority-Black district in its plan as objectionable and unlawful. Notwithstanding Council Chair Jones' plea to his constituents to support a plan with a single, heavily packed, majority-Black district, County

records show that 57 speakers registered to speak against the plan, with the majority addressing its unfairness to Black and BIPOC residents and its violation of the Voting Rights Act.[2]  *Id.*  Dozens of speakers opposing the Plan—including several of the Plaintiffs—implored the Council to reject the Plan as racially discriminatory and unlawful.  *Id.*  In addition, on December 20, 2021, in advance of the Council's scheduled vote that evening on the Plan, residents working with the Baltimore County Coalition for Fair Maps hand delivered to each Council member hundreds of letters, emails, testimonies and statements opposing Bill 103-21 as undemocratic, racially discriminatory, and unlawful.  *Id.*

Despite this overwhelming opposition, the Council unanimously adopted Bill 103-21 as its final redistricting plan on December 20, 2021.  As passed, Bill 103-21 preserves six districts as majority-white, doing so by packing an excessively high share of Black residents into District 4 and dividing majority-Black communities among Districts 1, 2, and 4.  Cooper Decl. ¶¶ 37-38.

Bill 103-21 packs Black voters into a single district (District 4) with the result that the district's voting age population is nearly 75% Black while no other district's voting age population is more than 32% Black. Cooper Decl. ¶¶ 37, 40.  In every district created by Bill 103-21 except District 4, the white voting age population outnumbers the Black voting age population by *at least 19 percentage points*.  *Id.* ¶ 40.

---

[2] Because the Council delayed discussion of the redistricting matter until more than two hours into the meeting and so many people had registered to speak, the meeting lasted over five-and-a-half hours, and not all of those registered were able to stay on the line until it was their turn to speak.

**Council Plan Voting Age Population Summary**

| District | Prison Adjusted Pop. | % Dev. | Population | 18+ Pop | % 18+ AP Black | % 18+ NH White |
|---|---|---|---|---|---|---|
| 1 | 122,391 | 0.01% | 122,074 | 95,419 | 29.71% | 49.50% |
| 2 | 118,343 | -3.30% | 118,145 | 91,675 | 31.18% | 55.55% |
| 3 | 119,477 | -2.37% | 119,377 | 94,192 | 8.09% | 77.58% |
| 4 | 119,487 | -2.37% | 119,068 | 93,489 | **74.74%** | 16.31% |
| 5 | 121,237 | -0.94% | 121,023 | 94,526 | 18.77% | 66.12% |
| 6 | 128,310 | 4.84% | 127,988 | 102,680 | 31.20% | 54.71% |
| 7 | 127,428 | 4.12% | 126,860 | 97,530 | 19.72% | 66.04% |

Cooper Decl. ¶ 34.

In addition, as illustrated below, Bill 103-21 divides certain majority-Black communities,[3] including Randallstown (84.6% Black), Milford Mill (86.3% Black), Lochearn (83.7% Black), and Owings Mills (63.2% Black), between Districts 2 and 4 (as well as District 1, with respect to Lochearn). Cooper Decl. ¶ 38. At the same time, the Bill 103-21 unites the adjacent majority-white community of Pikesville (67.3 % white) wholly in District 2. *Id.* ¶ 40.

---

[3] These data are taken from the 2019 American Community Survey, available at this link: https://www.census.gov/quickfacts/fact/table/US/PST045221

**Map of Bill 103-21's Districts with Detail of Black Communities Among Districts**



 In combination with the District 4 packing, division of these majority-Black communities in Bill 103-21 results in Bill 103-21's failure to create a second majority-Black district.  As a result, the adopted map is likely, as all prior Baltimore County maps have done, to elect at least six white candidates of choice out of seven seats.  *See id.*  That means over 85% of the seats will go to white-preferred candidates in a county that is only 52% white population in 2020.

Given the rapid diversification of Baltimore County, Bill 103-21 threatens to lock into place until 2032 an already-unequal districting scheme that will become more unequal over the next decade.  The demographic trends over the last twenty years show patterns of *decreasing* white population and *increasing* Black population.  The Black population has gone from 20% (2000) to 27% (2010) to 32% (2020) of Baltimore County without any commensurate shift in electoral opportunity (*i.e.*, one Black-majority district in 2001, 2011, and 2021).  Cooper Decl. ¶¶ 25-26.  If Bill 103-21 holds for the next decade, it will result in ever-increasing dilution of the Black vote.

The County Council could have easily drawn a map that would give Black voters political power commensurate with their share of the population.  Cooper Decl. ¶ 42.  Between late August

2021 and October 2021, Plaintiffs' counsel submitted five separate illustrative plans to the Redistricting Commission or Council showing how a plan with seven single-member districts could be drawn to include two majority-Black districts. *Id.* Each of these five plans adheres to all traditional redistricting principles, including that they (i) satisfy Constitutional one-person one-vote requirements, (ii) are reasonably shaped, compact, and contiguous, and (iii) respect communities of interest. *Id.* Unlike Bill 103-21, however, the five alternatives provided to the County by the Plaintiffs all would prevent dilution of minority voting strength.

The two maps below, developed by Plaintiffs' expert demographer and presented to the Council during its redistricting deliberations, illustrate how readily two majority-Black districts can be created on the western side of Baltimore County. Cooper Decl. ¶¶ 46-60 (explaining how Proposed Plan 1 and Proposed Plan 5 each create two districts where the Black voting age population is at least 20 percentage points higher than the White voting age population, ensuring that a cohesive Black community of voters would have a fair and realistic opportunity to elect representatives of their choice). Full-page versions of these maps are attached as Cooper Decl. Exs. E1 and F-1. The Baltimore County Council rejected these alternatives and instead packed and cracked the Black population to dilute the voting strength of Black and BIPOC residents.

**Plaintiffs' Proposed Plan 1**　　　　　　　　　**Plaintiffs' Proposed Plan 5**



Bill 103-21 is not the first time Baltimore County has sought to restrict equal opportunity for Black citizens.  It was enacted in the context of a County in which Black residents have borne and continue to bear the effects of longstanding societal, economic, and educational discrimination.  These social and historical conditions have long resulted in the almost complete exclusion of Black people from County government and discourage Black candidates from even stepping forward to try to seek public office.  Interacting with Bill 103-21's packing and cracking, the County's record of discrimination and its legacy confirm that Bill 103-21 denies Black voters equal electoral opportunities.

## III.    LEGAL STANDARD

The purpose of a preliminary injunction is to "prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits."  *United States v. South Carolina*, 720 F.3d 518, 524 (4th Cir. 2013) (quotations

omitted).  A court may enter a preliminary injunction if a plaintiff shows "(1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 188 (4th Cir. 2013) (en banc).  In each case, courts must "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  *Id*. at 24 (quotations omitted).

## IV.   ARGUMENT

### A.   Legal Framework

Section 2 prohibits any "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a).  Districts violate Section 2 where they "dilute the voting strength of politically cohesive minority group members, whether by fragmenting the minority voters among several districts where a bloc-voting majority can routinely outvote them, or by packing them into one or a small number of districts to minimize their influence in the districts next door."  *Johnson v. De Grandy*, 512 U.S. 997, 1007 (1994).  "Section 2 prohibits either sort of line-drawing where its result, interact[ing] with social and historical conditions, impairs the ability of a protected class to elect its candidate of choice on an equal basis with other voters."  *Id.* (citations omitted).

To prevail, a Section 2 plaintiff must show (1) the minority group is "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) the minority group "is politically cohesive"; and (3) "the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate."  *Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986).  Once these *Gingles* "preconditions" are established, courts also consider "the totality

11

of the circumstances"—including factors identified in the Senate Report accompanying the 1982 amendments to the VRA—to determine whether, as a result of the districts, "the political processes leading to nomination or election in the State or political subdivision are not equally open to participation" by members of the minority group. *Id.* at 43-44 (quoting 52 U.S.C. § 10301(b)). But "it will be only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* factors but still have failed to establish a violation of § 2 under the totality of circumstances." *United States v. Charleston Cnty.*, 316 F. Supp. 2d 268, 277 (D.S.C. 2003) (citation omitted), *aff'd*, 365 F.3d 341 (4th Cir. 2004).

**B.    Plaintiffs are substantially likely to succeed in showing the 2021 Redistricting Plan violates Section 2.**

**i.    *Gingles* Precondition One: An additional, reasonably compact majority-Black district can be drawn.**

The first *Gingles* factor is readily satisfied here because one can "creat[e] more than the existing number of reasonably compact districts with a sufficiently large minority population to elect candidates of its choice." *LULAC v. Perry*, 548 U.S. 399, 430 (2006) (quoting *De Grandy*, 512 U.S. at 1008). The numerosity aspect of this precondition involves a "straightforward," "objective, numerical test: Do minorities make up more than 50 percent of the voting-age population in the relevant geographic area?" *Bartlett v. Strickland*, 556 U.S. 1, 18 (2009); *accord, Marylanders for Fair Representation v. Schaefer*, 849 F. Supp. 1022, 1052 (D. Md. 1994) (three-judge-court) (collecting cases and holding that 53.6% Black voting-age population in proposed state delegate district was "sufficiently large" to satisfy *Gingles* factor 1).

Before the Council adopted Bill No. 103-21, Plaintiffs presented the Council with five separate plans, each demonstrating that Baltimore County's Black community is sufficiently large and geographically compact to comprise more than 50% of the voting-age population in two

reasonably compact county council districts.  In his declaration, Mr. Cooper confirms the viability of all five plans, two of which he discusses in detail—Plans 1 and 5.  Cooper Decl. ¶¶ 41-64.

 As Mr. Cooper explains, "the Black population in Baltimore County is concentrated in the western areas of the County . . . [and the] bulk of the County's Black population lives in geographically compact areas running throughout western Baltimore County."  Cooper Decl. ¶ 27. Therefore, "it is readily possible to create two substantial majority Black districts because the Black population on the western side of the County is 'large and geographically compact.'"  *Id.* ¶ 36.  With the County's seven-district arrangement, this approach would make the number of majority-Black council member districts commensurate with the county's roughly 30% Black voting age population (*i.e.* 30% x 7 = 2.1).  In contrast, by packing the Black population into one of seven districts (District 4) such that Black residents are over 74.7% of that district's voting age population, while also cracking majority-Black communities among Districts 1, 2, and 4, the County has diluted the voting influence of its Black voters.  Cooper Decl. ¶¶ 36-38.

Restated, the first *Gingles* test is simply whether majority-minority districts can be drawn that are "sufficiently large and geographically compact to constitute a majority in a single-member district."  *Johnson v. De Grandy,* 512 U.S. at 1005-07.  As Mr. Cooper explains, the alternative districts Plaintiffs proposed satisfy broadly acceptable analytical tests for compactness.  Cooper Decl. ¶ 61.  Within these districts, the total number of voters are equivalent to the total population in the other five districts.  *Id.* ¶¶ 47, 55.  And, in each of these two districts, the Black population is sufficiently large to constitute a majority.  *Id.*  Hence, the first *Gingles* test is readily satisfied.

In contrast to the Plaintiffs' proposed plans, Bill 103-21 packs Black voters into District 4 by splitting the population of several well-recognized majority-Black communities among

multiple councilmanic districts.  Cooper Decl. ¶ 38.  This manipulation of the Black population in these communities prevented creation of a second majority-Black district.

> In fact, the highest share of AP Black voting age population in any other district except District 4 in the Council Plan is 31.2%, in Districts 1 and 6.  And in every one of the districts in the Council Plan except District 4, the white voting age population outnumbers the Black voting age population by over 19 percentage points.  Thus, in six of the seven districts in the Council Plan, a white majority voting as a bloc would retain power to defeat the choices of a cohesive Black community of voters.

Cooper Decl. ¶ 40.  Bill 103-21 thus confounds the fundamental objective of Section 2 by impermissibly diluting the ability of the County's Black population to elect councilmembers of their choice.

### ii.    *Gingles* Precondition Two: The relevant communities are cohesive.

The second *Gingles* precondition is also satisfied here because Black voters in Baltimore County are politically cohesive.  *Gingles*, 478 U.S. at 49.  "Bloc voting by blacks tends to prove that the black community is politically cohesive, that is, it shows that blacks prefer certain candidates whom they could elect in a single-member, black majority district."  *Id.* at 69.

Dr. Barreto, an expert in voting patterns, analyzed racially polarized voting in Baltimore County.  *See generally* Barreto Decl.  To perform these analyses, Dr. Barreto used election data from 2010 to 2020 and a widely accepted methodology called ecological inference analysis.  *See Cane v. Worcester Cnty., Md.*, 840 F. Supp. 1081, 1087 (D. Md. 1994) (employing similar expert analysis in finding racially polarized voting in Worcester County); *Ala. State Conf. of NAACP v. Ala.*, 2020 WL 583803, at *29, n.27 (M.D. Ala. Feb. 5, 2020) (recognizing ecological inference as the "gold standard" for racially polarized voting analysis).  His analysis shows that Black voters in Baltimore County have demonstrated "strong cohesion" over a decade of elections.  Barreto Decl. ¶ 11.  Political cohesion among Black voters in Baltimore County was apparent in both

primary and general elections. *Id.* Racial polarization is particularly striking in elections involving Black candidates challenging white candidates, and it is these elections that courts have consistently held to be most probative in assessing minority vote dilution. *See, e.g. Cane*, 840 F. Supp., at 1090, *citing Citizens for a Better Gretna v. City of Gretna, La*., 834 F.2d 496, 503 (5th Cir. 1987).

In analyzing *Gingles* factors 2 and 3, the lack of elections contested between Black and white candidates due to the dearth of Black candidates willing to run for office in majority white areas is a significant issue, but also one that is common in places like Baltimore County with highly polarized voting and a long history of racial discrimination and exclusion. Courts addressing voting rights claims in this context properly take into account the reasonable justifications explaining the lack of Black challengers to white candidates in majority-white areas. For example, in *Marylanders for Fair Representation v. Schaefer*, the court noted:

> Blacks in Wicomico, Dorchester, Caroline, and Talbot Counties rarely run for public office in majority white constituencies, and when they do, they usually lose. At the county level, no black has ever been elected to any of the countywide single-member offices (i.e., State's Attorney, Clerk of Court, Register of Wills, or Sheriff). With only one exception, the four counties have never elected a black councilmember or commissioner at-large: Wicomico elected a black Republican County Councilmember, Emerson Holloway, in 1978, but he served just one term.

849 F. Supp. at 1059.

The pattern in Baltimore County has been similar, with a government maintained as nearly all-white and few Black candidates challenging the system in local elections due to the futility they see in it. Fugett Decl. ¶¶ 16-17. This means there are fewer Black-white elections available for analysis; however, those that do exist show strong patterns of Black political cohesion (as well as white bloc voting to defeat Black candidates, discussed in the next section).

Clear patterns of racially polarized voting are evidence.  For example, the Democratic primary for U.S. Senate in 2016. Congresswoman Donna Edwards, a Black woman, faced off against white Congressman Chris Van Hollen among eight other candidates with far less experience or name recognition.  This election is significant in illustrating racially polarized voting because, independent of partisanship, the statistical patterns demonstrate that Black and white voters have opposite candidate preferences within Democratic primaries.



Barreto Decl. ¶ 18.

The figure above shows the precinct results by race for Baltimore countywide and shows a clear pattern in which Black voters strongly preferred Edwards while white voters strongly preferred Van Hollen. Each dot represents a voting precinct.  *Id.* ¶ 18. Along the y-axis is percentage of white population in each precinct, meaning precincts on the far right of the graph have high percentages of white citizens and precincts on the far left have low percentages of white citizens. Along the x-axis is percentage of votes for a given candidate.  The graph illustrates a clear pattern of racially polarized voting:  In the upper far right, the precincts that are nearly all-white

voted around 85% for Van Hollen, and in the lower far left, the precincts that are nearly all-Black voted around 25% for Van Hollen.  On average, *eight percent* of the white electorate voted for the Black candidate Edwards. Barreto Decl. ¶ 20.  That statistic carries weight under the law. *Compare Gingles*, 478 U.S. at 80–82 (finding legally significant white bloc voting in North Carolina even where, on average, more than one-third of the white electorate voted for black candidates).  Again, this graph shows that the Black-White divide is *not* about partisanship; all of these voters were participating in the Democratic primary.  The same pattern holds true when voting in Districts 1, 2, and 4 is analyzed separately from the rest of the County.  Barreto Decl. ¶ 18.

The 2016 Van Hollen-Edwards election is not an outlier, but merely one example in which racially polarized voting persisted in Baltimore County over the past ten years, including the 2014 and 2018 gubernatorial elections, in which majority-Black precincts strongly favored Black candidates Anthony Brown and Ben Jealous over white candidate Larry Hogan.  *See* Barreto Decl. ¶¶ 14-17 (providing other examples). The figure below (Figure 2A from Dr. Barreto's Declaration), shows the same pattern of Black voter cohesion in the 2018 gubernatorial election:



These results more than satisfy the legal threshold of cohesive voting. *See Gingles*, 478 U.S. at 56 ("A showing that a significant number of minority group members usually vote for the same candidates is one way of proving the political cohesiveness necessary to a vote dilution claim.").

### iii.    *Gingles* **Precondition Three: White voters vote sufficiently as a bloc to usually defeat Black voters' preferred candidates.**

Finally, both countywide and in the areas where Mr. Cooper proposes potential new majority-Black districts, "the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 51. Such bloc voting need not be motivated by racial animus or bias. *United States v. Charleston Cnty., S.C.*, 365 F.3d 341, 348 (4th Cir. 2004). Instead, "legally significant" white bloc voting refers to the frequency with which, and not the reason why, whites vote cohesively for candidates who are not backed by minority voters. *Id*. at 348-49. Again, analysis of elections involving Black and white candidates are most probative in evaluating white bloc voting.

 In the same elections discussed above, Mr. Barreto found high levels of white bloc voting for candidates running against the candidates whom Black voters cohesively supported. For example, in the 2016 Van Hollen-Edwards Democratic primary election, the extreme racial polarization meant whites voting as a bloc were able to defeat Congresswoman Edwards, the Black-preferred candidate. Barreto Decl. ¶ 18. The same was true in the 2014 Hogan-Brown and 2018 Hogan-Jealous gubernatorial elections. *See* Barreto Decl. ¶¶ 14-17.

The results of this analysis support the conclusion that Black candidates of choice will lose elections in districts other than those where a majority of voters are Black. Indeed, the ability of white bloc voting to defeat Black candidates of choice has discouraged Black candidates from running outside of District 4 in the first instance. Fugett Decl. ¶¶ 16-17 (describing reasons for

dearth of Black candidates over time, and citing virtual impossibility, given racially polarized voting patterns, of his own viability as a competitive candidate in a district where white voting age population exceeds Black voting age population by over 25 percentage points). In sum, Black voters' candidates of choice are consistently defeated by white bloc voting, except when Black voters are a majority. *See Gingles*, 478 U.S. at 68 ("Bloc voting by a white majority tends to prove that blacks will generally be unable to elect representatives of their choice.").

This would not be the first court to evaluate racially polarized voting in Maryland and reach the same conclusion. *See Cane v. Worcester Cnty., Md.*, 840 F. Supp. 1081, 1090 (D. Md. 1994) (finding the "statistics taken together with the voting patterns and electoral system show that the white majority votes significantly as a bloc to enable it usually to defeat the minority's preferred candidate"); *Marylanders for Fair Representation v. Schaefer*, 849 F. Supp. 1022, 1059 (D. Md. 1994) (finding legally significant white bloc voting where Black candidates had never won in majority-white single-member county council districts). While Section 2 does not guarantee Black electoral success, "vote dilution" can be inferred "from political famine." *Johnson v. De Grandy*, 512 U.S. at 1017-18.

### iv.    Totality of the Circumstances and the Senate Factors

Once the three *Gingles* prerequisites are established, courts evaluate the totality of the circumstances, with special attention to the nonexhaustive list of "Senate factors" identified in *Gingles*, including: the extent to which members of a protected class are elected; any history of official discrimination in voting practices; discriminatory housing, education, and employment practices; and the existence of racial appeals in campaigning. *Gingles*, 478 U.S. at 38–40 (citing S. Rep. No. 97-417, at 28–29 (1982)).    "[I]t will be only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* factors but still have failed to establish a

violation of § 2 under the totality of circumstances." *Georgia State Conf. of NAACP v. Fayette Cnty. Bd.*, 775 F.3d 1336, 1342 (11th Cir. 2015).[4]

This is not an unusual case. Rather, the applicable Senate Factors used to examine the totality of circumstances confirm the Section 2 violation. There is no requirement that any particular number of factors be proved or that a majority of them point one way or the other. *Gingles*, 478 U.S. at 45. The Supreme Court has instructed that "the most important" factors are the "extent to which minority group members have been elected to public office in the jurisdiction" and the "extent to which voting in the elections of the state or political subdivision is racially polarized." *Id.* at 51 n.15. Here, Dr. Barreto's analysis confirms voting is highly racially polarized, Section IV.B.iii, *infra*, and Black candidates consistently lose elections in majority-white districts and countywide elections. Fugett Decl. ¶¶ 9-14. These two "most important" Senate Factors, along with others, confirm that allowing elections to take place under Bill 103-21 would deny Black voters equal electoral opportunities.

       a.    Baltimore County has a long and ongoing history of official, voting-related discrimination.

Baltimore County has a long and disgraceful history of racial discrimination against Black and BIPOC voters. To recap:

- No Black official has ever been elected to countywide office.
- No Black official had been elected to the County Council before 2002.
- Since the creation of a single majority-Black district in 2001, there has never been more than one Black councilmember at a time, and never one outside of District 4.

---

[4] *See also Mo. State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.*, 894 F.3d 924, 930 (8th Cir. 2018); *Sanchez v. Colorado*, 97 F.3d 1303, 1322 (10th Cir. 1996); *Clark v. Calhoun County, 88 F.3d 1393, 1396* (5th Cir. 1996); *NAACP v. City of Niagara Falls*, 65 F.3d 1002, 1019-20 n.21 (2d Cir. 1995); *Uno v. City of Holyoke*, 72 F.3d 973, 983 (1st Cir. 1995); *Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.,* 4 F.3d 1103, 1116 n.6 (3d Cir. 1993).

- No Black (or any non-white) candidate has ever been elected to the Council from any of the other six districts in Baltimore County, which are all majority white.

While the Black population of Baltimore County has grown tremendously over the last two decades, from 20% to 32% of the County's population, this population growth has not translated to the election of Black officials in Baltimore County's government. *See* Cooper Decl. ¶ 24; Fugett Decl. ¶ 20. Nor has the tremendous loss of white population in the County—falling from 73% to *52%* of the total county population over the last twenty years—resulted in any reduction of white elected officials; at all times, white men and women have held at least *85%* of the County Council seats. Cooper Decl. ¶ 25; Fugett Decl. ¶ 20.

b.      Baltimore County voters are racially polarized.

Black and white voters in Baltimore County demonstrably vote in a politically cohesive and polarized manner. As discussed at length in Sections IV.B.ii and IV.B.iii, *infra*, and in Dr. Barreto's declaration, Black voters in Baltimore County have demonstrated "strong cohesion" in voting patterns over a decade of primary and general election contests, and white voters consistently vote as a bloc to defeat Black voters' candidates of choice, particularly in racially contested elections. Sections IV.B.ii. and IV.B.iii, *infra*; Barreto Decl. ¶¶ 14-18.

The consistent losses among Black candidates running for office speak for themselves. These losses include:

- The loss of the only Black candidate ever to run for County Council in a majority-white district, when Harold Gordon ran and lost to Melvin Mintz in the Democratic primary for District 2 (Pikesville and Randallstown) in 1990 (when there were no Black persons on the Council);

- the loss of extremely well-qualified, thrice-gubernatorially-appointed Black Circuit Judge Alexander Wright *twice* to white candidates (who were not sitting judges) in non-partisan retention elections in 2000 and 2002, coming in last place against all non-Black candidates each time;

- the loss of the Black Lieutenant Governor, Democrat Anthony Brown, to white real estate broker Republican Larry Hogan in the 2014 gubernatorial race;

- the loss of Black Democrat Ben Jealous to Hogan in the 2018 gubernatorial race;
- the loss of sitting Black Congresswoman Donna Edwards to sitting white Congressman Chris Van Hollen in the 2016 Democratic primary for U.S. Senate;
- the loss of Black activist Linda Dorsey Walker against three white candidates in the 2018 Democratic primary for the three House of Delegates nominations in State Legislative District 11; and
- the loss of Black Democrat Carl Jackson to three non-Black candidates in the race for House of Delegates in State Legislative District 8.

Fugett Decl. ¶¶ 9-14; Barreto Decl. ¶¶ 14-18.  In each of these elections, the voters in Baltimore County were diametrically opposed along racial lines regarding which candidate they supported. Barreto Decl. ¶¶ 14-18.

At the County level, since the creation of District 4 as a majority-Black district in 2001, numerous Black candidates have run for election and the district's voters have consistently elected Black candidates to the County Council, including Council President Julian E. Jones.  Fugett Decl. ¶ 20.  Meanwhile, no Black candidate, nor any non-white candidate, has ever been elected to the Council from any of the remaining six (all majority-white) districts over the past two decades or at any time in history.  *Id.*

This pattern of racially polarized voting and history of loss discourages potential Black candidates from even considering running for office outside of a majority-Black district, believing it to be "futile" and "the prospects for success [to be seen] as negligible." Fugett Decl. ¶ 16; Section IV.B.iii, *infra*.  This was not for lack of interest.  When District 4 was established as a majority-Black district and opportunity was created, Black candidates "rushed forward to seek public office."  Fugett Decl. ¶ 19.  Four Black candidates sought the position in the Democratic primary, as well as a Black Republican contender – more Black candidates in that one district election than the *combined total* who had run for any County office in the history of the County.  *Id.*

    c. Baltimore County's voting practices enhance the opportunity for discrimination.

  The structure of the County Council districts—seven large districts—discriminates against Black voters by keeping them from being able to elect a representative number of their candidates of choice.  In 2000, Baltimore County's BIPOC population was 27% and growing. Cooper Decl. ¶ 25.  However, the County maintained a system of seven majority-white Council districts until 2001 and had an *all-white* County Council until 2002, meaning that the 27% BIPOC County residents had *zero* percent representation on the Council. Fugett Decl. ¶¶ 8-9, 20.  By 2020, Baltimore County's BIPOC population grew to 48%, with the Black population growing from 20% to 32%.  Cooper Decl. ¶ 25.  Since 2002, there has been only one Black councilmember at any given time and no other BIPOC councilmembers.  Fugett Decl. ¶ 20.  Thus, the County Council is made up of only 14% BIPOC/Black members, even though the voting population they represent is 48% BIPOC and 32% Black.  During the same period, the County's non-Hispanic white population was 73% in 2000 and declined to 52% in 2020.  Cooper Decl. ¶ 25.  Meanwhile, the white councilmembers made up 100% of the Council in 2000 and over 85% in 2020.

  The County is made up of large Council election districts and lacks incorporated municipalities.  It has no more localized municipal governments or elected municipal officials, thus all County residents are represented only by the County Councilmember elected from the district in which they live, and the County Executive, who is elected at large.  Cooper Decl. ¶ 22. This lack of elected municipal officials eliminates significant election opportunities for Black voters and candidates.  City or other local municipal councils are often a key stepping-stone to countywide office, especially for voters and candidates from racial minority groups that have historically been underrepresented in government.  *Id.* ¶ 23.  By eliminating these opportunities entirely, Baltimore County's governmental structure makes it harder for Black voters to influence

elections and gain self-representation.  This structure also allows the white countywide majority to defeat Black voters' candidates of choice.

> d.    Baltimore County's discrimination has produced severe
> socioeconomic disparities.

Black residents of Baltimore County bear the effects of longstanding racial inequalities, including in housing, education, and employment.  This history affects how and why citizens vote the way they do.  *Brown v. Bd. of Sch. Comm'rs of Mobile Cnty.*, 542 F. Supp. 1078, 1094 (S.D. Ala. 1982), *aff'd*, 706 F.2d 1103 (11ᵗʰ Cir. 1983), *aff'd* 464 U.S. 1005 (1983) ("Racial bloc voting by whites is attributable in part to past discrimination, and the past history of segregation and discrimination affects the choices of voters at the polls.").

*Housing and Zoning*

Baltimore County is the most segregated major jurisdiction in Maryland and one of the most segregated metropolitan areas in the country—a legacy of racially discriminatory Baltimore County policies.

Between 1950 and the mid-1960s, through the use of exclusionary zoning and openly discriminatory housing and development policies, Baltimore County contained its Black population within a small number of enclaves. *See* Ex. D, Decl. of Lawrence T. Brown ¶ 8.  Despite passage of the Fair Housing Act in 1968, the County continued its use of exclusionary zoning, continued to resist building public housing, and openly opposed any attempt to assist low-income families in moving to the County. As a result of these racist practices and policies, a 1974 report by the U.S. Commission on Civil Rights famously described the County as a "white noose" around the City of Baltimore.  *Id.* ¶ 12.  The Commission's investigation found that most County apartment complexes refused to rent to Blacks and that Baltimore County used rezoning, highway

construction, and public works projects to eliminate Black enclaves or limit their growth, forcing even long-time Black residents of the County to find substitute housing in Baltimore City. *Id.*

During the 1970s, the Baltimore County Executive made keeping Black individuals out of the County a central policy goal of his administration. Brown Decl. ¶ 14. Under his administration, the County destroyed all or part of numerous historically Black neighborhoods and replaced them with roads, schools, and commercial development; an MIT professor coined the term "expulsive zoning" to describe Baltimore County's repeated re-zoning of Black areas for business or industry while adjoining white neighborhoods were left intact. *Id.* ¶ 16. Real estate agents were instructed to inform the police chief if they sold Baltimore County homes to Black people. *Id.* ¶ 15. Due to the County's record of race discrimination, the U.S. Department of Housing and Urban Development (HUD) froze its funding to the County, citing official failures to develop and implement housing and fair housing plans required to obtain federal funds. *Id.* ¶ 17. By 1979, the League of Women Voters estimated that the County had lost $20 million in potential Community Development Block Grants ("CDBG") because Baltimore County officials refused to sign non-discrimination promises required for an "Urban County" to receive CDBG funds. *Id.*

During the 1980s, Baltimore County designated Owings Mills and White Marsh as growth areas. Brown Decl. ¶ 19. To begin receiving CDBG funds, the County filed Housing Assistance Plans with HUD promising to locate affordable housing in those areas. Nevertheless, County officials failed to follow through on these commitments, and, at the behest of their largely white constituents, east-side councilmembers succeeded in reducing the rental housing built in White Marsh, using racially coded phrases like making Honeygo a "quality community." *Id.* ¶ 19, 21, 24. As a result, little affordable housing was built in Owings Mills, and even less in White Marsh. *Id.*

Over the period from the 1990s through the early 2000s, Baltimore County continued its efforts to keep Black people out of the County, including by demolishing 4,100 apartment units, representing a substantial portion of its supply of federally assisted units occupied by families. Brown Decl. ¶ 25.  No replacement multi-family housing was built elsewhere in the County.  *Id.*

Today, Baltimore County does not own or operate any public housing or low-income housing.  *Id.* ¶ 27.  As a result, Baltimore County's performance in meeting the fair, affordable housing needs of low-income family households, most of whom are African American and/or Latino, is worse than similar suburban counties in Maryland.  *Id.*  Black households rent their homes at over twice the rate of white households.  Cooper Decl. ¶ 76.

Due to the County's record of race discrimination, civil rights organizations, including Plaintiff Baltimore County NAACP, and individual BIPOC residents, filed an administrative action against the County with HUD in 2011, alleging extensive violations of the Fair Housing Act, Title VI of the Civil Rights Act, the Rehabilitation Act, and the Americans with Disabilities Act.  Brown Decl. ¶ 29. In March 2012, HUD entered into a binding agreement with the complainants and the County, requiring the County to undertake a myriad of actions, monitored by HUD, to address the race discrimination and segregation its policies perpetuated.  *Id.*

*Education*

Until the 1940s, the County refused to provide Black students with a high school education in the County. That is, there was no high school at all that allowed enrollment of Black students. Black students were educated only to seventh grade by County schools, and Black County students who passed a special Blacks-only test qualifying them to attend high school could only attend a segregated Black high school in Baltimore City, if they were able to travel there. *Williams v. Zimmerman*, 192 A.2d 353 (Md. 1937).

According to a 2015 study by the University of Maryland, Baltimore County continues to have among the most segregated schools in the State.  Brown Decl. ¶ 30.  When school boundaries have been redrawn, efforts at desegregation have been resisted.  *See* Editorial, *Baltimore County's long legacy of segregation*, Baltimore Sun, Mar. 20, 2017; Liz Bowie & Erica Green, *Bridging the Divide*, Baltimore Sun, Mar. 17, 22, 25, & 28, 2017.

This divide is reflected in level of educational attainment. In Baltimore County, 43.8% of white residents over the age of 25 hold a college degree, while only 33.4% of Black residents do. Cooper Decl. ¶ 66.

### *Employment*

Although a larger percentage of Blacks (72.0%) work in the labor force than whites (63.4%), the earnings they bring home are consistently less. Cooper Decl. ¶ 73.  Data show that Black workers, both male and female, employed full time, year-round, earn substantially less money than do their white counterparts.  *Id.*  For Black men among this group, average income ($57,849) is dramatically less than it is for white men ($98,619), meaning Black men average just 59 cents for every dollar earned by white men.  *Id.*  The Black unemployment rate (for the working age population ages 16-64 – expressed as a percent of the civilian labor force) – is higher than for whites. At the time of the survey, 5.8% of working-age African Americans were unemployed, compared to a 3.3% rate for the white workforce.  *Id.* ¶ 74.  Black per capita income is 63% of white per capita income in the County, Black children are almost twice as likely to live in poverty, and Black families are 2.5 times more likely to participate in the food stamp program.  Cooper Decl. ¶¶ 67, 71-72.

In 2019, the United States Department of Justice took the extraordinary step of suing Baltimore County for race discrimination in its employment policies, asserting that the County's

police department engaged for years in a "pattern and practice of discrimination" that kept its ranks white by disqualifying Black applicants through use of a racially discriminatory test. Brown Decl. ¶ 36. In November 2020, the County entered into a court-supervised agreement with the Department of Justice requiring the County to revamp its hiring procedures to root out discrimination, meet hiring goals, and pay $2 million in damages to Black employment applicants who had been discriminated against. *Id.*

> e.      Black candidates are underrepresented in public office.

The County has continuously failed to achieve proportional representation of Black and BIPOC candidates in public office. No Black official has ever been elected to countywide office. Fugett Decl. ¶¶ 9, 17. No Black official had been elected to the County Council before 2002; since then, there has never been more than one Black councilmember at a time, and none outside of District 4. *Id.* ¶ 20. As stressed in multiple sections and expert reports herein, the shrinking non-Hispanic white population of Baltimore County has had outsized representation on the County Council for the last two decades and beyond. As of 2020, the County's BIPOC population stood at 48%. Cooper Decl. ¶ 25. The Black population was 32%. *Id.* The non-Hispanic white population had declined to 52%. *Id.* Nevertheless, the white population controls—and has controlled at all times—at least 6 of 7, or over 85%, of the County Council seats. Fugett Decl. ¶ 20. When Black candidates do run for office in district, countywide, or statewide elections, white voters vote as a bloc to defeat them time and again. Fugett Decl. ¶¶ 9-14. Nonetheless, the County Council continues to perpetuate this starkly disparate representation in public office through its passage of Bill 103-21.

> f.      Baltimore County is not responsive to its Black voters.

There is, and historically has been, a lack of responsiveness on the part of County Council to the particularized needs of the Black residents of Baltimore County. As discussed above, the

County's long history of discriminatory policies and practices in education, housing, and employment reflect the County's continuing failure to address the needs of its Black voters. Section IV.B.iv.d, *infra*.

The County Council's lack of responsiveness is also evident in its refusal to adopt a redistricting plan which included two majority-Black council districts, despite continuous appeals to do so from many concerned citizens, including Plaintiffs, at multiple Council hearings preceding the passage of Bill No. 103-21.  Section II.C, *infra*; Fugett Decl. ¶¶ 23-24.  For example, when white residents of Towson complained that the Commission's initial redistricting plan split their community between two districts, the Council heeded the white residents' appeals to unify Towson in the final plan; they did the same in response to the complaints of the white residents of Country Club Estates in Lutherville.  Fugett Decl. ¶ 27.  Simultaneously, the Council ignored the pleas of its Black and BIPOC residents to create two majority-Black districts and disregarded the potential plans solving this issue that were proposed by Plaintiffs and their counsel.  Fugett Decl. ¶ 27; Section II.C, *infra*.  The County's lack of responsiveness to Black voters contrasts sharply with the responsiveness of the State of Maryland to the *very same concerns* voiced by Black Baltimore County voters with respect to the State Legislative Redistricting Plan.  There, after concerns were raised about the initial redistricting proposal's unfairness to Black voters in Owings Mills through its maintenance of State Legislative District 11A as a majority white multimember district, the Attorney General and State Legislative Redistricting Advisory Committee promptly changed course and proposed creation of a new single-member majority-Black delegate subdistrict within

District 11 to increase its fairness to the area's increasing population of Black voters and to comply with the Voting Rights Act.[5]  Fugett Decl. ¶¶ 25-27.

> g.    The justification for the new County Council map lacks a legitimate government interest.

The County Council's only argument for failing to create two majority-Black districts in its redistricting plan was that county geography and population distribution make it infeasible.[6] This is demonstrably false, as Plaintiffs provided Baltimore County officials with *five different* illustrative plans with two majority-Black districts to show there were several ways to do so. Cooper Decl. ¶ 42; Fugett Decl. ¶ 27.  All five plans provided by the Plaintiffs would have prevented dilution of minority voting strength and been in compliance with the requirements of the VRA. Thus, no legitimate reason exists to justify the Council's denial of Black voters' right to fully participate in the electoral process.

**C.    Black Baltimore County voters, including Plaintiffs, will suffer irreparable harm absent an injunction.**

Plaintiffs and thousands of other Baltimore County citizens will suffer irreparable injury absent a preliminary injunction from this Court. "It is beyond cavil that 'voting is of the most fundamental significance under our constitutional structure.'" *Burdick v. Takushi*, 504 U.S. 428,

---

[5] According to House Speaker Adrienne Jones, who represents Baltimore County and is a member of the legislative committee conducting redistricting for the state, the Maryland Attorney General advised the committee that inclusion of a new majority-Black subdistrict within State Legislative District 11 is required under Section 2 due to demographic changes in the area—echoing claims made by the Plaintiffs with respect to County redistricting in the same area.  *See* B. Leckrone, "Analysis: The Consequential Changes in General Assembly's Redistricting Proposal" *Maryland Matters*, January 17, 2022, *available  at* https://www.marylandmatters.org/2022/01/17/analysis-the-consequential-changes-in-general-assemblys-redistricting-proposal/.

[6] *See* Final Report of the Councilmanic Redistricting Commission at pp. 4-7, available at https://resources.baltimorecountymd.gov/Documents/CountyCouncil/Redistricting/Redistricting_Commission_Final_Rpt_2021_Signed.pdf.

433 (1992) (quoting *Ill. Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979)).

Courts routinely find that restrictions on the fundamental right to vote, even for a brief period of

time, constitute irreparable injury.  *See, e.g.*, *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986)

(the denial of the fundamental right to vote is unquestionably "irreparable harm"); *Obama for Am.*

*v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (same).  In particular, discriminatory voting laws are

"the kind of serious violation of the Constitution and the Voting Rights Act for which courts have

granted immediate relief."  *United States v. City of Cambridge*, 799 F.2d 137, 140 (4th Cir. 1986).

The potential harm to Plaintiffs here is irreparable. It is impossible to provide adequate

relief for claims such as the ones raised here during or after an election.  *See Republican Party of*

*N.C. v. Hunt*, 841 F. Supp. 722, 728 (E.D.N.C. 1994) (granting preliminary injunction because,

*inter alia*, plaintiffs would be irreparably harmed if existing method for electing superior court

judges were followed).  If preliminary relief is not granted and Plaintiffs prevail at trial, Plaintiffs'

core right to political participation will have been violated by an election being decided using

districts that impermissibly diluted the votes of certain citizens.

Without a fair map, Black and BIPOC Baltimore Countians will be deprived of fair

representation through at least 2032 (*i.e.*, until after the next census).  The creation of the first

black-majority district in 2001 brought Black citizens a dose of electoral opportunity that had been

unjustly absent, but the Baltimore County of today is far more diverse than the Baltimore County

of twenty years ago.  *See* Cooper Decl. ¶ 25-26 (charting, since 2020, growth of BIPOC population

from 27 to 48% and waning of white population from 73 to 52%).  That diversity is not reflected

in the County government, and the disparity, already intolerable, will only increase.

Finally, district courts in this Circuit have found irreparable harm from and enjoined

redistricting schemes found likely to violate Section 2.  *See, e.g.*, *NAACP-Greensboro Branch v.*

*Guilford Cnty. Bd. of Elections*, 858 F. Supp. 2d 516 (M.D.N.C. 2012) (granting preliminary injunction because, *inter alia*, plaintiffs would be irreparably harmed if redistricting law were allowed to take effect); *Republican Party of N.C. v. Hunt*, 841 F. Supp. 722, 728 (E.D.N.C. 1994) (granting preliminary injunction because, *inter alia*, plaintiffs would be irreparably harmed if existing method for electing superior court judges were followed).

    **D.    The balance of equities and the public interest favor relief.**

    When the Defendant is a governmental actor, these two factors merge and are properly considered together. *Roe v. Dep't of Defense*, 947 F.3d 207, 230 (4th Cir. 2020) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)); *Taliaferro v. N.C. State Bd. of Elections*, 489 F. Supp. 3d 433, 438 (E.D.N.C. 2020) ("The Court considers the public interest and the balance of the equities together.").

    The balance of equities also points strongly in favor of preliminary relief for at least three reasons: (1) the potential harm to Defendant is minimal, especially when compared to the potential harm to Plaintiffs; (2) there is sufficient time to adopt a new redistricting plan; and (3) Plaintiffs did not delay in raising their claims.

    The equities weigh in favor of granting Plaintiffs' motion because any burden Defendants may claim pales in comparison to the deprivation of Plaintiffs' core right to political participation. Defendants may claim harm from the administrative costs of redistricting and potential voter confusion. But "a state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction." *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) (internal quotations and citation omitted). *See also Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003) (finding that defendant "is in no way harmed by

issuance of a preliminary injunction which prevents it from enforcing a regulation, which, on this record, is likely to be found unconstitutional").

Further, Md. Election Law Code Ann. § 5-303(a)(1) establishes a deadline of February 22, 2022, for candidate registration, and § 8-201(a) establishes the date of the primary election as June 28, 2022.  There is still sufficient time for maps to be enacted and vetted without undermining the public's interest in an orderly election in 2022.  The County, for example, could readily adopt one of the five plans that Plaintiffs submitted during the redistricting process.  These timing-based concerns, far from harming Defendant or the public interest, "simply serve to emphasize why a preliminary injunction during these early stages of the filing period would better serve the public than waiting until the eve of the election."  *NAACP-Greensboro Branch v. Guilford Cnty. Bd. of Elections*, 858 F. Supp. 2d 516, 529 (M.D.N.C. 2012).  At that point, or any time thereafter, "[a] victory on the merits by plaintiffs would require the court either to nullify the elections that had already taken place and thereafter order new elections at considerable cost and time to the public and to all involved, or to bring the campaigns then in process to a staggering halt . . . .  Either alternative would be equally undesirable and would result in further delay and hardship to plaintiffs in vindicating their rights established by a victory on the merits."  *Republican Party of N.C.*, 841 F. Supp. at 728.

Finally, Plaintiffs have not delayed in raising their claims.  To the contrary, Plaintiffs filed suit one day after the Baltimore County Council adopted its redistricting plan.  Plaintiffs then filed a Notice of this Motion promptly after receiving the Court's Case Management Order.  Moreover, Plaintiffs had written the County Attorney on October 25 and again on December 3, 2021, to inform him of the same Voting Rights Act concerns set forth here and to inform the County that

they would file suit if a second majority-Black district were not created. Plaintiffs' diligence in raising their claims and pursuing relief should further tip the scale in favor of granting relief.

For the reasons discussed, the balance of equities and public interest support injunctive relief at this stage, before the election cycle begins.

## V.    Conclusion

For the foregoing reasons, Plaintiffs request that the Court issue a preliminary injunction enjoining implementation of Bill 103-21 and ensuring the creation of two majority-Black districts.

Respectfully submitted,

/s/ *Deborah A. Jeon*
Deborah A. Jeon (Bar #06905)
Tierney Peprah (Bar # 21986)
AMERICAN CIVIL LIBERTIES UNION
OF MARYLAND
Clipper Mill Road Suite 350
Baltimore, MD  21211
(410) 889-8555
jeon@aclu-md.org

/s/ *John A. Freedman*
John A. Freedman (Bar #20276)
Mark D. Colley (Bar #16281)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave, N.W.3600
Washington, D.C.  20001
(202) 942-5000
john.freedman@arnoldporter.com

/s/ *Andrew D. Freeman*
Andrew D. Freeman (Bar #03867)
BROWN GOLDSTEIN & LEVY LLP
120 E. Baltimore Street, Suite 2500
Baltimore, MD  21202-6701
(410) 962-1030
adf@browngold.com

Michael Mazzullo (pro hac vice pending)
ARNOLD & PORTER KAYE SCHOLER LLP
250 W. 55th Street
New York, NY 10019
(212) 836-8000
michael.mazzullo@arnoldporter.com

*Counsel for Plaintiffs*

Dated: January 19, 2022