**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Northern Division)**

| | |
|---|---|
| BALTIMORE COUNTY BRANCH OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, *et al.*,<br><br>              Plaintiffs,<br><br>       v.<br><br>BALTIMORE COUNTY, MARYLAND, *et al.*,<br><br>              Defendants. | Civil Action No. 1:21-cv-03232-LKG |

<u>**DEFENDANT BALTIMORE COUNTY'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**</u>

Dated:  January 31, 2022

Respectfully submitted,

*/s/ Ava E. Lias-Booker*

Ava E. Lias-Booker (Fed. Bar No. 05022)
Melissa O. Martinez (Fed. Bar No. 28975)
**MCGUIREWOODS LLP**
500 E. Pratt Street, Suite 1000
Baltimore, Maryland 21202-3169
(410) 659-4400
(410) 659-4599 Fax
alias-booker@mcguirewoods.com
mmartinez@mcguirewoods.com

Kathryn M. Barber (Admitted *Pro Hac Vice*)
**MCGUIREWOODS LLP**
Gateway Plaza
800 East Canal Street
Richmond, VA 23219-3916
(804) 775-1000
(804) 775-1061 Fax
kbarber@mcguirewoods.com

***Counsel for Defendant Baltimore County, Maryland***

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ..................................................................................... ii

LIST OF EXHIBITS ............................................................................................... v

INTRODUCTION ................................................................................................. 1

FACTUAL BACKGROUND ................................................................................. 5

LEGAL STANDARD ............................................................................................ 7

ARGUMENT ........................................................................................................ 7

I.      PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS OF THEIR § 2 CLAIM ................................................................................................ 7

      A.    Plaintiffs Fail To Identify Reasonably Compact Alternative Districts That Could Accommodate A Sufficiently Large Minority Population .......................... 9

      B.    Plaintiffs Fail To Show That Black Voters In Districts 1 And 2 Are Politically Cohesive ........................................................................... 16

      C.    Plaintiffs Fail To Show Racially Polarized Voting ............................................. 17

            1.    Plaintiffs do not identify Black-preferred candidates .............................. 18

            2.    Plaintiffs ignore electoral successes of Black-preferred candidates ........ 20

      D.    The Totality Of The Circumstances Does Not Show Vote Dilution ................. 23

            1.    Plaintiffs do not identify racial polarization or exclusionary voting constructs ............................................................................................. 24

            2.    Plaintiffs focus on pre-2002 history while ignoring significant recent improvements and responsive legislation targeted at the Black community ...................................................................................... 25

            3.    Bill 103-21 is easily justified as a reasonable redistricting measure ....... 28

II.     PLAINTIFFS DO NOT ESTABLISH THAT MANDATORY INJUNCTIVE RELIEF IS WARRANTED ....................................................................... 29

CONCLUSION ................................................................................................... 31

CERTIFICATE OF SERVICE ............................................................................. 32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ala. State Conf. of Nat'l Ass'n for Advancement of Colored People v. Alabama*,
No. 2:16-CV-731-WKW, 2020 WL 583803 (M.D. Ala. Feb. 5, 2020) ...............10, 12, 14, 21

*Bartlett v. Strickland*,
556 U.S. 1 (2009) .........................................................................................................2, 8

*Benisek v. Lamone*,
138 S. Ct. 1942 (2018) .............................................................................................29, 30

*Bush v. Vera*,
517 U.S. 952 (1996) ................................................................................................8, 9, 16

*Cane v. Worcester Cty., Md.*,
35 F.3d 921 (4th Cir. 1994) .......................................................................................23, 24

*Cane v. Worcester Cty., Md.*,
840 F. Supp. 1081 (D. Md. 1994) ....................................................................................17

*Collins v. City of Norfolk, Va.*,
816 F.2d 932 (4th Cir. 1987) (*Collins I*) ............................................................................18

*Collins v. City of Norfolk, Va.*,
883 F.2d 1232 (4th Cir. 1989) (*Collins II*) ..............................................................8, 18, 24

*Dewhurst v. Century Aluminum Co.*,
649 F.3d 287 (4th Cir. 2011) ..........................................................................................29

*E. Tennessee Nat. Gas Co. v. Sage*,
361 F.3d 808 (4th Cir. 2004) ............................................................................................6

*Growe v. Emison*,
507 U.S. 25 (1993) .....................................................................................................7, 25

*Hall v. Virginia*,
385 F.3d 421 (4th Cir. 2004) ......................................................................................8, 23

*Holloway v. City of Va. Beach*,
531 F. Supp. 3d 1015 (E.D. Va. 2021) .............................................................................16

*Johnson v. De Grandy*,
512 U.S. 997 (1994) ..................................................................................................3, 8, 9

*Levy v. Lexington Cty., S.C.*,
  589 F.3d 708 (4th Cir. 2009) ................................................................7, 16, 17

*Lewis v. Alamance Cty., N.C.*,
  99 F.3d 600 (4th Cir. 1996) .........................................................8, 16, 18, 21

*LULAC v. Perry*,
  548 U.S. 399 (2006)................................................................................9, 12

*Marylanders for Fair Representation, Inc. v. Schaefer*,
  849 F. Supp. 1022 (D. Md. 1994) ......................................................9, 10, 17

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010).......................................................................................31

*N.C. State Ports Authority v. Dart Containerline*,
  592 F.2d 749 (4th Cir. 1979) ...................................................................29, 30

*Nken v. Holder*,
  556 U.S. 418 (2009)......................................................................................30

*Profiles, Inc. v. Bank of Am. Corp.*,
  453 F. Supp. 3d 742 (D. Md. 2020) ..............................................................29

*Roe v. Dep't of Def.*,
  947 F.3d 207 (4th Cir. 2020), *as amended* (Jan. 14, 2020) ...............................6, 7

*Shaw v. Hunt*,
  517 U.S. 899 (1996).....................................................................................2, 12

*Singleton v. Merrill*,
  No. 2:21-CV-1291-AMM, 2022 WL 265002 (N.D. Ala. Jan. 24, 2022) ............22

*Thornburg v. Gingles*,
  478 U.S. 30 (1986).................................................................. *passim*

*United States v. Charleston Cty., S.C.*,
  365 F.3d 341 (4th Cir. 2004) ...............................................3, 8, 22, 23

*Voinovich v. Quilter*,
  507 U.S. 146 (1993).........................................................................................7

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)..............................................................................6, 29, 30

*Wright v. Sumter Cty. Bd. of Elections*,
  979 F.3d 1282 (11th Cir. 2020) ...................................................................21

Case 1:21-cv-03232-LKG   Document 34   Filed 01/31/22   Page 5 of 38


**Rules**

Federal Rule of Civil Procedure 65 ....................................................................................1


**Statutes**

§ 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301 .................................................... *passim*

iv

## LIST OF EXHIBITS

| | |
|---|---|
| Exhibit 1 | October 25, 2001 NAACP Letter |
| Exhibit 2 | Baltimore County 2002 Councilmanic Districts |
| Exhibit 3 | Bill 103-21 with Exhibits A and B |
| Exhibit 4 | October 25, 2021 Letter from Pikesville-Greenspring Community Coalition, Inc. |
| Exhibit 5 | December 15, 2021 Letter from Greater Arbutus Business Association |
| Exhibit 6 | December 14, 2021 Letter from P. Wolf |
| Exhibit 7 | James Gimpel Declaration |
| Exhibit 8 | August 24, 2021 Redistricting Commission Meeting Minutes |
| Exhibit 9 | Redistricting Manual |
| Exhibit 10 | Troy Williams Declaration |

Defendant Baltimore County, Maryland, through undersigned counsel and pursuant to Federal Rule of Civil Procedure 65, hereby opposes the Motion for Preliminary Injunction (the "Motion for Preliminary Injunction" or "Motion") filed by Plaintiffs Baltimore County Branch of the National Association for the Advancement of Colored People, League of Women Voters of Baltimore County, Common Cause Maryland, Charles Sydnor, Anthony Fugett, Dana Vickers Shelley, Danita Tolson, Sharon Blake, Gerald Morrison, and Niesha McCoy ("Plaintiffs"), and in support states:

## <u>INTRODUCTION</u>

Plaintiffs challenge the County Council's adoption of Bill 103-21, a redistricting plan that substantially preserves—and in fact improves upon—the seven-district map once promoted by Plaintiff, the National Association for the Advancement of Colored People ("NAACP").  In 2001, the NAACP and other activists pushed for a new map creating a majority-Black[1] district with an almost 60% Black population:  District 4.  *See* **Exhibit 1**, Oct. 25, 2001 NAACP Letter at 3; **Exhibit 2**, Baltimore County 2002 Councilmanic Districts.  That map was adopted, and a Black Councilmember has been elected to represent District 4 on the Council in every election since. **Exhibit 1**, Oct. 25, 2001 NAACP Letter at 3.  This success in District 4 has not diminished or diluted Black voting power in the adjacent Districts 1 and 2, where Plaintiffs now propose creating new majority-Black districts.[2]  Although no other Black candidates have run for County Council

---

[1] Baltimore County and the U.S. Census Bureau both use the term "Black or African American" in presenting demographic data.  Consistent with the Plaintiffs' Complaint, ECF 1, and Memorandum in Support of their Motion for Preliminary Injunction, ECF 28-1, this Opposition will use the term "Black."

[2] The NAACP submitted a total of five proposed maps to the Council; Plaintiffs, however, only argue that Proposed Plan 1 and Proposed Plan 5 qualify as alternatives to the Council's adopted map.  Indeed, they had to abandon the other three maps because those maps relied on census data that, when adjusted as required under State law, did not create two majority-Black districts.  As a result, Plaintiffs must show either that vote dilution is occurring in District 1 and can be remedied

1

in those districts, Black-preferred candidates have run and won Council seats, while Black candidates who are also Black-preferred candidates have run for and won other local elections out of the same districts.  *See infra* Part I.C.2.  In the last two decades, therefore, Black voting power has solidified and continued to grow in these western districts of Baltimore County, with tangible electoral success.

Against this backdrop, Plaintiffs cannot show they are likely to prove their vote dilution claim under § 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301.  Plaintiffs ignore the risks their challenge poses to Black voting power and success in the County in pursuit of a numerically driven analysis that ignores the preconditions set forth in *Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986)).

First, Plaintiffs' general assertions about population growth "in the western areas of the County," ECF 28-1 at 3, not only ignore that most Black population growth has actually occurred in eastern areas but also tell this Court nothing about the relevant question: whether District 1 or District 2 could be reshaped in accordance with traditional redistricting principles to account for a geographically compact Black population in that "particular area."  *Shaw v. Hunt*, 517 U.S. 899, 917 (1996).  Plaintiffs fail to justify their proposed maps that break up communities of interest, ignore traditional boundaries, and threaten to dilute existing Black voting power.  Without a showing that the Black voting-age population has "the potential to elect a representative of its own choice in [one of these] single member district[s] . . . there neither has been a wrong nor can [there] be a remedy."  *Bartlett v. Strickland*, 556 U.S. 1, 15 (2009).

---

by making that district majority-Black under Proposed Plan 1, or vote dilution is occurring in District 2 and can be remedied by making that district majority-Black under Proposed Plan 5. Plaintiffs' discussion of a third "influence" district has no relevance, as "§ 2 does not require the creation of influence districts."  *Bartlett v. Strickland*, 556 U.S. 1, 13 (2009).

Second, Plaintiffs do not, and cannot, carry their burden of proving the second and third *Gingles* preconditions: that the Black community is cohesive or that Black-preferred candidates are consistently defeated by a white voting bloc. Plaintiffs repeatedly fail to undertake the "intensely local" inquiry that § 2 requires. *United States v. Charleston Cty., S.C.*, 365 F.3d 341, 349 (4th Cir. 2004). Rather than address the District 1 and 2 elections most probative to whether racially polarized voting happens in those districts, Plaintiffs and their experts draw overbroad conclusions from irrelevant statewide elections and omit any meaningful analysis of political cohesion or candidates of choice. A properly granular analysis of voting patterns in Districts 1 and 2 shows that the Black populations in those districts consistently elect their candidates of choice, and white voters often join with Black voters to elect such candidates.

Third, Plaintiffs' cursory treatment of the totality of the circumstances cements the conclusion that they lack a viable cause of action, especially because their "challenge goes to a series of single-member districts, where dilution may be more difficult to grasp." *Johnson v. De Grandy*, 512 U.S. 997, 1012 (1994). Plaintiffs ignore the significant strides the County has made in diversity and equality in the last two decades, including sea changes in the makeup of County leadership, ongoing efforts to increase community engagement on issues impacting minority residents, and the passage of legislation addressing the needs of and supported by the Black community. The full picture shows that Black voters have gained increasingly meaningful opportunities to engage in County politics and elect candidates of their choice. The Council's adopted plan solidifies and furthers that power.

Finally, Plaintiffs fail to establish that the equities warrant the injunctive relief they seek. Plaintiffs seek to change the status quo by requiring the Council to adopt a new map. Contrary to Plaintiffs' assertions, ECF 28-1 at 1, denying that extraordinary relief at this preliminary stage

does not "lock in" any alleged harm to Plaintiffs, much less for ten years.  It simply means that this litigation (and the status quo) will continue.  Plaintiffs can, despite failing to clearly show a likelihood of success, further attempt to prove their case.  In contrast, granting Plaintiffs the extreme remedy they seek would disrupt the County and statewide election machinery already in motion for the upcoming fall elections, require drastic changes in district lines that threaten to reduce voter participation (and Black voting power), and thereby harm the public interest.

Plaintiffs' fail to carry their burden of showing that the extraordinary remedy they seek is justified.  The Motion for Preliminary Injunction should be denied.

## FACTUAL BACKGROUND

Following the 2020 decennial census, the Baltimore County Council undertook the redistricting required by state and federal law.  After considering all relevant factors and community input, the Council proposed Bill 103-21, adopting a plan that maintained District 4 as a majority-Black district while preserving longstanding precinct and community lines and improving the overall compactness of the district map.  *See* **Exhibit 3**, Bill 103-21.  Bill 103-21 also created, for the first time, a majority-minority district:  District 1.  *See id*. at Exhibit B.

Although the Council received and evaluated alternative proposals for redistricting maps that would add a second majority-Black district, the Council also received letters from community groups and business associations opposing those plans (and supporting the Council's proposal). These letters opposed the alternative maps because, by splitting communities, the plans threatened to harm both community interests and potentially diminish minority voting power.  *See, e.g.,* **Exhibit 4**, Oct. 25, 2021 Letter from Pikesville-Greenspring Community Coalition, Inc.; **Exhibit 5**, Dec. 15, 2021 Letter from Greater Arbutus Business Association; **Exhibit 6**, Dec. 14, 2021 Letter from P. Wolf.  After evaluating community input and the relevant proposals, the Council enacted Bill 103-21.  That legislation adopts the map preserving a majority-Black district and

longstanding communities of interest while increasing the compactness of the overall map. **Exhibit 7**, Gimpel Decl. ¶ 8.   The map also properly accounts for the County's current demographics.

The County's Black population did, in fact, grow in the last ten years—but not in the pattern Plaintiffs suggest.   Between 2010 and 2020, the Black population in Baltimore County grew by only 46,055 people, increasing the Black population from 26.05% to 29.93%.   **Exhibit 8**, Aug. 24, 2021 Redistricting Commission Meeting Minutes, Demographic Overview at 4.   That is just a 3.88% increase.   And that marginal population growth among Blacks is concentrated in Districts 6 and 7—both located on the County's *eastern* side:

 

Yet, Plaintiffs focus their challenge on the other side of the County, where the total Black populations in Districts 1, 2, and 4 have only grown by a total of 1.38%.   *Report of Maryland Precinct Data*, 2020 Census, MARYLAND DEP'T OF PLANNING (Sept. 2021), https://planning.maryland.gov/Redistricting/Documents/2020data/GreenReport.pdf;   *Report of Maryland Precinct Data*, 2010 Census, MARYLAND DEP'T OF PLANNING (May 2011), https://planning.maryland.gov/Redistricting/Documents/2010data/GreenReport_web.pdf.   In fact,

the Black population in District only grew by 4.48% since 2010.  *Id.*  In District 1, the Black population *decreased* by 1.61%.  *Id.*

And although Plaintiffs argue that District 4's Black population reflects "packing," Plaintiffs fail to tell the Court that Blacks represented 71% of the population in District 4 in 2011, and they did not challenge that percentage as unconstitutional.  *See* **Exhibit 9**, Baltimore County Redistricting Manual at Appendix B.  That percentage has grown only to 72.59% according to the 2020 census—a mere 1.76% growth.  **Exhibit 3**, Bill 103-21 at Exhibit B.

Plaintiffs now contend that, based almost entirely on these demographic changes, the Council should be made to throw out its legal map and adopt one of the proposals the Council already considered and rejected:  Proposed Plan 1 or Proposed Plan 5.  But Plaintiffs do not, and cannot, establish that the County's adopted map violates the Voting Rights Act.  Plaintiffs are thus not entitled to have their own plan adopted, especially not at this preliminary stage.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  And when the injunction sought is, like the one requested here, a mandatory one that would change the status quo, it "should be granted only in those circumstances when the exigencies of the situation demand such relief."  *E. Tennessee Nat. Gas Co. v. Sage*, 361 F.3d 808, 828 (4th Cir. 2004).  To obtain the requested preliminary injunction "enjoining implementation of Bill 103-21 and ensuring the creation of two majority-Black districts," ECF 28-1 at 34, Plaintiffs must establish that (1) they are likely to succeed on the merits, (2) likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest.  *Id.* at 20.  "Although Plaintiffs need not establish a certainty of success, they must make a clear showing that they are

likely to succeed at trial." *Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020), *as amended* (Jan. 14, 2020).  Plaintiffs fail to carry this burden.

## ARGUMENT

This Court should deny Plaintiffs' request for extraordinary relief requiring the Council to adopt a new redistricting plan.  Plaintiffs do not make the required showing of likelihood of success, nor do they show that the remaining equitable factors warrant the relief they seek.

## I.   PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS OF THEIR § 2 CLAIM.

Plaintiffs do not make a clear showing that they are likely to succeed at trial on their claim that Bill 103-21 violates § 2 of the Voting Rights Act.

That claim requires Plaintiffs to prove by a preponderance of the evidence that (1) the Black population in District 1 or 2, where Plaintiffs want a new majority-Black district created, is sufficiently large and geographically compact to constitute a majority in a single-member district, (2) the Black population in those districts is politically cohesive, and (3) the white majority in those districts votes as a bloc such that it usually defeats the Black-preferred candidate.  *Levy v. Lexington Cty., S.C.*, 589 F.3d 708, 713 (4th Cir. 2009) (citing *Gingles*, 478 U.S. at 50-51).

These "factors cannot be applied mechanically and without regard to the nature of the claim." *Voinovich v. Quilter*, 507 U.S. 146, 158 (1993).  In particular, the Court should evaluate Plaintiffs' showing on these factors through the lens that Plaintiffs are alleging vote dilution caused by single-member districts—when the Supreme Court has "stated on many occasions that multimember districting plans, as well as at-large plans, generally pose greater threats to minority-voter participation in the political process than do single-member districts." *Growe v. Emison*, 507 U.S. 25, 40 (1993).

7

Only "[i]f these preconditions are met" must the Court "then determine under the 'totality of circumstances' whether there has been a violation of Section 2." *Lewis v. Alamance Cty., N.C.*, 99 F.3d 600, 604 (4th Cir. 1996); *see also Hall v. Virginia*, 385 F.3d 421, 426 (4th Cir. 2004) ("[T]he failure of a minority group to satisfy all of the *Gingles* preconditions means that it cannot sustain a claim under Section 2.").

"[S]imply clearing the *Gingles* hurdles, while necessary to prove a possible violation of § 2, is not sufficient to establish an actual violation." *Charleston Cty.*, 365 F.3d at 348.  Instead, the Court "must undertake a searching practical evaluation of the past and present reality, which demands a comprehensive, not limited, canvassing of relevant facts." *Id.*  The relevant factors may include those set forth by the Senate Report accompanying the 1982 Amendments to the Act, though those "factors are neither comprehensive nor exclusive." *Collins v. City of Norfolk, Va.*, 883 F.2d 1232, 1236 (4th Cir. 1989) (*Collins II*).

Plaintiffs fail to show that, under the appropriately robust, locally focused inquiry, they are likely to satisfy all three *Gingles* preconditions and ultimately prove that Bill 103-21 causes vote dilution under the totality of the circumstances.

## A.    Plaintiffs Fail To Identify Reasonably Compact Alternative Districts That Could Accommodate A Sufficiently Large Minority Population.

Plaintiffs cannot satisfy *Gingles*' first precondition: a showing that the County could create "more than the existing number of reasonably compact districts with a sufficiently large minority population to elect candidates of its choice." *De Grandy*, 512 U.S. at 1008.  This precondition breaks into two tests: (1) a numerical test asking whether the Black population makes up more than 50 percent of the voting-age population in the proposed alternative district, *Bartlett*, 556 U.S. at 18; and (2) a reasonable compactness test asking whether the new district would be "reasonably compact and regular, taking into account traditional districting principles," *Bush v. Vera*, 517 U.S.

8

952, 977 (1996) (emphasis omitted). That a numerical majority, standing alone, cannot satisfy precondition 1, reflects that "[f]ailure to maximize" the number of potential majority-Black districts "cannot be the measure of § 2." *De Grandy*, 512 U.S. at 1017. For the same reason, mere (and minimal) growth in the Black population—especially when it is spread across the County and not concentrated in Districts 1 or 2—does not suffice to establish precondition 1.

Reasonable compactness is where Plaintiffs fail to carry their burden on this first precondition. "[N]o precise rule has emerged governing § 2 compactness," but "the inquiry should take into account traditional districting principles such as maintaining communities of interest and traditional boundaries." *LULAC v. Perry*, 548 U.S. 399, 433 (2006). The Court should also evaluate the alternative district's geographical compactness as compared to previous or existing districts, and "should be reluctant to order the creation of Voting Rights districts of bizarre or dramatically irregular shape." *Marylanders for Fair Representation, Inc. v. Schaefer*, 849 F. Supp. 1022, 1053 (D. Md. 1994). Indeed, proposed districts that "reach[] out to grab small and apparently isolated minority communities" are "not reasonably compact." *Perry*, 548 U.S. at 402.

And such districts that ignore traditional districting principles to group voters by race risk violating the Fourteenth Amendment by making race "the predominant factor" in redistricting. *Vera*, 517 U.S. at 959 (emphasis omitted); *see also Schaefer*, 849 F. Supp. at 1053 ("[A]lthough a State can—and at times must—place great weight on race when redistricting, it may not do so to the exclusion of all traditional, nonracial districting principles, leaving a district that rationally can be understood only as an effort to classify and separate voters by race.").

The alternative maps that Plaintiffs put forth in Proposed Plans 1 and 5 fail the test for reasonable compactness, especially when compared to the Council's adopted map. *See Schaefer*, 849 F. Supp. at 1053 ("Voting Rights litigants should adduce evidence systematically comparing

proposed redistricting plans to either the plan being challenged or the predecessor plan in effect during the last relevant election.").

At the outset, *both* Plaintiffs' and the County's expert evidence show that the Council's adopted map scores higher on generally accepted measures of compactness than the two alternatives proposed by Plaintiffs—and even scores higher than the two previous, legal maps unchallenged by Plaintiffs (and in fact promoted by the NAACP in 2001). *See* ECF 28-2, Cooper Decl. ¶ 61, Fig. 12; **Exhibit 7**, Gimpel Decl. ¶ 8.  As Table 1 from Dr. Gimpel's declaration reflects, the County's 2020 plan scores highest on overall compactness out of the past three County maps *and* when compared to Plaintiffs' Proposed Plan 1 and Proposed Plan 5. *Id*.

These disparate scores confirm what a layman's comparison of the relevant maps already shows:  Plaintiffs' proposed maps are geographically irregular, suggesting that the Black populations are not sufficiently compact to support regular, reasonably compact redistricting, especially not in Districts 1 and 2. *Id.* ¶ 10.  These maps simply do not "pass[] the eyeball test for geographical compactness." *Ala. State Conf. of Nat'l Ass'n for Advancement of Colored People v. Alabama,* No. 2:16-CV-731-WKW, 2020 WL 583803, at *20 (M.D. Ala. Feb. 5, 2020); *see also* **Exhibit 7**, Gimpel Decl. ¶¶ 10-11.

For example, Proposed Plan 1 removes District 4's boundary with Baltimore City and splits up the once-compact coverage of southwestern Baltimore County.  Instead of having District 4 cover that entire southwestern portion, District 1 would wrap around the western and southern portions of Baltimore City, while District 4 would wrap around District 1. *Id.* ¶ 10.  This shape is plainly irregular and a marked shift from previous maps, as it cuts historically intact communities across multiple districts.

**Baltimore County's Plan**                          **NAACP Proposed Plan 1**

     

Similarly, Proposed Plan 5 removes District 4's boundary with Baltimore City and would

have District 2 cover the northwest portion abutting Baltimore City, as well as the western portion

of the County abutting Baltimore City, in a reverse C-shape.  *Id.* ¶ 11.  That map would also have

District 1 extend to the west of what is currently part of District 4.  *Id.*  As Dr. Gimpel opines,

"[a]ny lay person could look at the NAACP's proposed plan 5 and determine that the western

councilmanic districts look gerrymandered."  *Id.*

**Baltimore County's Plan**                          **NAACP Proposed Plan 5**

     

The irregularities in these proposed alternatives reflect that there is "physical dispersal of the African-American population" in these districts and therefore "is an indicator of non-compactness." *Alabama*, 2020 WL 583803, at *24.  To reach a numerical majority in the alternative districts, Plaintiffs' maps "reach[] out to grab small and apparently isolated minority communities." *Perry*, 548 U.S. at 402; *see also* **Exhibit 7**, Gimpel Decl. ¶ 11.

These alternative maps therefore appear non-compact as a whole, but the adopted map also scores higher on compactness when focusing on the specific districts where Plaintiffs claim vote dilution is occurring.  The Black population in those particular districts must be sufficiently compact to establish any potential § 2 violation *in that district*—otherwise, "where that district sits, there neither has been a wrong nor can be a remedy." *Shaw*, 517 U.S. at 916 (1996).  Under Plaintiffs' Proposed Plan 1 making District 1 a second majority-Black district, District 1 scores lower than the adopted plan on the compactness measures.  The same is true for District 2 under Proposed Plan 5.  Although that plan gives District 2 a numerical Black majority, it does so at the expense of compactness, as it is far less compact than District 2 under both measures.  Plaintiffs' own expert evidence reflects similar differences in compactness between the adopted plan and their proposed alternatives.[3]

---

[3] Plaintiffs' expert does not justify the lower compactness scores of Plaintiffs' proposed maps other than to vaguely state that "[t]here is no bright line rule on what constitutes an acceptable compactness score" and the alternative plans are within an undefined "normal range for compactness."  ECF 28-2, Cooper Decl. ¶ 62.

| Compactness Scores of Previous Baltimore County Redistricting Plans, the 2020 Proposal, and NAACP Maps 1 and 5. | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **1990** | | **2000** | | **2010** | | **2020** | | **NAACP 1** | | **NAACP 5** | |
| **Location** | PPTest | Stest | PPTest | Stest | PPTest | Stest | PPTest | Stest | PPTest | Stest | PPTest | Stest |
| District 1 | 0.172 | 0.415 | 0.378 | 0.615 | 0.420 | 0.648 | 0.463 | 0.680 | 0.188 | 0.434 | 0.270 | 0.519 |
| District 2 | 0.299 | 0.546 | 0.399 | 0.631 | 0.361 | 0.601 | 0.417 | 0.646 | 0.389 | 0.623 | 0.272 | 0.521 |
| District 3 | 0.349 | 0.591 | 0.379 | 0.616 | 0.466 | 0.682 | 0.543 | 0.737 | 0.394 | 0.627 | 0.441 | 0.664 |
| District 4 | 0.308 | 0.555 | 0.278 | 0.527 | 0.308 | 0.555 | 0.348 | 0.590 | 0.252 | 0.502 | 0.245 | 0.495 |
| District 5 | 0.027 | 0.164 | 0.141 | 0.376 | 0.234 | 0.484 | 0.142 | 0.377 | 0.106 | 0.326 | 0.109 | 0.331 |
| District 6 | 0.159 | 0.399 | 0.023 | 0.151 | 0.035 | 0.186 | 0.289 | 0.538 | 0.262 | 0.512 | 0.326 | 0.571 |
| District 7 | 0.044 | 0.210 | 0.035 | 0.186 | 0.021 | 0.144 | 0.067 | 0.259 | 0.051 | 0.226 | 0.054 | 0.232 |
| **Average** | **0.194** | **0.411** | **0.233** | **0.443** | **0.264** | **0.471** | **0.324** | **0.547** | **0.235** | **0.464** | **0.245** | **0.476** |
| PPtest=Polsby Popper test for Compactness | | | | | | | | | | | | |
| Stest=Schwartzberg test for Compactness | | | | | | | | | | | | |
| For both tests, high values closer to 1 indicate more compactly drawn districts | | | | | | | | | | | | |

Along with failing tests for geographical compactness, both sides' evidence shows that Plaintiffs' proposed alternatives violate traditional districting principles by splitting longstanding communities of interest and voting precincts. Plaintiffs' plans also undermine the goal of maintaining continuity in representation.

Proposed Plan 1 splits 15 communities, most of them after decades of remaining intact under the County maps. ECF 28-2, Cooper Decl. ¶ 64; **Exhibit 7**, Gimpel Decl. ¶¶ 10, 35. For example, Proposed Plan 1 splits cohesive communities in the southwest corner of Baltimore County, rather than maintain that area in a single district as it has been for decades. *Id.* The Arbutus Business Association and other community members wrote to oppose this plan, describing Southwest Baltimore County as a "unified large community" and stating that the proposed split of that community would "erase and negate all our team and community building." **Exhibit 5**, Dec. 15, 2021 Letter from Greater Arbutus Business Association; *see also* **Exhibit 6**, Dec. 14, 2021 Letter from P. Wolf ("Arbutus, Lansdowne and Catonsville have slowly and painstakingly developed supportive relationships over the years. Splitting the western portion from the eastern portion of the district will reopen arbitrary lines that help no one."). The same map would split

13

the Liberty Road corridor, which has historically remained intact in District 4, into three separate districts: Districts 1, 4, and 3. **Exhibit 7**, Gimpel Decl. ¶ 10.

Plaintiffs' expert asserts that it is the Council's map that splits communities—but fails to explain how the longstanding divisions that the plan maintains reflect splits among communities of interest rather than just minor, long-accepted divisions reasonably marked by the major highway running through them. ECF 28-2, Cooper Decl. ¶ 39. "A shared community of interest cannot be assumed." *Alabama*, 2020 WL 583803, at *24. As Cooper failed to do in another redistricting case, he also fails here to "discuss the regional, cultural, social, economic, or political ties, if any, among the African-American communities in" alternative Districts 1 and 2. *Id.* Instead, he simply looks at overall demographic numbers to summarily claim that the Council's maintenance of longstanding community lines is impermissible, without addressing how the Council's plan in fact preserves actual communities of interest.

Plaintiffs and Cooper similarly fail to justify Proposed Plan 5's lack of compactness. That map would split 22 precincts along with several communities. **Exhibit 7**, Gimpel Decl. ¶ 36. In contrast, the Council's adopted plan minimizes the number of split precincts. And although it splits some census "places," it does so according to divisions already present in the County's 2000 and 2010 redistricting plans. *Id.* Proposed Plan 5, however, would move more than 270,000 residents out of their current districts, thereby producing an abysmal core retention rate across all districts and particularly in District 2. *Id.* ¶ 32. As Dr. Gimpel opines, such a drastic shift does not track traditional redistricting principles and, as has been documented, is likely to reduce political engagement. *Id.*

14

| Core Retention Across Redistricting Plans Showing Continuity of Constituencies | | | | |
|---|---|---|---|---|
| | 2000 to 2010 | 2010 to 2020 | 2010 to NAACP 1 | 2010 to NAACP 5 |
| District 1 | 0.999 | 1.000 | 0.564 | 0.949 |
| District 2 | 0.938 | 0.988 | 0.749 | 0.548 |
| District 3 | 0.888 | 0.988 | 0.788 | 0.828 |
| District 4 | 0.950 | 1.000 | 0.548 | 0.595 |
| District 5 | 0.765 | 0.510 | 0.521 | 0.542 |
| District 6 | 0.713 | 0.556 | 0.720 | 0.420 |
| District 7 | 0.904 | 1.000 | 1.000 | 0.924 |
| **Average** | **0.880** | **0.863** | **0.699** | **0.687** |
| Cell entries show proportion of the residents in the district from the previous decade carried over to the new (proposed) district.   Estimates use 2020 block data. | | | | |

Indeed, Plaintiffs' proposed plans threaten to dilute the minority voting strength that District 4 in particular has created and preserved over the last two decades—not just for District 4 alone but for Black residents across the County.  Not only would these alternative maps disrupt continuity of representation in a way likely to decrease voter turnout, but they would thin Black voting power by reducing it in District 4 and only marginally increasing it in either District 1 or 2. This result not only conflicts with traditional districting principles, *see id*. ¶ 12, but is also unnecessary because Black voters can elect their candidates of choice without changing the map. *See infra*.

In sum, Plaintiffs' reliance on broad demographic numbers—which only reflect minimal change in the Black population—does not get them where they need to be on precondition 1.  Their alternative maps, despite creating numerical Black majorities in either District 1 or 2, fail the standards for reasonable compactness.  They disrupt longstanding communities of interest and voting lines, appear irregular and gerrymandered, and overall fall far short of the reasonable map adopted by the Council.  The "bizarre shaping" of the proposed districts, "cut[ing] across pre-existing precinct lines and other natural or traditional divisions," not only shows noncompactness,

15

but could also be suggestive of "a level of racial manipulation that exceeds what § 2 could justify." *Vera*, 517 U.S. at 980–81. Plaintiffs have not shown a likelihood of success on precondition 1, and the preliminary injunction should be denied.

**B.    Plaintiffs Fail To Show That Black Voters In Districts 1 And 2 Are Politically Cohesive.**

Plaintiffs also fail to clearly show they are likely to prove precondition 2 by establishing that District 1 or 2 contain a politically cohesive group of Black voters. "Political cohesion . . . implies that the group generally unites behind a single political platform of common goals and common means by which to achieve them." *Levy*, 589 F.3d at 720. Courts may not simply assume "that voters of a particular race, because of their race, think alike, share the same political interests, and will prefer the same candidates at the polls"—such assumptions offend "the principles of equal protection." *Lewis*, 99 F.3d at 618. Instead, a Voting Rights Act plaintiff "must provide evidence that [a minority community in the relevant area has] a history of working, voting, advocating, or organizing together around similar political, social, economic, or legal issues in the community." *Holloway v. City of Va. Beach*, 531 F. Supp. 3d 1015, 1048 (E.D. Va. 2021).

Plaintiffs make no meaningful effort to carry their evidentiary burden (or to show that they are likely to succeed in doing so at trial). They and their expert Matt Barreto focus instead on countywide Black voting patterns in statewide races, ignoring other issues beyond voting that are relevant to political cohesion, and without addressing more probative primary voting and local elections. Barreto and Plaintiffs effectively conflate the showing Plaintiffs must make on white bloc voting with the separate (though related) showing they must make of political cohesion. As a result, they manage to make neither showing.

In fact, when faced with a number of diverse candidates in one election, Black voters in Districts 1 and 2 do not coalesce to one candidate at levels that could be deemed "cohesive." For

example, in the 2018 gubernatorial primary election, multiple Democrats were on the ballot:  Ben

Jealous, Rushern Baker, Jim Shea, and Krish Vignarajah.  Mr. Jealous and Mr. Baker are Black;

Ms. Vignarajah is of South Asian descent.  Although Mr. Jealous won Districts 1 and 2, the voting

data establishes that he did not win overwhelmingly over the other candidates.  Instead, Mr. Jealous

won Districts 1 and 2 by 44.3% and 35.0%, respectively, while the other candidates split the rest

of the votes almost equally.  Plaintiffs fail to address statistics such as these and thus fail to carry

their burden of showing a likelihood of success in proving precondition 2.

> ### C.    Plaintiffs Fail To Show Racially Polarized Voting.

Plaintiffs also do not clearly show that they are likely to prove precondition 3.  Again,

Plaintiffs address this precondition at too high a level of generality and without accounting for all

of the district-specific evidence most relevant to assessing allegedly polarized voting.  As one

example, rather than attempt to prove racial polarization in Districts 1 and 2, Plaintiffs rely on the

fact that two Maryland courts found racially polarized voting in *different* parts of Maryland—parts

that are more rural and less diverse.  *See* ECF 28-1 at 19 (pointing to *Schaefer*, 849 F. Supp. at

1059, which addressed the Eastern Shore, and *Cane v. Worcester Cty., Md.*, 840 F. Supp. 1081,

1090 (D. Md. 1994), which addressed southeastern Worcester County.).  But it is the specific

voting patterns in the districts where Plaintiffs allege vote dilution occurs that matter.  Plaintiffs

fail to adequately address that evidence or the elements relevant to it.

Precondition 3 asks the Court "determine whether the majority votes as a bloc to enable it

to usually defeat the minority's preferred candidate."  *Levy*, 589 F.3d at 716.  Contrary to what

Plaintiffs and their expert apparently assume, this analysis does not begin and end with voting

patterns in biracial (white vs. Black candidate) elections.  Instead, "[a]scertaining whether legally

significant white bloc voting exists begins with the identification of the minority members'

'preferred candidates.'"  *Collins II*, 883 F.2d at 1237.  "[A] minority-preferred candidate may be

a non-minority, just as a minority candidate may be the preferred candidate of the voters of the majority's race." *Lewis*, 99 F.3d at 607.  As a result, the analysis of precondition 3 is "not . . . so simple as how many blacks versus whites were elected"; rather, "[t]he court must examine the parties' studies of voting preferences to determine which were the preferred candidates of the majority and minority communities." *Collins v. City of Norfolk, Va.*, 816 F.2d 932, 937 n.5 (4th Cir. 1987) (*Collins I*).  Only then does the Court "inquire whether in general a white bloc vote normally will defeat the combined strength of minority support plus white 'crossover' vote for the minority's preferred candidates." *Collins II*, 883 F.2d at 1237.

### 1.    *Plaintiffs do not identify Black-preferred candidates.*

Plaintiffs skip over the necessary first step in analyzing alleged white bloc voting:  they simply assume that only Black candidates are the Black community's candidates of choice in Districts 1 and 2.  Barreto states that "not every election contest contains a minority preferred candidate" and then makes no effort to identify any minority-preferred candidates in any elections. Instead, he analyzes only (statewide) elections involving Black candidates.  ECF 28-3, Barreto Decl. ¶ 10.  Meanwhile, Plaintiffs' non-expert declarant Anthony Fugett hypothesizes that Black candidates will not run because an unidentified "they" are convinced they will lose based on judicial elections predating District 4's creation.[4]  ECF 28-4, Fugett Decl. ¶¶ 9-12.  This conclusory hypothetical, accompanied by Barreto's failure to scrutinize voter preferences, cannot carry Plaintiffs' burden.

---

[4] Baltimore County currently has three Black Circuit Court judges:  Judges Vicki Ballou-Watts, Sherrie R. Bailey, and Jan Marshall Alexander.  Baltimore County Circuit Court Judges and Family Magistrates, https://www.baltimorecountymd.gov/departments/circuit/judges/ (last visited Jan. 30, 2022).  The issues surrounding Judge Wright's early-aughts appointment as the County's first Black judge are not a current concerns, especially given Plaintiffs' failure to provide any evidence suggesting that racially polarized voting occurs in electing Baltimore County judges.

Because Plaintiffs rely on the false premise that only Black candidates and all Black candidates are the minority group's preferred candidates, they try to prove polarization with examples that do not necessarily reflect candidates of choice.  Plaintiffs place great weight on the Democratic Senate primary race between (white) Chris Van Hollen and (Black) Donna Edwards. Plaintiffs assume that Ms. Edwards was the Black-preferred candidate solely because she is Black. But the evidence shows that the circumstances surrounding this particular election were much more complex.  Only four of the 46 members of the Congressional Black Caucus, who worked with Ms. Edwards in the House, endorsed Ms. Edwards over Mr. Van Hollen.  Politico, "Edwards Confronts Black Lawmakers Over Refusal To Back Her," https://www.politico.com/story/2016/04/donna-edwards-congressional-black-caucus-chris-van-hollen-222169 (last visited Jan. 30, 2021).  Even then-Representative Elijah Cummings, whose endorsement carried great weight with Maryland voters, refused to endorse Ms. Edwards.  *Id*.  Nor did Ms. Edwards win majority-Black precincts with significant numbers; rather, she struggled to get 60-65% of the vote in the precincts with the most Black voters.  Without showing that Ms. Edwards, despite this contrary evidence, was in fact a Black-preferred candidate, Plaintiffs' emphasis on this election gets them nowhere.

Plaintiffs' myopic focus on Black candidates is further undermined by evidence that Black voters in Districts 1 and 2 often support, and elect, non-Black candidates to the Council.  One need only look at the two current Council Members representing District 1 and District 2.  Council Member Tom Quirk won District 1 in 2018 with 68% of the vote—at a time when the district's population of Black voters was between 27.2% (the percentage in 2011) and 28.33% (the percentage in 2020).  *See* **Exhibit 9**, Baltimore County Redistricting Manual at Appendix B; **Exhibit 3**, Bill 103-21 at Exhibit B. He carried Black-dominated precincts with much higher

percentages.  In precinct 001-006 (Edmonson), which has the highest percentage of Black voters among District 1 precincts, Mr. Quirk won 92.75% of the vote.  **Exhibit 7**, Gimpel Decl. ¶ 22. And in precinct 001-001 (Woodlawn), which has the second highest percentage of Black voters in District 1, Mr. Quirk won 92.55% of the vote.  *Id*.  He enjoyed strong and cohesive support from the Black voting age population:  he was the Black candidate of choice.  And he won.

The same is true of Council Member Izzy Patoka, who represents District 2.  He won 71.8% of the overall vote in District 2 in 2018, but enjoyed even greater success in heavily-Black precincts.  In precinct 002-007 (Old Court), which has the highest percentage of Black voters in District 2, Mr. Patoka won 95.35% of the vote.  *Id*.  And in precinct 002-008 (Winand), which has the second highest percentage of Black voters in District 2, Mr. Patoka won 92% of the vote.  *Id*. Both of these Council Members are white, but both have been supported as the Black community's candidates of choice in their respective districts—and it is the preferences of the Black voters in those districts that are most relevant to assessing Plaintiffs' claim of racial bloc voting.  Because white candidates have achieved electoral success as Black-preferred candidates, Plaintiffs cannot show a likelihood of success on precondition 3.

### 2. *Plaintiffs ignore electoral successes of Black-preferred candidates.*

Even if Plaintiffs' preferred-candidate analysis were adequate (it is not), Plaintiffs and their expert also fumble the precondition 3 analysis at its second step.  First, Plaintiffs wrongly assume that only Black candidate vs. white candidate elections are relevant to determining whether a white majority regularly defeats Black-preferred candidates.  Then, they compound this error by ignoring the most relevant Black-white election showing that Black voters in District 2 can elect their candidates of choice, including when those candidates are themselves Black.

The Fourth Circuit has made clear that, especially when elections involving minority candidates are not the "substantial majority of the total number of elections," a district court

evaluating racially polarized voting "must consider, at a minimum, a representative cross-section of elections, and not merely those in which a minority candidate appeared on the ballot." *Lewis*, 99 F.3d at 608; *see also id.* at 605 ("[B]y considering only elections in which a black candidate was on the ballot, the district court failed to analyze a sufficient number of elections to enable it to determine whether white bloc voting usually operates to defeat minority-preferred candidates."). And this representative cross-section should focus on endogenous elections—those involving the same seats at issue—over less-relevant exogenous elections. *See Wright v. Sumter Cty. Bd. of Election*s, 979 F.3d 1282, 1292-93 (11th Cir. 2020).

Plaintiffs disregard these standards by proffering only evidence of exogenous elections involving Black candidates. Plaintiffs' and Barreto's focus on just three statewide, Black-white elections "exaggerate[s] the extent of polarization and render[s] the data unreliable." *Alabama*, 2020 WL 583803, at *29. Indeed, with no explanation from Plaintiffs as to why the 2018 Council elections are not probative, those Black-driven electoral successes rebut Plaintiffs' cherry-picked evidence of racial polarization.[5]

Driving the nail into that coffin is another election that Barreto ignores, and Plaintiffs deal with only cursorily: the election of Black and Black-preferred candidate Cheryl Pasteur to the District 2 school board in 2018. The voting districts for the Baltimore County School Board are the same as the councilmanic districts. *Board of Education*, MARYLAND MANUAL ON-LINE, https://msa.maryland.gov/msa/mdmanual/36loc/bco/html/functions/bcoeducation.html (last visited Jan. 31, 2022). Ms. Pasteur ran against white Jewish candidate Anthony Glasser for the District 2 seat. **Exhibit 7**, Gimpel Decl. ¶ 21. Ms. Pasteur was the Black candidate of choice, as

---

[5] Fugett's declaration discusses unsuccessful campaigns by Black candidates in state legislative districts and Democratic primaries, ECF 28-4, Fugett Decl. ¶ 14, but Fugett, as a non-expert, does not scrutinize those elections and Barreto disregards them entirely.

she won Black-dominated precincts in high numbers. *Id*. But just as importantly, Ms. Pasteur also made a strong showing in mostly white, Jewish precincts (where voters refused to vote for her white, Jewish opponent over her) and won 66.14% of the overall vote in District 2. *Id*. So not only did Black voters support Ms. Pasteur, but she won sufficient white crossover votes to defeat a white candidate.[6]

Ms. Pasteur's election shows that Black candidates have run in District 2 as the Black-preferred candidate and have won—meaning no white majority bloc defeated them. Nor did any white majority bloc defeat the Black-preferred candidates Tom Quirk and Izzy Patoka. As a result, Plaintiffs do not show that any white voting bloc "usually" or "typically" defeats Black-preferred candidates in Districts 1 and 2 and particularly not in District-specific elections.[7]

Plaintiffs' selective evidence of supposed polarization does not change this conclusion, especially because they paint those statewide elections in broad strokes without meaningfully

---

[6] Plaintiffs' only response to this compelling evidence against racial polarization is Fugett's claim that Ms. Pasteur's victory "is an outlier explained by the sole white candidate's failure to mount a campaign." ECF 28-4, Fugett Decl. ¶ 15. This assertion is not only incorrect (and hardly supported by Mr. Glasser not completing a candidate questionnaire), but it is also irrelevant to precondition 3. To evaluate precondition 3, the Court may only look to *whether* a white majority consistently defeats Black-preferred candidates—not to *why* particular candidates might have won or lost. *See Charleston Cty.*, 365 F.3d at 348. Causation is only potentially relevant once the Court reaches the totality of the circumstances inquiry. *Id*. Yet Plaintiffs fail to address it there or anywhere in their brief, instead leaving this key evidence for a single paragraph in Fugett's declaration.

[7] This strong evidence that Black-preferred candidates are elected in Districts 1 and 2 sets this case far apart from the recent congressional redistricting decision in *Singleton v. Merrill*, No. 2:21-CV-1291-AMM, 2022 WL 265002 (N.D. Ala. Jan. 24, 2022). The electoral statistics relevant to Baltimore County and especially to Districts 1 and 2 do not show anything close to the "clear[] and intensely racially polarized" voting that was basically undisputed in that case. *Id*. at *67. This action is also distinguishable on other material grounds, including the lack of compactness in Plaintiffs' proposed alternatives and the absence of evidence of continued struggles with official voting-related discrimination or racial appeals like those experienced in Alabama. *See id*. at *70-73.

addressing the Democratic primary evidence for those elections.  As Dr. Gimpel explains, Black candidates in the Democratic gubernatorial primaries have performed well when running against white and Asian candidates.  **Exhibit 7**, Gimpel Decl. ¶ 23.  For example, in the 2018 primary, Ben Jealous and Rushern Baker, both Black Democrats, performed about the same across both majority white and diverse precincts.  *See* **Exhibit 7**, Gimpel Decl., Figures 2-4.  No white majority bloc swept in to handily defeat either candidate, even in white-majority precincts, and Jealous far out-performed the white and Asian candidates.  *See id.*

In sum, Plaintiffs neither adequately identify Black-preferred candidates nor sufficiently address the most relevant elections in which those candidates have won with both Black and white support.  Plaintiffs thus fail to clearly show they are likely to succeed at trial in proving precondition 3.

### D.    The Totality Of The Circumstances Does Not Show Vote Dilution.

Plaintiffs' failure to establish a clear likelihood of success on the *Gingles* preconditions defeats their § 2 claim, making it unnecessary to evaluate the totality of the circumstances.  *See Hall*, 385 F.3d at 426.  But even if the Court were to reach this step, Plaintiffs fail to show they can likely prove, under the "inclusive examination of the totality of the circumstances" required, that Bill 103-21 causes vote dilution in District 1 or District 2.  *Charleston Cty.*, 365 F.3d at 348.

The "essence" of the totality-of-the-circumstances "inquiry is whether the electoral structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by minority and majority voters to elect their preferred representatives."  *Cane v. Worcester Cty., Md.*, 35 F.3d 921, 925 (4th Cir. 1994).  *Gingles* identified factors relevant to this analysis:

> (1) a history in the state or political subdivision of official voting-related discrimination against the minority group;

(2) the extent of racial polarization in the elections of the state or political subdivision;

(3) the extent to which the state or political subdivision has used voting practices or procedures that enhanced the opportunity for discrimination against the minority group;

(4) the exclusion of minority group members from the candidate slating processes;

(5) the extent to which past discrimination in areas such as education, employment, and health hinder the ability of members of the minority group to participate effectively in the political processes;

(6) the use of racial appeals in political campaigns;

(7) the extent to which minority group members have been elected to public office in the relevant jurisdiction;

(8) whether elected officials exhibit a significant lack of responsiveness to the particularized needs of minority group members; and

(9) whether the policies offered to justify the challenged voting practice are tenuous.

*See id.* (citing *Gingles*, 478 U.S. at 44-45).  Although "each of these factors may be probative, no single factor or combination of factors is dispositive."  *Id*.  Nor are these factors exclusive.  *Collins II*, 883 F.2d at 1236.

Plaintiffs assert that the totality of the circumstances shows vote dilution based mainly on (1) allegedly racially polarized elections, (2) Baltimore County's undisputed history of discrimination, and (3) the Council's decision not to adopt Plaintiffs' alternative maps.  Plaintiffs' selective focus on these areas does not show that vote dilution occurs in Districts 1 or 2.

### 1.   *Plaintiffs do not identify racial polarization or exclusionary voting constructs.*

The evidence does not show racial polarization, much less to any significant degree.  *See supra* Part I.C.  The evidence especially does not show racial polarization in Districts 1 and 2, where Plaintiffs allege vote dilution occurs.  To the contrary, it shows that Black candidates like

Cheryl Pasteur can, and do, win elections in the same councilmanic districts.  The facts also show that Black voters in Districts 1 and 2 can, and do, elect other candidates of choice to the Council. Plaintiffs ignore these statistics.  Instead, they cherry-pick outdated examples of losses by Black candidates, including a *1990* election and Judge Wright's early-aughts losses—disregarding the changes in the last decades, including the election of three Black judges for the County.  As to the more recent statewide and legislative district elections, these examples mean little when Plaintiffs failed at preconditions 2 and 3 to show that the Black candidates involved were the Black community's preferred candidates and Plaintiffs' expert did not analyze these exogenous races against more relevant District 1 and 2 races.  *See supra* Part I.B-C.

Further, no evidence shows that elections in those localities or elsewhere in the State involve the use of racial appeals or voting practices that either exclude minority group members or enhance opportunities to discriminate against Blacks.  Plaintiffs argue that it is the very seven-district structure of the County Council map that discriminates against Black voters, ECF 28-1 at 22, but Plaintiffs themselves advocate for maintaining that structure.  Plaintiffs do not explain how single-member councilmanic districts—which the Supreme Court has repeatedly cast as preferable to at-large, multi-member districts—are somehow illegitimate.  *See Growe*, 507 U.S. at 30 ("[W]e have strongly preferred single-member districts for federal-court-ordered reapportionment.").  They are not, especially when the evidence shows that Black candidates like Cheryl Pasteur and other Black-preferred candidates are repeatedly elected in those districts.  Plaintiffs simply want the same structure, just drawn differently.

### 2.  *Plaintiffs focus on pre-2002 history while ignoring significant recent improvements and responsive legislation targeted at the Black community.*

Plaintiffs' focus on pre-2002 Baltimore County history ignores the creation of District 4 that year—which they themselves lobbied for—as well as the significant improvements the County

has made to encourage equality of opportunity and engage the Black community since then.  It cannot be that vote dilution is found any time a state has a history of discrimination.  Indeed, inequality was built into the very structure of this country.  Instead, taking a comprehensive view of the relevant circumstances requires looking at the specific locality's work to improve upon and remedy these historical realities.

Baltimore County has made significant improvements in the areas that Plaintiffs identify—strides Plaintiffs ignore.  Baltimore County Chief Diversity Officer Troy Williams' Declaration describes much of the County's ongoing efforts to increase equity and engagement across the County and with specific focus on the Black population.  And Plaintiffs' own expert evidence reflects that, despite historical inequities the County continues to combat, Black residents have achieved huge gains in the areas of employment and education.

For example, although Plaintiffs fault the County for housing disparities—focusing on issues dating as far back as the 1950s—the Department of Housing and Community Development has, in more recent years, established multiple programs addressing low-income families' housing needs.  **Exhibit 10**, Williams Decl. ¶ 27.  The Baltimore County Enterprise Strategic Plan for 2019-2022 also focuses on housing as well as other equity initiatives.  *Id.* ¶ 22.

In the same vein, Plaintiffs accuse the County of racial discrimination in employment, but the County has created an Employee Advisory Council, appointed women and people of color to executive leadership positions, and appointed diversity officers in key departments (including the Police Department) to further its efforts at equal employment across the County.  *Id.* ¶¶ 10-14. Moreover, evidence submitted by Plaintiffs shows that Black residents in Baltimore County now participate in the labor force and are employed at higher rates than non-Hispanic White residents, including in government positions.  *See* ECF 28-2, Cooper Decl., Ex. G-1 at 10 (reflecting that, in

2019, 72.0% of Blacks were in the labor force compared to 63.4% of Non-Hispanic Whites and 67.7% of Blacks were employed compared to 61.3% Non-Hispanic Whites); *see also id.*, Ex. G-2 at 5-7 (listing similar employment statistics and reflecting that 23.6% Black workers are employed in government positions compared to just 16.0% of white workers).

Plaintiffs' evidence also reflects that—despite Plaintiffs' pessimistic view—the Black community has, in recent years, reached higher or substantially equal levels of educational enrollment and attainment as compared to the white population.  As of 2019, 26.7% of the Black population in Baltimore County held a high school degree or its equivalent, compared to just 25.5% of the white population and exceeding the total population average, also of 25.5%.  *See* ECF 28-2, Cooper Decl., Ex. G-2 at 3; *see also id.*, Ex. G-1 at 5.  Though fewer Black residents currently hold college degrees, they now outpace white locals when comparing school enrollment levels— meaning that statistic appears likely to change.  18.3% of the Black population is enrolled in high school compared to 17.8% of the white population, and 33.8% of Blacks in the County are enrolled in college or graduate school, compared to 33.0% of the white population and 32.2% of the total population.  *See id.*, Ex. G-2 at 3.

Contrary to Plaintiffs' characterizations, the County has also worked to increase minority engagement in the community.  In particular, the Baltimore County Human Relations Commission, which enforces the County's antidiscrimination law, also provides resources related to civil rights and discrimination.  **Exhibit 10**, Williams Decl. ¶ 10.  The Commission has also partnered with the County's Public Library and radio station to host community forums focused on criminal justice, voter empowerment, and health issues relevant to the County's Black and minority populations.  *Id.*  The County has also created a Diversity, Inclusion and Equity Community

Advisory Council that works to ensure equal access to services including education and prioritizes outreach to traditionally underserved communities, including the Black community.  *Id.* ¶¶ 11, 13.

And the County Council has enacted legislation directly responsive to minority needs. Plaintiffs assert that the Council is not responsive to the electorate—but point only to the Council's well-reasoned and thoroughly deliberated decision to adopt Bill 103-21 over some community opposition (and with community support).  ECF 28-1 at 28-30.  That argument takes an overly narrow view of the political responsiveness factor and ignores Council actions that respond to Black interests.   In particular, the Council enacted Bill 96-20, *i.e.*, the Strengthening Modernization, Accountability, Reform, and Transparency (SMART) Policing Act, in 2020. **Exhibit 10**, Williams Decl. ¶ 18.  That legislation aimed at policing reform addressed Black community needs and was strongly supported by Black community groups.

In sum, contrary to the dire picture Plaintiffs paint, Baltimore County is on the forefront of diversity, equity, and inclusion measures targeted at the Black community.  And its County Council is directly responsive to, and engaged with, Black voters.  The County and Council's measures targeted at Black residents have improved and will continue to improve the group's ability to take equal part in the community, especially through voting.

### 3.   *Bill 103-21 is easily justified as a reasonable redistricting measure.*

Plaintiffs also try to cast the Council's adopted redistricting plan as unjustified based solely on their view that the Council's rejection of their alternative plans was illegitimate.  The Council's decision to adopt its own map instead of Plaintiffs' is not evidence that the Council's map itself has no legitimate government interest behind it.  Indeed, adopting an entirely new map lacking reasonably compact districts could itself have reflected an illegitimate emphasis on race at the expense of traditional redistricting principles.  *See supra* Part I.A.  The Council instead acted legitimately by beginning with the existing district map and working to ensure continuity.  **Exhibit**

**7**, Gimpel Decl. ¶¶ 9, 29-30.  The Plaintiffs' proposed alternatives, in contract, gave little weight to continuity, compactness, or other well-established redistricting principles.  *Id.* ¶ 32; *supra* Part I.A.

Moreover, Plaintiffs fail to provide any evidence that the Council did not act according to law and undertake a "transparent, multi-step process" to adopt its new map.  *Id.* ¶ 12.  The available evidence shows instead that the Council acted according to its special expertise and familiarity with the County to balance competing considerations and produce a map that accounts for the need to preserve Black voting strength alongside other traditional districting principles.  *Id.* ¶ 38.  That Plaintiffs would prefer alternative, less-compact maps that split communities does not show that the Council's map lacks justification.  Nor does it show that the totality of the circumstances compels the conclusion that Plaintiffs will likely prove vote dilution at trial.

## II.   PLAINTIFFS DO NOT ESTABLISH THAT MANDATORY INJUNCTIVE RELIEF IS WARRANTED.

The Court should deny Plaintiffs' Motion because they fail to clearly show a likelihood of success on the merits.  *See Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 293 (4th Cir. 2011) (affirming denial of motion for preliminary injunction based on plaintiffs' failure to establish likelihood of success); *see also Profiles, Inc. v. Bank of Am. Corp.*, 453 F. Supp. 3d 742, 753 (D. Md. 2020) (that a plaintiff has not shown likelihood of success "prevents entry of . . . a preliminary injunction.").

Even if the remaining *Winter* factors were relevant, they would require the same result.  *Benisek v. Lamone*, 138 S. Ct. 1942, 1943–44 (2018) ("[A] preliminary injunction does not follow as a matter of course from a plaintiff's showing of a likelihood of success on the merits.").  At the outset, Plaintiffs cannot clearly show that they are likely to be irreparably harmed without immediate relief because they cannot show that Bill 103-21 causes vote dilution.  *See N.C. State*

*Ports Authority v. Dart Containerline*, 592 F.2d 749, 750 (4th Cir. 1979) ("There is a correlation between the likelihood of plaintiff's success and the probability of irreparable injury to him."). They especially cannot show that any such harm would continue "through at least 2032." ECF 28-1 at 31. The Court's exercise of discretion to deny extraordinary relief at this preliminary stage would not prevent Plaintiffs' challenge from continuing to trial. Nor would it bar some future challenge if, before the next census, Plaintiffs developed sufficient evidence that the map produces vote dilution. Plaintiffs' fear of being "lock[ed] in" to the just-adopted map, ECF 28-1 at 1, is overblown. Nor do Plaintiffs explain the sudden urgency behind the major changes they propose to the County's districting structure when the overall Black population was just 1.59% less in 2011—yet Plaintiffs saw no need to challenge the decennial redistricting in that year.

And even if Plaintiffs could show likely harm, they could not show that the balance of equities tips in their favor or that an injunction would serve the public interest. *Nken v. Holder*, 556 U.S. 418, 435 (2009) ("[T]he third and fourth factors . . . merge when the Government is the opposing party"). "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24.

In contrast to the unlikely and unproven harm Plaintiffs claim they will suffer without an injunction, the public interest will be harmed by throwing out a legitimate and legally adopted redistricting plan on the 2022 election cycle. "[A] due regard for the public interest in orderly elections" can support the Court's "discretionary decision to deny a preliminary injunction," even if a redistricting plan has been held unlawful (which Bill 103-21 is not). *Benisek*, 138 S. Ct. at 1944–45. This interest supports denial here.

Statewide candidate filing deadlines are set for February 22, beginning a fast-paced election cycle that will culminate in the fall.  Even if this Court requires the Council to adopt one of the Plaintiffs' proposed alternatives before that date, doing so threatens to "work[] a needlessly chaotic and disruptive effect upon the electoral process."  *Id.* at 1945.  Especially because Plaintiffs' alternative maps disrupt core retention and drastically shift district lines, they threaten to cause voter confusion and suppress voter turnout—including (if not especially) among the Black population that Plaintiffs seek to protect.  Indeed, the potentially negative impact of either plan on Black voting power counsels against granting injunctive relief at this early stage when Plaintiffs have not made a strong showing on the merits.  *See supra* Part I.

"An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course."  *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010).  Plaintiffs have not carried their burden of clearly showing that the mandatory relief they seek is warranted.  Their Motion should therefore be denied.

## **<u>CONCLUSION</u>**

WHEREFORE, for these reasons, the Court should deny Plaintiffs' Motion for Preliminary Injunction.

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on this 31st day of January, 2022, a copy of the foregoing Opposition to Plaintiffs' Motion for Preliminary Injunction, accompanying Exhibits, and Proposed Order were served via the Court's CM/ECF system upon all counsel of record.


*/s/ Melissa O. Martinez*
Melissa O. Martinez