UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
(Northern Division)

| | |
|---|---|
| BALTIMORE COUNTY BRANCH OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> BALTIMORE COUNTY, MARYLAND, *et al.*, <br><br> Defendants. | Civil Action No. LKG-21-03232 |

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION**
**FOR PRELIMINARY INJUNCTION**

## **TABLE OF CONTENTS**

TABLE OF CONTENTS....................................................................................................I

TABLE OF AUTHORITIES ...........................................................................................II

INTRODUCTION ........................................................................................................... 1

RESPONSE TO THE COUNTY'S "FACTUAL" BACKGROUND ........................................... 2

ARGUMENT ................................................................................................................... 4

I.     THE COUNTY'S BRIEF CONFIRMS THAT PLAINTIFFS ARE SUBSTANTIALLY
    LIKELY TO SUCCEED IN SHOWING THAT BILL 103-21 VIOLATES SECTION 2 ... 4

    A.    *Gingles* Precondition One: An additional, reasonably compact majority-Black
        district can be created.................................................................................. 4

    B.    *Gingles* Precondition Two: The relevant communities are cohesive......................... 12

    C.    *Gingles* Precondition Three: White voters vote sufficiently as a bloc to usually
        defeat Black voters' preferred candidates. ................................................... 14

        1.    The Election of Cheryl Pasteur to the Baltimore County School Board ........... 14

        2.    The County and Dr. Gimpel fail to undertake a serious statistical study of
            electoral performance consistent with court standards. .................................... 16

    D.    The County fails to rebut that the totality of the circumstances and the Senate
        Factors support the finding of a violation of Section 2 ............................... 17

II.    THE COUNTY FAILS TO CONTEST MEANINGFULLY THE EQUITABLE
    FACTORS SUPPORTING A PRELIMINARY INJUNCTION. ....................................... 19

CONCLUSION.............................................................................................................. 20

## **TABLE OF AUTHORITIES**

**Cases**

*Abrams v. Johnson*,
   521 U.S. 74 (1925) ............................................................................................................. 7

*Ala. State Conf. of NAACP v. Ala.*,
   2020 WL 583803 (M.D. Ala. Feb. 5, 2020) ................................................................... 13

*Bartlett v. Strickland*,
   556 U.S. 1 (2009) .............................................................................................................. 5

*Bush v. Vera*,
   517 U.S. 952 (1996) ....................................................................................................... 7, 8

*Cane v. Worcester Cnty.*,
   841 F. Supp. 1081 (D. Md. 1994) ........................................................................ 9, 11, 16

*Cane v. Worcester Cnty., Md.*,
   840 F. Supp. 1081 (D. Md. 1994) .................................................................................. 13

*Collins v. City of Norfolk*,
   816 F.2d 932 (4th Cir. 1987) .......................................................................................... 15

*Covington v. North Carolina*,
   270 F. Supp. 3d 881 (M.D.N.C. 2017) .......................................................................... 20

*Georgia v. Ashcroft*,
   539 U.S. 461 (2003) .......................................................................................................... 2

*League of United Latin Am. Citizens (LULAC) v. Perry*,
   548 U.S. 399 (2006) ....................................................................................................... 8, 9

*LULAC v. Clements*,
   999 F.2d 831 (5th Cir. 1993) .......................................................................................... 16

*Marylanders for Fair Representation v. Schaefer*,
   849 F. Supp. 1022 (D. Md. 1994) ............................................................................ 10, 16

*NAACP-Greensboro Branch v. Guilford Cnty. Bd. of Elections*,
   858 F. Supp. 2d 516 (M.D.N.C. 2012) .......................................................................... 20

*Reno v. Bossier Par. Sch. Bd.*,
   520 U.S. 471 (1997) .......................................................................................................... 1

*Shaw v. Hunt*,
   517 U.S. 899 (1996) ....................................................................................................... 5, 7

*Singleton v. Merrill*,
   No. 2:21-cv-1536-AMM, 2022 WL 264819 (N.D. Ala. Jan. 24, 2022) ................. 2, 3, 5, 8

*Thornburg v. Gingles*,
   478 U.S. 30 (1986) .................................................................................................. *passim*

*U.S. v. Charleston County, S.C.*,
   365 F.3d 341 (4th Cir. 2004) .......................................................................................... 16

*United States v. Charleston Cnty.*,
   316 F. Supp. 2d 268 (D.S.C. 2003) ........................................................................... 1

*United States v. City of Cambridge*,
   799 F.2d 137 (4th Cir. 1986) ................................................................................. 19

**Statutes**

§ 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301 .................................................... *passim*

**Other Authorities**

Final Report of the Councilmanic Redistricting Commission at 4-5.  Accessible at:
   https://resources.baltimorecountymd.gov/Documents/CountyCouncil/Redistricting/
   Redistricting_Commission_Final_Rpt_2021_Signed.pdf. ........................................................ 6

## INTRODUCTION

Bill 103-21, Baltimore County's adopted redistricting plan, packs and cracks the County's large and geographically compact population of Black citizens—nearly a third of its overall population—with the effect of confining their influence to one out of the County's seven council districts. This is textbook vote dilution that Section 2 of the Voting Rights Act was designed to eradicate. *Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 479 (1997).

Opposing Black voters' request for relief from this discriminatory scheme, the County argues for a plan that "substantially preserves" the 2001 map, retaining white residents' control of six of the seven districts. ECF 34 at 1. But we are no longer in 2001. The Black share of the County's population has gone from 21% in 2000 to 32% in 2020, and the BIPOC share from 27% in 2000 to 48% in 2020. The County turns the Voting Rights Act on its head by arguing that an antiquated map is worth preserving because it was lawful 20 years ago.

Black citizens in Baltimore County are entitled to a second Black-majority district under Section 2. For the reasons explained in our opening brief and below, Plaintiffs have demonstrated that all three *Gingles* preconditions are met, and accordingly, a finding that Section 2 has been violated is presumptive. *See, e.g., United States v. Charleston Cnty.*, 316 F. Supp. 2d 268, 277 (D.S.C. 2003) (citation omitted), *aff'd*, 365 F.3d 341 (4th Cir. 2004). Specifically, Plaintiffs have shown that two Black-majority districts can be readily drawn consistent with traditional redistricting principles and that, absent a second majority-Black district, Baltimore County's electoral process will remain unequally open to its Black citizens for yet another decade.

The County and its expert nit-pick the illustrative plans Plaintiffs proposed while never directly disputing that a second Black-majority district can be established consistent with traditional districting principles. The County claims its map is more compact, but does not dispute that Plaintiffs' plans are reasonably compact, which is what Section 2 requires. The County leaves

Plaintiffs' evidence largely unrebutted, providing no demographic analysis for why a second majority-Black district is not feasible and failing to address meaningfully Plaintiffs' extensive evidence of racially polarized voting.  While accusing Plaintiffs of giving "cursory" treatment to the Senate Factors (ECF 34 at 3), the County largely ignores 11 pages of Plaintiffs' opening brief that lay out why the applicable Senate factors strongly support finding a Section 2 violation.  ECF 28-1 at 19-30.  The County's superficial discussion of the other equitable factors (ECF 34 at 29-31) does little more than reiterate the County's erroneous merits position.  The evidence Plaintiffs have amassed—and a proper application of the law—warrant the preliminary injunction Plaintiffs seek.

## RESPONSE TO THE COUNTY'S "FACTUAL" BACKGROUND

The County's contention that there has been "marginal population growth among Blacks" (ECF 34 at 5) is wrong.  Indeed, it is contradicted by the County's expert.  ECF 34-7 ¶ 19 ("Black population growth has occurred throughout the County").  This mistake rests simultaneously on an incorrect demographic measure, denominator manipulation, and poor arithmetic.

First, the County cites "single-race Black" statistics, ignoring the U.S. Census's "any-part Black" designation (which includes individuals who identify as multi-racial or multi-ethnic).  ECF 34 at 5-6.  In addition to undercounting Black growth (for example, omitting residents who identify as both Black and Hispanic), the County ignores the Supreme Court's direction that the "any-part Black" (APB) designation should be used for Section 2 purposes.  *Georgia v. Ashcroft*, 539 U.S. 461, 473 n.1 (2003).[1]  Notably, Dr. Gimpel's report does not corroborate the figures in the

---

[1] Since the moving brief was filed, the parties and the Court have additional benefit of a 225-page opinion from a three-judge court in the Northern District of Alabama, enjoining use of the State's adopted congressional map as noncompliant with Section 2.  *See Singleton v. Merrill*, No. 2:21-cv-1536-AMM, 2022 WL 264819 (N.D. Ala. Jan. 24, 2022) (three-judge-court).  There, Black voters and civil rights organizations brought a Section 2 challenge to Alabama's seven-seat

County's brief; Dr. Gimpel does not provide any demographic statistics prior to 2020. By incorrectly using "single-race Black" statistics throughout its brief, the County systematically undercounts its Black residents.

Second, the County's math understates Baltimore County's rapid racial diversification when it claims there is "just a 3.88% increase" in Black population since 2010. *See, e.g.,* ECF 34 at 5. Between 2010 and 2020, the any-part Black population in Baltimore County grew by almost 55,000 people, increasing the Black share of the population from 27.4% to 32.2%. ECF 28-2 (Cooper Decl.) ¶ 27. And between 2000 (when the first majority-Black district was created) and 2020, the Black population in Baltimore County grew by 118,814 people, increasing the Black share of the population from 20.7% to 32.2%. *Id.* If we were to follow the Council's percentage-by-addition formula, the Black population grew by about 11.5%. But under any common understanding of how to calculate percentage growth, the Black population grew by *75.9%* and the Black share of the population grew by *55.3%*. *Id.*

Third, the County argues that the "marginal population growth among Blacks" was "concentrated in Districts 6 and 7" on the eastern side of the County. ECF 34 at 5. Again, that is not true. Rather, the County's own maps show dramatic Black population growth on both the County's eastern *and western* sides. This point is conceded by Dr. Gimpel: "Black population growth has occurred throughout the county, *not in a concentrated area*[.]" ECF 34-7 ¶ 19

congressional map on the basis that it constituted vote dilution by packing and cracking the Black population (27% of the state) into only one Black-majority district. The *Singleton* court specifically rejected Alabama's argument that single-race Black data should be used in assessing majorities under *Gingles*. *Id.* at *58. After explaining why APB data is the proper measure, including that this is the consensus view of the Supreme Court, numerous other courts, and the Department of Justice, the *Singleton* court concluded that using "single-race Black" data would require the court to "marginaliz[e]" Black residents "based on their decision to identify both as Black and as part of another race or other races." *Id.* at *58.

(emphasis added).  Moreover, because the County's Black population in 2000 was considerably higher on the west side than the east side, similar rates of Black population growth across the County have resulted in a considerably larger Black population (both by number and percentage) on the west side.

Fourth, both the County and Dr. Gimpel fail to address the dramatic decline in white population over the past 20 years.  As attested by Plaintiffs' expert, while "Baltimore County's overall population grew by more than 100,000 during this period, from 754,292 to 854,535 persons, the County's non-Hispanic White population fell by even more—110,627 persons—representing a *decline* of 20%."  ECF 28-2 ¶ 27.

The County downplays the Black and BIPOC population's expansive growth and ignores the County's declining white population for a reason: to acknowledge Baltimore County's demographic transformation over two decades is to acknowledge that non-white citizens are entitled to electoral opportunity beyond what was available two decades ago and that white citizens no longer have a right to dominate six of the County's seven councilmanic districts.

## ARGUMENT

I.   **The County's brief confirms that Plaintiffs are substantially likely to succeed in showing that Bill 103-21 violates Section 2.**

A.   *Gingles* **Precondition One: An additional, reasonably compact majority-Black district can be created.**

Plaintiffs' opening brief established that the first *Gingles* precondition is satisfied, *i.e.,* an additional, reasonably compact majority-Black district can be drawn.  ECF 28-1 at 12-14.  In response, the County claims that Plaintiffs' alternative plans do not adhere to certain secondary redistricting considerations as well as the County's map does.  These arguments, amplified by bluster, are intended to distract the Court from the key question to be addressed in assessing the first *Gingles* precondition: Does the protected group pursuing the claim—in this case Black

4

Baltimore County residents—make up "more than 50 percent of the voting-age population in the relevant geographic area" so as to form a majority in a single member district?  *Bartlett v. Strickland*, 556 U.S. 1, 18 (2009).  The indisputable answer here is yes.[2]

Plaintiffs presented Baltimore County with five illustrative plans drafted by their expert demographer (William Cooper)[3] that demonstrate how the County's seven election districts could be configured so two reasonably compact districts would include a substantial majority of Black voting age population, rather than the single, heavily-packed Black district in Bill 103-21.  All five plans readily satisfy *Gingles* 1 and are consistent with *all* traditional redistricting principles.

Plaintiffs submit additional exhibits that overlay the three maps in contention (the County's and Plaintiffs' Plans 1 and 5) on a map showing the racial composition of the western portion of the County.  *See* Ex. F (Cooper 2d Decl.) Exs. D-4, E-5, F-5.  Those maps, together with Mr. Cooper's analysis, make it even more clear that it is possible to create a second majority-Black district consistent with traditional principles, and that the County's proposed map illegally packs Black voters into District 4 and cracks other Black communities among Districts 1, 2, and 4.

---

[2] Contrary to the County's unsupported assertion, ECF 34 at 1-2, n.2, Plaintiffs have not abandoned Plans 2, 3, or 4.  Moreover, the County's speculation is predicated on a fundamental error in law, evident in their suggestion that "Plaintiffs must show either that vote dilution is occurring in District 1 . . . or District 2" and must "be remedied by making that district majority-Black."  This misstates the law.  Under *Shaw v. Hunt*, 517 U.S. 899 (1996), it is clear that "a plaintiff must prove that the minority group 'is sufficiently large and geographically compact to constitute a majority in a single-member district.'"  *Id.* at 914.  Unlike *Shaw*, the vote dilution problem here is not tied to a particular district. Plaintiffs have submitted evidence (in the form of the Cooper declaration) that the "relevant area" is the County as a whole, and the sufficient concentration of Black voters exists in the western part of the County (i.e., current District 4 and the surrounding vicinity).

[3] The *Singleton* court found Mr. Cooper "highly credible," his approach "not dogmatic," and his methods and conclusions "highly reliable."  2022 WL 264819 at *59.

Plaintiffs hired Mr. Cooper during the County's redistricting process to illustrate multiple ways that two reasonably compact majority-Black districts can be established and to present those findings to the County.  Instead of taking the work of Mr. Cooper and Section 2 compliance seriously, the County never consulted any expert or conducted any demographic studies to consider the feasibility of another majority-Black district.  The County's failure to do so after Plaintiffs repeatedly alerted the County that its proposed map violated the Voting Rights Act reflects recklessness approaching deliberate indifference.[4]

The County's expert—hired *after* Bill 103-21 was enacted—baldly asserts that the Council's plan "meets the requirements of the law" and "there is nothing about it that is objectionable."  ECF 34-7 ¶ 7.  In addition to his assertion being legally irrelevant under *Gingles* and improper expert testimony of a legal conclusion, Dr. Gimpel provides no support for his position.  He does not substantiate why the County Plan complies with Section 2.  He offers no justification for packing District 4 to increase its Black voting-age population to 75% under Bill 103-21, a glaring omission given that the County's own data, ECF 34-2 at 3 (County 2001 Plan), shows the district was only 58.6% Black in *overall* population when first implemented in 2001, and yet has performed effectively to allow Black voters to elect preferred candidates for two

---

[4] The Baltimore County Councilmanic Redistricting Commission, which recommended the plan adopted in Bill 103-21 (with only minor modification) did not report any consultation with demographic experts in deciding to reject a second majority-Black district.  Instead, it adopted an arbitrary and irrational approach by examining *only* census blocks with majority Black populations to calculate whether two majority-Black districts could be established from *just* those census blocks.  Final Report of the Councilmanic Redistricting Commission at 4-5.  Accessible at: https://resources.baltimorecountymd.gov/Documents/CountyCouncil/Redistricting/Redistricting_Commission_Final_Rpt_2021_Signed.pdf.  This was arbitrary because the Commission failed to consider the possibility that a second majority-Black district could be developed using census blocks that are not majority-Black.  Because many majority-Black census blocks may be well over 50% Black, *every* individual census block in a majority-Black district need not also be majority-Black.  A majority-Black district can and usually does combine both census blocks that are well-over 50% and ones that are nearly 50%.  Ex. F (Cooper Second Decl.) ¶ 6.

decades.  And Dr. Gimpel provides no explanation for why it is **not** possible to unpack District 4 to foster creation of a second majority-Black district.  ECF 34-7 ¶ 8.

With nothing else to offer, the County advances three critiques of the Plaintiffs' maps.  In addition to being legally irrelevant, each is wrong on the merits.  In many cases, the County's contentions in its brief are not supported by Dr. Gimpel's analysis; in others, Dr. Gimpel's analysis is internally inconsistent, in that the criticisms he lodges against some of Plaintiffs' proposed maps and districts are even more evident in the County's Plan.

1.  ***Compactness***: The County's primary argument is that the Plaintiffs' "Proposed Plans 1 and 5 fail the test for reasonable compactness."  ECF 34 at 9.  This assertion is not supported by Dr. Gimpel's analysis: Dr. Gimpel does not actually say that any of the Plaintiffs' proposed plans are not "reasonably compact"; rather, he says only that the County's plan is "compliant with traditional compactness," and that the County Plan "scores higher on the compactness tests than" two of Plaintiffs' five proposed plans.  ECF 34-7 ¶ 8.

The County argues that the Council-approved districts are more compact and less "irregular" than Plaintiffs' plans.  ECF 34 at 10-12.  These arguments about the absolute and relative compactness of the majority-Black districts Plaintiffs have proffered miss the point.

> The first *Gingles* condition refers to the compactness of the minority population, not to the compactness of the contested district." *Vera*, 517 U.S., at 997, 116 S.Ct. 1941 (KENNEDY,J., concurring); *see also Abrams*, 521 U.S., at 111, 117 S.Ct. 1925 (BREYER, J., dissenting) (compactness to show a violation of equal protection, "which concerns the shape or boundaries of a district, differs from § 2 compactness, which concerns a minority group's compactness"); *Shaw II, supra*, at 916, 116 S.Ct. 1894 (the inquiry under § 2 is whether "the minority group is geographically compact" (internal quotation marks omitted)).

*League of United Latin Am. Citizens (LULAC) v. Perry*, 548 U.S. 399, 433 (2006).  Provided the Black population is sufficiently concentrated to constitute the majority within a single reasonably compact district (or, here, two districts), the Section 2 compactness criterion is satisfied.

In assessing "reasonable compactness," the shape of the district is a secondary consideration: *reasonable* compactness looks at whether the district has been drawn in a bizarre manner just to pull in a sufficient number of Black voters (which would raise Constitutional concerns).  The Supreme Court has expressly rejected "as impossibly stringent" the view that "a district must have the least possible amount of irregularity in shape, making allowances for traditional district criteria." *Bush v. Vera*, 517 U.S. 952, 977 (1996) (citation omitted).  As the *Singleton* court recognized, the goal is *not* to maximize compactness, nor is this some sort of "beauty contest":

> Critically, our task is not to decide whether the majority-Black districts in the Duchin plans and Cooper plans are "better than" or "preferable" to a majority-Black district drawn a different way. Rather, the rule is that "[a] § 2 district that is **reasonably** compact and regular, taking into account traditional districting principles," need not also "defeat [a] rival compact district[ ]" in a "beauty contest[ ]." *Vera*, 517 U.S. at 977–78 (emphasis in original) (internal quotation marks omitted). In analyzing this issue, we are careful to avoid the beauty contest that a great deal of testimony and argument seemed designed to try to win.

*Singleton*, 2022 WL 264819 at *65.  Dr. Gimpel acknowledges that drawing district boundaries requires flexibility and that no redistricting criterion is paramount.  ECF 34-7 ¶ 2 ("There is no perfect map … a broad range of maps are legally acceptable").  Dr. Gimpel also concedes that the Council plan "is not the only reasonable plan that could have been enacted."  *Id*. ¶ 7.

The County and Dr. Gimpel point to the shape of Plaintiffs' proposed districts as demonstrating insufficient compactness.  ECF 34 at 10 ("geographically irregular"); ECF 34-7 ¶¶ 10-11 ("look geographically irregular").  Not only is this sort of "beauty contest" analysis irrelevant to *Gingles* factor 1, but Dr. Gimpel's subjective assessments are easily rebutted:

- Dr. Gimpel's assessment of Plaintiffs' Plan 1 (ECF 34-7 ¶ 10) ignores that Plan 1 includes districts shaped no more oddly than those in the Council's plan and merely divides the County's western region in a more north/south rather than east/west fashion.

- With respect to Plan 5, Dr. Gimpel notes District 2's alignment along the Baltimore City border (ECF 34-7 ¶ 11), but the district previously included much of that border.  And the extension of District 1 does no more that modestly change its current parameters.

- Dr. Gimpel's presentation of "compactness scores" (ECF 34-7 Tbl. 1) makes clear that, compared with the other districts in the County, there is nothing extreme about any of Plaintiffs' plans.  Districts in the 2010 map, which Dr. Gimpel believes meet legal standards (*id.* ¶ 9), show less compactness than the majority-Black districts in Plans 1 and 5 to which he now objects.  ECF 34-7 at 8 (Table 1) (*i.e.* 2010 map has PPTest scores of .021 and .035 and Stest scores of .144 and .186, far less compact than either Plan 1 or Plan 5).  The same holds true for the 1990 and 2000 districts.  Even with regard to Bill 103-21, the compactness scores for District 5 (.142/.377) and District 7 (.067/.259) are below those for the new majority-Black districts in either Plan 1 (.188/.434) or Plan 5 (.272/.521).

The majority-Black districts in Plaintiffs' plans do not display the sort of abnormal lines and shapes that courts have sometimes found problematic.  The issue is whether a district is "reasonably compact," because "compactness is a relative concept which must be interpreted in light of § 2's 'laudatory national mission' of opening the political process to minorities." *Cane v. Worcester Cnty.,* 841 F. Supp. 1081, 1086-87 (D. Md. 1994) *aff'd* 35 F.3d 921, (4th Cir. 1994).  Rejecting a compactness challenge raised by Worcester County to an illustrative plan drawn by William Cooper for the County Commission there, the *Cane* Court opined:

> The plaintiffs' proposed Plan 1 is not unreasonably irregular in shape, considering the population dispersal within the County. The plan merely affirms the existing racial divisions in the County. . . . The districts may not be symmetrical, but they are compact. They do not rely on districts that run through several "tentacle-like corridors" nor are the district's boundary lines so unreasonably irregular, bizarre or uncouth as to approach obvious gerrymandering. They are in line with the configurations of electoral districts that have been approved in other cases.

*Id.*  In Plaintiffs' plans, the Black population in the proposed Black-majority districts resides within the same small region within the County and in contiguous communities.  No district lines stretch across unusual distances or into different areas of the County.  *See LULAC*, 548 U.S. at 435; *Marylanders for Fair Representation v. Schaefer*, 849 F. Supp. 1022, 1054 (D. Md. 1994) (three-judge-court) (finding state legislative districts sufficiently compact to satisfy *Gingles* 1 despite

9

linking together dense Black populations from different cities with a narrow rural corridor). Similarly here, the same expert, Mr. Cooper, analyzed the compactness of Plaintiffs' plans and concluded, "both of the Plaintiffs' Proposed Plans are reasonably shaped and compact – and clearly within the normal range for compactness." ECF 28-2 (Cooper Decl.) ¶ 62.

Despite its exaggerated protestations, the County understands that compactness is a secondary redistricting consideration when assessing a district drawn to prevent minority vote dilution. Indeed, as the Baltimore County Redistricting Manual notes, "[t]he requirements of compactness and contiguousness are *not problematic for Council districts*; these criteria often become relevant in challenges to the gerrymandering schemes which are sometimes alleged in Congressional redistricting cases." ECF 34-9 at 4 (emphasis added).

**2.** ***Community Splits***: The County also objects that the majority-Black districts Plaintiffs suggest result in undue "splits" of communities (in Plan 1) or precincts (in Plan 5). ECF 34 at 13-15. Although the Baltimore County Charter provides that councilmanic districts should be drawn with "due regard" to "current natural, geographic, and community boundaries" (ECF 34-9 at 3), this is understood to be a decidedly "subsidiary" requirement, derived from state law requirements that state legislative districts give "due regard" to "political subdivisions." ECF 34-9 at 6-7. Not only is this a subsidiary consideration, but, because the County has no municipalities, there are no "political subdivisions" here that must be honored. Instead, the County Charter calls only for "due regard" for a "community," which in Baltimore County is recognized as both imprecise and not strictly tied to planning districts or community association boundaries. *Id*. at 7-8. Splitting traditional communities between districts is not foreclosed (*id.* at 9) and is undeniably warranted when necessary to achieve Voting Rights Act compliance. *E.g., Cane*, *supra* at 1086-87 ("While the plan does entail running the newly created districts across other voting district lines and through

towns, this is unavoidable because of the heavy white population and the need to achieve a majority African–American population in one of the districts.")

Dr. Gimpel objects to the split of some communities in Plaintiffs' Plan 1 (ECF 34-7 ¶ 35) but fails to acknowledge that none of those community splits are found in Plaintiffs' Plan 5. Further, as explained in the declaration of Senator Charles Sydnor, Plan 1 recognizes and respects the "community of interest" among neighborhoods situated inside the Baltimore Beltway.  Ex. H (Sydnor Decl.) Ex. H, ¶ 10.

Although acknowledging that Plan 5 "splits fewer census 'places'" than the County's map, Dr. Gimpel contends that the County map's split of predominantly Black communities is preferable because those communities have been split before.  ECF 34-7 ¶ 36.  In other words, despite their vigorous objection to splitting predominantly white communities, ECF 34 at 13-14, ECF 34-7 ¶ 35, the County and Dr. Gimpel dismiss as unimportant the County map's split of Black communities.  Ex. H (Sydnor Decl.) ¶ 12; ECF 28-2 at ¶ 39-40.

In sum, the County's overheated protests about community and precinct splits cannot circumvent the legal concerns raised by Plaintiffs, as these are secondary considerations which can only be accommodated after vote dilution issues grounded in Section 2 are addressed.[5]

**3.  *"Core Retention"***: Finally, the County challenges Plaintiffs' Plan 5 on the basis that it purportedly produces "an abysmal core retention rate," according to Dr. Gimpel's calculations.  ECF 34 at 14-15.  As with precinct splits, neither the County nor Dr. Gimpel cite any authority for the

---

[5] Failing to appreciate that Mr. Cooper used precinct splits intentionally to address concerns voiced by Baltimore County residents about community splits, Dr. Gimpel objects to the number of precincts split in Plaintiffs' Plan 5 and suggests this indicates a "hastily drawn map."  ECF 34-7 ¶ 36.  Neither the County nor Dr. Gimpel cites any authority for why precincts should not be split to protect communities of interest, as Mr. Cooper did in Plan 5, nor for the notion that avoidance of such splits constitutes a basis to circumvent Section 2.

proposition that so-called "core retention rates" are a material consideration when assessing Section 2 compliance.  *See* ECF 34-7 ¶¶ 26-32.[6]  As Plaintiffs' expert Mr. Cooper explains, core retention is "a largely irrelevant consideration" because the need for new district lines that comply with Section 2 compels changes to the voting populations in adjacent districts.  Ex. F (Cooper 2d Decl.) ¶ 4.  The County's first majority Black district—lauded by Dr. Gimpel—could not have been created had the County applied his core retention concept in 2001.  *See* ECF 34-7 ¶ 16.  In any case, neither the County nor Dr. Gimpel explain why this concept has any relevance given the tremendous demographic changes in the County since that time.

Not only is Dr. Gimpel's "retention rate" data irrelevant legally, its numbers contradict his argument. The retention rates in the proposed new majority-Black districts are better than what Dr. Gimpel found acceptable elsewhere: in Plan 1, District 1 has a retention rate superior to Districts 5 and 6 in the Council's map; in Plan 5, the District 2 retention rate (which Dr. Gimpel describes as "particularly" abysmal) exceeds the rate he finds acceptable in the Council map's District 5.

**B.**     ***Gingles* Precondition Two: The relevant communities are cohesive.**

The County's suggestion that racially polarized voting does not exist in Baltimore County (ECF 34 at 17), is astounding.  In the history of Baltimore County, no white councilmember has ever been elected to a Black-majority district and no Black councilmember has ever been elected to a white-majority district.  ECF 28-4 (Fugett Decl.) ¶ 20.  The County's *own expert* concedes that the County Council is aware "of the fact that there has been sufficient racial bloc voting in the

---

[6] Dr. Gimpel references Supreme Court decisions recognizing incumbency protection as a legitimate, political (i.e. non-race based) redistricting consideration, ECF 34-7 ¶ 29, but there is no assertion that the Council drew its map to serve such objectives.  None of the referenced decisions suggests that incumbency protection would ever trump Section 2 considerations. Moreover, all of Plaintiffs' proposed plans protect all incumbents running for reelection.  None of Dr. Gimpel's cited authorities recognizes maintaining geographic continuity either as important or a basis to reject districts drawn to comply with Section 2.

County's past" and that "there is a tendency for Black populations to favor Black candidates and white populations to prefer white ones." ECF 34-7 ¶¶ 15, 20. It is plain that Black and white voters in Baltimore County have different electoral preferences.

Dr. Gimpel does not argue otherwise. Rather, in response to the thorough analysis demonstrating racially polarized voting presented by Plaintiffs' expert Dr. Matthew Barreto, he is silent. Dr. Gimpel's declaration never mentions the 2016 Senate Van Hollen-Edwards primary. Nor does he contend with the compelling analysis Dr. Barreto provides regarding the Hogan-Jealous or Hogan-Brown gubernatorial races. And, in contrast to Dr. Barreto, Dr. Gimpel does not employ any scientific methodology to analyze election data.[7] Rather than engage in statistical analysis, Dr. Gimpel offers anecdotes and guesswork, untethered from any methodology accepted by courts in voting rights cases. ECF 34-7 ¶ 14.

For example, Dr. Gimpel claims that Maryland is "arguably more racially progressive." ECF 34-7 ¶ 14. It is unclear how wishful speculation that Maryland might be seen by some as racially progressive on a statewide basis has any relevance to the issues confronting Baltimore County, with its long history of racism and racial polarization. No state (much less a subdivision within a state), progressive or not, is free to draw maps that unfairly dilute minority citizens' votes. Dr. Gimpel also asserts "abundant evidence suggests that the white voters regularly vote for Black candidates" in the County (ECF 34-7 ¶ 14), without actually providing any evidence at all. Finally, Dr. Gimpel combines these two unanchored thoughts to offer his personal "view" that it is

_____

[7] To reach his conclusions, Plaintiffs' expert, Dr. Barreto, used election data from 2010 to 2020 and a widely accepted methodology called ecological inference analysis. *See generally* Barreto Decl.; *Cane v. Worcester Cnty., Md.*, 840 F. Supp. 1081, 1087 (D. Md. 1994) (employing similar expert analysis in finding racially polarized voting in Worcester County); *Ala. State Conf. of NAACP v. Ala.*, 2020 WL 583803, at *29, n.27 (M.D. Ala. Feb. 5, 2020) (recognizing ecological inference as the "gold standard" for racially polarized voting analysis). The Council's expert never mentions, much less conducts, ecological inference analysis to support his opinions.

unnecessary to draw "additional majority-minority Council seats in Baltimore County" (ECF 34-7 ¶ 14), disregarding decades of Supreme Court case law under the Voting Rights Act.

C.    ***Gingles* Precondition Three: White voters vote sufficiently as a bloc to usually defeat Black voters' preferred candidates.**

As established in Dr. Barreto's analysis of white bloc voting, Plaintiffs are also likely to succeed in establishing that "the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate" (*Gingles* 3).   *Thornburg v. Gingles*, 478 U.S. 30, 51 (1986); ECF No. 28-1 at 18-19 & ECF 28-3 ¶¶ 14-21.   In response, the County offers (i) Cheryl Pasteur's election to the school board, (ii) conjecture, and (iii) hyperbolic rhetoric about "nails" in "coffins."   ECF 34 at 21-22.   Ms. Pasteur's singular election to a non-partisan seat on the Board of Education does *not* stand for the County's proposition that "Black candidates have run . . . and have won" in the County.   ECF 34 at 22.   And the County's unsupported theory that white Baltimore County voters cross over to elect Black-preferred candidates is demonstrably false.

1.    **The Election of Cheryl Pasteur to the Baltimore County School Board**

The County and Dr. Gimpel rely heavily on Cheryl Pasteur's election, but ignore its aberrational character, which fully rebuts their *Gingles* 3 analysis.   Ms. Pasteur's 2018 election to the school board was barely a contest.   She was a well-known and extremely qualified candidate— a former FBI agent, longtime educator, and former principal of Old Court Middle and Randallstown High Schools—while her opponent, Anthony Glasser, was a relatively unknown optometrist with no professional background in education.   Pasteur Decl., Ex. G, ¶¶ 3, 6.   Ms. Pasteur had four decades of professional experience in education and *mounted a vigorous campaign*, raising and spending thousands of dollars, attending public events, and organizing hundreds of volunteers.   Dr. Glasser *did not raise or spend a nickel* on his "campaign," avoided

public appearances, engaged no evident volunteers, had no campaign signs or literature, and failed even to respond to the Baltimore Sun's candidate questionnaire. *Id.* ¶¶ 7-12.  And the race at issue was a non-partisan school board position rather than an office through which candidates compete through partisan primaries.

Even if Ms. Pasteur had competed in a typical contested election, she is the *only* example throughout all Baltimore County history of a Black candidate getting elected to County-level office outside of District 4.  The County repeatedly cites Ms. Pasteur's election to overstate the success of Black-preferred "candidates" in the plural when it should use the singular.  *See* ECF 34 at 22 ("Ms. Pasteur's election shows that *Black candidates* have run in District 2 as the Black-preferred candidate and have won—meaning no white majority bloc defeated them.); *id.* at 24-25 ("*Black candidates* like Cheryl Pasteur can, and do, win elections in [Districts 1 and 2]") (emphases added). It happened once.[8]  The County's single example (there are no others) does not disturb Plaintiffs' strong showing that white bloc voting in the County *generally* defeats Black-preferred candidates. Rather, as the *Gingles* Court made clear, the occasional success of one or even a few Black candidates in particular elections does not disprove the general existence of racial bloc voting.  *Gingles*, 478 U.S. at 57-58.  This is because, as is true in the case of Ms. Pasteur, special circumstances may explain minority success in certain contests within the larger context of a racially polarized electorate.  *Id.*; *see also Collins v. City of Norfolk*, 816 F.2d 932, 937-38 (4th Cir. 1987).

---

[8] Dr. Gimpel uses the singular, but nevertheless mischaracterizes Ms. Pasteur as "an example" as if others exist.  ECF 34-7 ¶ 21.  According to Dr. Gimpel, this one-off school board race "suggests that there is no pronounced racial polarization in County elections[.]"  *Id.*  That is an illegitimate conclusion to reach from a single, virtually uncontested, nonpartisan, down-ballot election. Barreto Decl. ¶ 22.

### 2. The County and Dr. Gimpel fail to undertake a serious statistical study of electoral performance consistent with court standards.

Dr. Barreto found high levels of white bloc voting for candidates running against the Black candidates whom Black voters cohesively supported. For example, in the 2016 Van Hollen-Edwards Democratic primary election, the extreme racial polarization meant whites voting as a bloc were able to defeat Congresswoman Edwards, the Black-preferred candidate (countywide and, most relevantly, in County Districts 1, 2, and 4). ECF-28-3, ¶ 18. The same was true in the 2014 Hogan-Brown and 2018 Hogan-Jealous gubernatorial elections. *See* ECF-28-3, ¶¶ 14-17.

The County tries to brush aside these examples by focusing on how "Black voters in Districts 1 and 2 often support, and elect, non-Black candidates to the Council." ECF 34 at 19. There is no question that Black citizens in Districts 1 and 2 often vote for non-Black Council candidates; the extreme racial polarization and white-majority status of Districts 1 and 2 has meant there has rarely been anyone other than non-Black candidates to choose from.[9] But the elections of Tom Quirk and Izzy Patoka *did not feature a Black candidate against a white candidate*, which are the elections most probative under Section 2.[10]

---

[9] ECF 28-4 (Fugett Decl.) ¶¶ 16-17 (describing reasons for dearth of Black candidates, including virtual impossibility, given racially polarized voting, of his own viability in a district where white voting age population exceeds Black voting age population by over 24 percentage points).

[10] *U.S. v. Charleston County, S.C.,* 365 F.3d 341, 350 (4th Cir. 2004) (recognizing that election contests between Black and white candidates are most probative of racially polarized voting); *LULAC v. Clements,* 999 F.2d 831, 864 (5th Cir. 1993) ("This court has consistently held that elections between white candidates are generally less probative in examining the success of minority-preferred candidates, generally on grounds that such elections do not provide minority voters with the choice of a minority candidate.") (collecting cases); *Cane v. Worcester County, supra,* at 1090, ("[E]lections in which the preferred minority candidate is an African–American are more probative."). *Accord, Marylanders for Fair Representation v. Schaefer*, *supra* at 1059-60 (assuming the point and examining only Black-white elections and Black candidate lack of success in majority-white districts over time to find proof of white bloc voting sufficient to defeat Black-preferred candidates.).

A statistical analysis of the elections featuring Black candidates against white candidates demonstrates that white bloc voting would defeat Black candidates in Districts 1 and 2 under the County's new map.  The chart below is a performance comparison for the 2016 Van Hollen-Edwards Democratic primary election, the 2014 Hogan-Brown gubernatorial election, and the 2018 Hogan-Jealous gubernatorial election.  In the County's Districts 1 and 2, whites voting as a bloc consistently outperform the Black candidate:

**Candidate Performance Comparisons in Bill 103-21's Map for Districts 1, 2, and 4:**

| Year | Election Type | Office | Candidates | Candidate Race | District 1 | District 2 | District 4 |
|------|---------------|--------|------------|----------------|------------|------------|------------|
| 2014 | General | Governor | Hogan (R) | White | 54.4% | 53.8% | 22.2% |
|      |         |          | Brown (D) | **Black** | **42.9%** | **44.5%** | **76.1%** |
| 2016 | Primary | Senate | Van Hollen (D) | White | 51.2% | 64.1% | 32.8% |
|      |         |        | Edwards (D) | **Black** | **39.8%** | **29.9%** | **61.8%** |
| 2018 | General | Governor | Hogan (R) | White | 54.2% | 56.6% | 29.6% |
|      |         |          | Jealous (D) | **Black** | **44.5%** | **42.6%** | **69.4%** |

Ex. E (Barreto 2d Decl.) ¶ 14.  The Black candidates would have won were the elections confined to majority-Black District 4.  And, as demonstrated in Dr. Barreto's performance analysis, they generally would have won in both majority-Black districts in Plaintiffs' Plans 1 and 5.  They would have lost, however, were the elections confined to the County's majority-white Districts 1 and 2.  Ex. E (Barreto 2d Decl.) ¶¶ 13-16.  In Baltimore County, Black and white citizens do vote differently.

### D.    The County fails to rebut that the totality of the circumstances and the Senate Factors support the finding of a violation of Section 2.

The County does not dispute any of the "Senate factors" that Plaintiffs have established – that the County (1) has a history of racial segregation that excluded Black citizens from the County and thus deprived them of the opportunity to vote there, (2) has extremely racially polarized voting, (3) continues to have significant racial disparities in education, employment, health, and housing,

and (4) has a history of almost never electing Black candidates to public office.  ECF 28-1 at 20-30.  The County's response seems to be "things aren't as bad as they used to be" and "trust the white councilmembers to take care of their Black constituents."

The County also does not dispute any aspect of Dr. Lawrence Brown's account of the County's racist history, including recent instances of exclusion of affordable housing and refusal to desegregate schools, resulting in the County being the most segregated major county in Maryland and continuing to have among the most segregated schools in the State.  ECF 28-3 (Brown Decl.)  ¶¶ 28, 32.  The County simply claims that the County "has made significant improvements."  ECF 34 at 26.  But the relevant question is not how far the County has come, it is how far it has to go.

The County provides a declaration from its Chief Diversity Officer (an office only created in 2019) that misleadingly states that the County Council has appropriated funds for affordable housing.  ECF 34-10 ¶ 20.  Mr. Williams and the County fail to mention that this funding is required under a Court-ordered monitoring agreement with the U.S. Department of Housing and Urban Development as to which the County is severely out of compliance.  As described in the Declaration of Charles Matthew Hill, attached as Exhibit I, in March 2016, HUD entered into a binding Voluntary Compliance Agreement with various organizations advocating for fair housing, individual BIPOC and disabled residents, and the County.  *Id.* ¶ 8.  The agreement requires the County to undertake a myriad of actions, monitored by HUD, to address the race discrimination and segregation its policies perpetuated.  *Id.*  While the County may have budgeted money to create affordable housing, the County has failed to meet its obligations under the agreement to facilitate the production of 1,000 "hard units" of affordable, accessible housing in particular census tracts with high-performing schools, economic opportunities, and racial/economic diversity.  *Id.* ¶ 10.

In light of the County's neglect toward Black and BIPOC citizens in search of affordable housing (despite a formal agreement requiring certain thresholds be met), the County's self-congratulatory claims about "improvements" and special diversity committees ring hollow.

## II.    The County fails to contest meaningfully the equitable factors supporting a preliminary injunction.

The County appears not to dispute that a Section 2 violation constitutes an irreparable harm to minority voters such as Plaintiffs.  ECF 34 at 9-10.  *See United States v. City of Cambridge*, 799 F.2d 137, 140 (4th Cir. 1986) (discriminatory voting laws are "the kind of serious violation of the Constitution and the Voting Rights Act for which courts have granted immediate relief").  Instead, the County resorts to unsupported hyperbole regarding a speculative and unsupported claim of "potentially negative impact of either [of Plaintiffs'] plan[s] *on Black voting power*," an incredible claim given the County's steadfast resistance to equal voting opportunities for its Black and BIPOC citizens.  ECF 34 at 31.

As an initial matter, denying preliminary relief simply because the first deadline of this election cycle is approaching would create a perverse incentive for municipalities to defer redistricting decisions until the eleventh hour in order to delay or avoid judicial review.  By enacting a lawful plan in the first place, the County could have avoided the need to readjust its councilmanic districts as election season approaches.  Instead, the County chose to enact a map that dilutes Black and BIPOC citizens' voting strength, despite full knowledge that it was unlawful under the Voting Rights Act.  The County does not enjoy a free pass from complying with federal law in this year's elections.

In any event, the County's claims are indefensible, and this Court has time and authority to ensure that the County effectively implements a lawful map.  The County has been aware *for months* that its proposed plan violated the Voting Rights Act and that the slow pace of its

consideration of the maps would push up against the election deadline.  And because Plaintiffs in this case have offered a plethora of potential remedial plans, altering Bill 103-21 to resolve its legal defect will take little time.  Any "inconvenience" legislators face in having to fix an unlawful plan they enacted just seven weeks ago "does not rise to the level of a significant sovereign intrusion."  *Covington v. North Carolina*, 270 F. Supp. 3d 881, 895 (M.D.N.C. 2017).  These timing-based concerns, far from harming the County or the public interest, "simply serve to emphasize why a preliminary injunction during these early stages of the filing period would better serve the public than waiting until the eve of the election."  *NAACP-Greensboro Branch v. Guilford Cnty. Bd. of Elections*, 858 F. Supp. 2d 516, 529 (M.D.N.C. 2012).

## CONCLUSION

The Court should preliminarily enjoin Bill 103-21's implementation prior to the February 22, 2022, deadline for candidate registration, as there is still sufficient time for maps to be enacted and vetted without undermining the public's interest in an orderly election in 2022.

Dated: February 7, 2022          Respectfully submitted,

/s/ *Deborah A. Jeon*                         /s/ *John A. Freedman*
Deborah A. Jeon (Bar #06905)           John A. Freedman (Bar #20276)
Tierney Peprah (Bar # 21986)            Mark D. Colley (Bar #16281)
AMERICAN CIVIL LIBERTIES UNION   ARNOLD & PORTER KAYE SCHOLER LLP
OF MARYLAND                                601 Massachusetts Ave, N.W.3600
Clipper Mill Road Suite 350               Washington, D.C.  20001
Baltimore, MD  21211                        (202) 942-5000
(410) 889-8555                                 john.freedman@arnoldporter.com
jeon@aclu-md.org


/s/ *Andrew D. Freeman*                   Michael Mazzullo (pro hac vice pending)
Andrew D. Freeman (Bar #03867)       ARNOLD & PORTER KAYE SCHOLER LLP
BROWN GOLDSTEIN & LEVY LLP       250 W. 55th Street
120 E. Baltimore Street, Suite 2500      New York, NY 10019
Baltimore, MD  21202-6701                 (212) 836-8000
(410) 962-1030                                  michael.mazzullo@arnoldporter.com
adf@browngold.com

*Counsel for Plaintiffs*