# EXHIBIT E

# SECOND DECLARATION OF MATTHEW A. BARRETO

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | |
|---|---|
| Baltimore County Branch of the National Association for the Advancement of Colored People, *et al.*,<br><br>*Plaintiffs,*<br><br>v.<br><br>Baltimore County, Maryland, *et al.*,<br><br>*Defendants*. | Civil Action No. LKG-21-3232 |

### SECOND DECLARATION OF MATT BARRETO, PH. D.

1. I previously executed a declaration on January 18, 2022, that was submitted in this action (ECF 28-3). Since then, I have reviewed Baltimore County's Memorandum of Law in Opposition to Plaintiffs' Motion for Preliminary Injunction (ECF 34) and the accompanying Declaration of Dr. James Gimpel (ECF 34-7).

2. As explained, in this matter I have been working with Dr. Kassra Oskooii, tenured professor of Political Science at the University of Delaware.

3. It is our conclusion that Dr. Gimpel's declaration does not follow accepted social science practices for analyzing racially polarized voting. While he offers opinions, his declaration does not contain the type of ecological inference (EI) analysis that courts have relied on in Section 2 voting rights cases. We outline our rebuttal to Dr. Gimpel below.

4. Dr. Gimpel does not disagree that Blacks are currently over 30% of Baltimore County's population, which, as demonstrated by the district maps for Plaintiffs' proposed alternative redistricting plans, is clearly large enough in size and sufficiently compact to establish

1

two majority-Black council districts in Baltimore County. While Dr. Gimpel claims that Black population growth has occurred throughout the County, he does not dispute that a second Black-majority district can be drawn in the west side of the County where the largest population concentration can be found.

5. When localities redraw political district boundaries after every decennial census, they must take into account demographic and population changes over the previous decade. In Baltimore County, the Black population grew by 54,982 while the White population declined by 61,293.

6. In paragraph 12 of his report, Dr. Gimpel acknowledges that "minorities should not be spread so thinly across districts that they have no opportunity to elect their candidate of choice." But this is precisely what Baltimore County does to Black voting strength: on the one hand overly packing the Black population into District 4, and on the other hand cracking it across Districts 1 and 2 such that Black voters are spread so thinly across Districts 1 and 2 that they have no opportunity to elect their candidate of choice.

11. There is no question that the 2022 redistricting map adopted by Baltimore County does not perform for Black candidates of choice outside of District 4 (that is, Black candidates who are the candidates of choice of Black voters). The key elections for the Court to consider are those in which Black candidates faced White candidates.

12. In his report, Dr. Gimpel offers no opinion, data or evidence disputing our detailed statistical analysis that key elections with Black candidates demonstrate racially polarized voting. Black voters were very cohesive in support for Black candidates Anthony Brown, Benjamin Jealous and Donna Edwards. White voters in Baltimore County bloc-voted against all three of these Black candidates. Dr. Gimpel is in agreement with this analysis.

13. What's more, the results of our performance analysis, reported in Table 1 below, show that the newly adopted County map does not perform for Black candidates of choice in Districts 1 and 2[1]. In fact, *White Republican* candidate, Larry Hogan, easily defeated Black Democrats in the 2014 and 2018 gubernatorial elections in those districts. The defeat of these Black candidates of choice resulted from the white bloc-voting patterns that I attested to in my earlier declaration. Because District 1 (29.71% Black VAP) and District 2 (31.18% Black VAP) crack the Black population residing in this part of the County, there is no question that the existing map does not perform to elect the Black candidates of choice. Stated differently, Black voters cannot overcome the clear White bloc-voting that we had observed. In contrast, District 4 shows clear evidence of packing, by creating a district with a very large Black population (74.74% Black VAP). Unsurprisingly, the same Black candidates who lost in Districts 1 and 2, won with very high margins (ranging from about 30 to 50 percentage points) in District 4.

14. **Table 1: Candidate Performance Comparisons in Newly adopted 2022 County Map Districts 1, 2, and 4**

| Year | Election Type | Office | Candidates | Candidate Race | District 1 | District 2 | District 4 |
|---|---|---|---|---|---|---|---|
| 2014 | General | Governor | Hogan (R) | White | 54.4% | 53.8% | 22.2% |
| | | | Brown (D) | **Black** | **42.9%** | **44.5%** | **76.1%** |
| 2016 | Primary | Senate | Van Hollen (D) | White | 51.2% | 64.1% | 32.8% |
| | | | Edwards (D) | **Black** | **39.8%** | **29.9%** | **61.8%** |
| 2018 | General | Governor | Hogan (R) | White | 54.2% | 56.6% | 29.6% |
| | | | Jealous (D) | **Black** | **44.5%** | **42.6%** | **69.4%** |

15. While Dr. Gimpel states that Mr. Brown and Mr. Jealous were successful in their own Democratic *primary* elections, he offers no statistical analysis to show they were preferred by White voters. Further, and perhaps most devastating to his claims, when the full electorate in Districts 1 and 2 are considered, Whites voted strongly against Mr. Brown and Mr. Jealous in the November election, instead siding with White Republican candidate Larry Hogan.

3

16. While Dr. Gimpel and Baltimore County argue that some White Democrats have won office with Black support, they cannot ignore the fact that when *Black* Democrats run against White opponents, they lose. This evidence supports Plaintiffs' point that, while the Black voters in Baltimore might prefer White Democrats when there is no Black opponent, when a *Black* Democrat contests an election, White voters bloc-vote against the Black candidate. In his analysis of the 2014 and 2018 Democratic Gubernatorial primary election, Dr. Gimpel suggests that there is a sufficient number of crossover White votes for Black candidates to win in Districts 1 and 2. *See* Gimpel Decl. ¶¶ 23-25. Not only does he fail to conduct any actual social science analysis that would yield scientifically acceptable point estimates of racial voting behavior, he also completely ignores what transpires in the general elections as demonstrated above.

15. In Table 2 below, we compare how Black Democrats Anthony Brown and Ben Jealous would have performed using the district boundaries under the newly adopted county map relative to other high-profile general races featuring *White* Democratic candidates. As the results vividly show, the only Democrats who do not perform (i.e., win) in Districts 1 and 2 are the two Black Democrats. Using the 2014 general election results, Anthony Brown would have received 42.9% and 44.5% of the votes in new Districts 1 and 2, respectively. On the same exact ballot, White Democratic candidate for Attorney General, Brian Frosh, would have secured 55.7% and 59.9% of new District 1 and 2 votes, respectively. Based on the 2018 results, Ben Jealous would have received 44.5% and 42.6% of the votes in new Districts 1 and 2, respectively. On the same ballot, the White Democrats running for Senate and Attorney General would have secured more than 65% of Districts 1 and 2 votes. This analysis provides additional evidence of the

4

tremendous barriers that even prominent Black candidates would face in Districts 1 and 2 if the County's map is allowed to take effect.

16. **Table 2: Candidate Performance Comparisons in Newly adopted 2022 County Map in elections with White and Black Democrats: Districts 1 and 2**

| Year | Election Type | Office | Candidates | Candidate Race | District 1 | District 2 |
|------|---------------|--------|------------|----------------|------------|------------|
| 2014 | General | Governor | Hogan (R) | White | 54.4% | 53.8% |
|      |         |          | Brown (D) | **Black** | **42.9%** | **44.5%** |
| 2014 | General | Attorney General | Pritzker (R) | White | 39.6% | 37.1% |
|      |         |                  | Frosh (D) | White | **55.7%** | **59.9%** |
| 2018 | General | Governor | Hogan (R) | White | 54.2% | 56.6% |
|      |         |          | Jealous (D) | **Black** | **44.5%** | **42.6%** |
| 2018 | General | Senate | Campbell (R) | White | 27.6% | 23.0% |
|      |         |        | Cardin (D) | White | **65.8%** | **70.7%** |
| 2018 | General | Attorney General | Wolf (R) | White | 33.2% | 31.7% |
|      |         |                  | Frosh (D) | White | **66.7%** | **68.3%** |

17. This pattern is easily visualized in a scatterplot array of previous election performance across all voting precincts in new Districts 1, 2, and 4 comparing elections with White Democrats and Black Democrats. Rather than just showing the Court one or two precincts, we present the full set of 93 precincts across these districts to show the clear pattern of vote choice by race of voters and race of candidates. These results are presented as a four-graph panel in Figure 1 below. The top two graphs show that when a White Republican faces a Black Democrat, Whites bloc-vote against the Black Democrat, as evidenced by the blue regression line sloping downwards to far below 50% support. The bottom two graphs show, however, that when a White Republican faces a White Democrat, Whites provide enough crossover votes to help White Democrats to win the election.

**Figure 1: Election Results by Race, Baltimore County in D1, D2, and D4**



19. Without citing any evidence, Dr. Gimpel claims that White voters in Maryland are "arguably more racially progressive than other states" and "regularly vote for Black candidates," and he asserts that "in my view, this mitigates the need for drawing additional majority-minority Council seats." Gimpel Decl. at ¶ 14. As we have made clear, however, Districts 1 and 2 are deprived of Black population through the County's packing of District 4, and further crack the Black population, such that they do not perform for Black candidates of choice. Dr. Gimpel does not provide any comprehensive statistical analysis to dispute our finding that, when Black candidates of choice run, Whites bloc-vote against them. Dr. Gimpel does not provide any statistical analysis to dispute our finding that Black voters are highly cohesive and unite behind Black candidates of choice. In fact, he agrees, writing "to be sure, there is a tendency for Black populations to favor Black candidates and white populations to prefer white ones." Gimpel Decl. ¶ 20.

20. In approving of the County's creation of District 4 as a necessary VRA majority-Black (and now super-majority Black) district, Dr. Gimpel seems to take the position that there is in fact racially polarized voting in Baltimore County and that the County correctly responded to the NAACP's and ACLU's urging to create the first-ever majority-Black- district in 2002, but he also appears to believe that Blacks deserve only one district out of seven 20 years later. There is an inherent contradiction in Dr. Gimpel's position about a second Black performing district in 2022. If he agrees that there is in fact racially polarized voting – which there is – and there is evidence that Black candidates of choice are blocked by White voters – which there also is – then the same factors that required the creation of a Black district in 2002 require the creation of a second Black district in 2022, given that Blacks now compose a much larger share of the voting age population.

21. Dr. Gimpel points to the fact that, since 2002, no Black candidate has lost to a White candidate in a race for County Council (using a cutoff date that allows him to ignore the one Black candidate who did run and lose for the council in 1990). Gimpel Decl. ¶ 21. But he draws no conclusion from that fact. The absence of such an election is most readily explained (as Anthony Fugett described in his declaration at paragraphs 10, 12, and 16) as the result of no Black candidate having been foolish enough to run for the Council in heavily White districts in which Whites bloc-vote against Black candidates.

22. Dr. Gimpel points to one aberrational election, the 2018 school board election in District 2 in which a Black candidate, Cheryl Pasteur, defeated a white candidate, Anthony Glasser. But, as described in Ms. Pasteur's declaration, that was the result of an exceptionally high-profile Black candidate (Ms. Pasteur) who mounted a vigorous campaign in what was essentially an uncontested election. Dr. Glasser, who had no background in education, apparently spent no money and almost no effort on his "campaign." That Ms. Pasteur was able to win that election – the only example in County history of a Black candidate defeating a white candidate in a majority-White district – in no way "suggests that that there is no pronounced racial polarization in County elections," as Dr. Gimpel asserts in paragraph 22 of his declaration. Making that assertion based on a single, highly unusual election is far outside the bounds of accepted social science practices for analyzing racially polarized voting. Indeed, Dr. Gimpel did not conduct any ecological inference analysis reporting Black or White vote choice estimates for the candidates in this election. He simply makes an assertion based on election results.

23. In Voting Rights Act lawsuits, courts have widely accepted ecological inference as a method to assess racially polarized voting. The methods accepted include Goodman's ecological regression and King's ecological inference, a more precise and statistically robust

version of ecological regression. Ecological inference (EI) is also widely used in published social science to ascertain vote choice estimates by race and ethnicity. EI is a well-known method and regularly used by both the courts and political scientists to study racially polarized voting. In our analysis, we rely on the software package eiCompare[2], which we developed and published (Collingwood et al. 2016; Barreto et al. 2019), based on King (1997) and Rosen, et al. (2001)[3]. The methods, analysis and tables we presented in my original declaration of January 18, 2022, and throughout this second declaration rely on accepted statistical analysis of racially polarized voting. In a recent Section 2 Voting Rights Act lawsuit, a federal judge cited eiCompare analysis as accurate and scientifically valid:

> Plaintiffs' expert in political science and statistical analysis, Dr. Matthew Barreto, (see Tr. at 154:5-11), used accurate and scientifically validated methods to identify and analyze racially polarized voting in the District… In sum, Dr. Barreto is extremely well credentialed and at the leading edge of political science and statistical analysis with respect to racially polarized voting and voting estimates. I found him to be entirely credible… Through a statistical package and method called eiCompare, Dr. Barreto then used both King's EI and RxC to estimate voting preference by race and compared the results.

*NAACP, Spring Valley Branch v. E. Ramapo Cent. Sch. Dist.*, 462 F. Supp. 3d 368, 381 (S.D.N.Y. 2020), *aff'd sub nom. Clerveaux v. E. Ramapo Cent. Sch. Dist.*, 984 F.3d 213 (2d Cir. 2021).

24. In contrast, Dr. Gimpel does not run any ecological inference (or ecological regression) analysis for any elections that he discusses. He provides a combination of commentary, summary of election results, sometimes citing a few hand-picked precincts, and unconventional Excel charts of selected precinct results. None of this constitutes ecological inference or racially polarized voting analysis that proves whether Whites vote in favor of Black candidates of choice. In order to offer evidence of Gingles 2 or Gingles 3 prongs, Dr. Gimpel must provide the court with accepted ecological inference analysis, which he has not done.

25. In his report, Dr. Gimpel refers to the need to pack, or overconcentrate, the Black population in a single district so it can reliably elect Black candidates of choice, but he provides no analysis of election results showing that the such over-packing of Black population is necessary. Gimpel Decl. ¶ 15. In fact, as our analysis above shows, District 4 consistently votes for Black candidates at the 70% or sometimes 80% level, thereby "wasting" Black votes that could go towards electing Black candidates of choice in another district. District 4 can easily be "unpacked" so the Black population can shift to an adjacent district to form a second majority-Black district.

26. Experts in the field voting rights make clear that over-packing is a form of vote dilution, which Dr. Gimpel completely ignores. Packing of minority voters and vote dilution is described in a Law Review article by Gerry Hebert and Allan Lichtman in 1993[4]. Hebert was Special Litigation Counsel for the U.S. Department of Justice in the Voting Section for more than 20 years and often oversaw VRA litigation on precisely these types of cases related to over-packing of the Black population. The rationale for unpacking districts is indeed part of the *Gingles* decision and should be considered a VRA principle when evaluating legislative districting. They write: "packing occurs when minorities are aggregated into one or more districts beyond the level needed for minority voters to achieve effective political control. Such packing "wastes" minority votes that could empower minorities to elect candidates of their choice in a larger number of districts. To prove packing, plaintiffs must also demonstrate that the alleged packed districts waste minority votes by concentrating minorities beyond the level needed for effective political control."

27. Analysis of the NAACP's proposed maps shows that two districts can perform to elect Black candidates of choice.

10

28. Our performance analyses of Plaintiffs' proposed Plans 1 and 5, reported below in Tables 2 and 3, illustrate that drawing a second Black-majority district would give Black voters the opportunity to elect their candidates of choice, in spite of significant White bloc-voting. Had the districts been drawn as shown under Plan 1, Brown, Edwards, and Jealous would have won in the proposed Black-majority District 1 and continue to win in District 4. Under the County's map, all three Black candidates lose in District 1. With the districts drawn as proposed under Plaintiffs' Plan 5, Brown and Jealous would have won in the Black-majority District 2, while Edwards would vastly improve her chances of electoral success. Once again, all the Black candidates would continue to win in District 4.

29. **Table 2: Candidate Performance Comparisons in NAACP MAP 1 Districts 1, 2, and 4**

| Year | Election Type | Office | Candidates | Candidate Race | District 1 | District 2 | District 4 |
|---|---|---|---|---|---|---|---|
| 2014 | General | Governor | Hogan (R) | White | 36.5% | 55.9% | 37.3% |
|  |  |  | Brown (D) | **Black** | **61.1%** | 42.1% | **60.6%** |
| 2016 | Primary | Senate | Van Hollen (D) | White | 38.5% | 70.7% | 41.6% |
|  |  |  | Edwards (D) | **Black** | **53.9%** | 23.7% | **52.2%** |
| 2018 | General | Governor | Hogan (R) | White | 40.3% | 58.0% | 40.6% |
|  |  |  | Jealous (D) | **Black** | **58.6%** | 41.1% | **58.2%** |

30. **Table 3: Candidate Performance Comparisons in NAACP MAP 5 Districts 1, 2, and 4**

| Year | Election Type | Office | Candidates | Candidate Race | District 1 | District 2 | District 4 |
|---|---|---|---|---|---|---|---|
| 2014 | General | Governor | Hogan (R) | White | 56.0% | 36.7% | 38.6% |
|  |  |  | Brown (D) | **Black** | 41.3% | **61.5%** | **59.7%** |
| 2016 | Primary | Senate | Van Hollen (D) | White | 52.5% | 49.9% | 42.5% |
|  |  |  | Edwards (D) | **Black** | 38.5% | 44.7% | **51.4%** |
| 2018 | General | Governor | Hogan (R) | White | 55.5% | 42.4% | 41.7% |
|  |  |  | Jealous (D) | **Black** | 43.2% | **56.7%** | **57.3%** |

31. All of the opinions in this declaration and my previous declaration are offered to a reasonable degree of professional certainty in my capacity as an expert on political science,

11

social science statistical analysis, demographics, and voting patterns, including analysis of racially polarized voting. This report is intended to provide a summary reply to Dr. Gimpel on issues related to demographics and voting patterns in Baltimore County. If additional data becomes available or relevant, I will provide additional data analysis as requested by the Court and counsel.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

_____
Matt Barreto

Agoura Hills, California
Executed on February 7, 2022

**End Notes**

[1] Results for all performance analysis tables presented here are based on the datasets used in my initial declaration. As previously noted, early, provisional, and absentee votes by precincts are not reported by the State of Maryland or Baltimore County for election years 2014 and 2018. For 2018, I relied on election data compiled by the Redistricting Data Hub (https://redistrictingdatahub.org), which apportioned early, provisional, and absentee votes to precincts in the same share that the election day votes were split among candidates.

[2] Collingwood, Loren, Kassra Oskooii, Sergio Garcia-Rios, and Matt Barreto. 2016. "eiCompare: Comparing Ecological Inference Estimates across EI and EI: RxC." The R Journal. 8:2; Barreto, Matt, Loren Collingwood, Sergio Garcia-Rios and Kassra Oskooii. 2019. "Estimating Candidate Support: Comparing Iterative EI and EI-RxC Methods" Sociological Methods and Research. 48(4).

[3] King, Gary. 1997. A Solution to the Ecological Inference Problem. Princeton, NJ: Princeton University Press; Rosen, Ori, Wenxin Jiang, Gary King, and Martin A. Tanner. 2001. "Bayesian and Frequentist Inference for Ecological Inference: The R x C Case." Statistica Neerlandica 55(2):134-56

[4] Allan J. Lichtman and J. Gerald Hebert. 1993. "A General Theory of Vote Dilution." La Raza Law Reivew. 6(1).