# EXHIBIT H

# DECLARATION OF SENATOR CHARLES E. SYDNOR III

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | |
|---|---|
| Baltimore County Branch of the National Association for the Advancement of Colored People, *et al.*,<br><br>*Plaintiffs,*<br><br>v.<br><br>Baltimore County, Maryland, *et al.*,<br><br>*Defendants.* | Civil Action No. LKG-21-3232 |

## DECLARATION OF SENATOR CHARLES E. SYDNOR III

1. I, Charles E. Sydnor III, am over 18 years old and am competent to testify. I am one of the plaintiffs in this case, and I submit this declaration upon personal knowledge in support of Plaintiffs' motion for preliminary injunction in this matter.

2. I am a Black registered voter residing in Baltimore County, Maryland. I was born and raised in Baltimore and have lived in Catonsville since 2002.

3. I received my Juris Doctor and Masters of Policy Sciences degrees from the University of Maryland School of Law and University of Maryland Baltimore County, respectively, in May 2000. I received my Bachelor's degree with departmental honors from Johns Hopkins University and my A-course diploma from Baltimore Polytechnic Institute. I am admitted to practice law before Maryland and District of Columbia courts and the United States Supreme Court.

4. Since 2001, I have worked with a Columbia, Maryland-based affordable housing organization and am currently employed as an Associate General Counsel. Prior to my tenure

there, I clerked at the Circuit Court for Baltimore City and, while in law school, with the U.S. Department of Justice, Office of Justice Programs, Office for Civil Rights and U.S. Equal Employment Opportunity Commission.

5. I currently represent District 44 in the Maryland State Senate. I have been a member of the Senate since January 8, 2020. Previously, I represented District 44B in the Maryland House of Delegates from January 2015 until January 2020.

6. I was a recipient of Maryland Coalition Against Sexual Assault's Visionary Award (2022), the Maryland Nurses Association's Legislator of the Year Award (2020), the University of Maryland Francis King Carey School of Law Black Law Student Association's Graduate of the Year Award (2020), Maryland Consumer Rights Coalition's Most Promising Legislator Award (2017), Daily Record's Leadership in Law Award (2012), the University of Maryland Francis King Carey School of Law's Public Service Award (2000) and Johns Hopkins University's Student Excellence Award for Leadership and Service Award (1996).

7. In preparing this declaration, I have reviewed the Plaintiffs' Memorandum in Support of Preliminary Injunction; the Declaration of William S. Cooper; Oct. 25, 2021, Letter from Pikesville-Greenspring Community Coalition; Dec. 15, 2021, Letter from Greater Arbutus Business Association; Dec. 14, 2021, Letter from Paula W. Wolf; and the Declaration of James Gimpel, Ph.D.

8. In its brief, the County brings up community members' concerns asserting that one of the illustrative redistricting maps proposed by the Plaintiffs splits up communities of interest among different districts. Specifically, the County points to the southwestern communities of Arbutus, Lansdowne, and Catonsville, which are split between two different districts in Plaintiffs' Proposed Plan 1. However, the County ignores the fact that the other map Plaintiffs put forward

— Proposed Plan 5 — keeps all those communities intact and in a single district (District 1). The County expresses the same concern over the split of Pikesville between two districts in Plaintiffs' Proposed Plan 1. Again, however, those concerns are alleviated in Proposed Plan 5, which keeps Pikesville together in one district (District 2). As Mr. Cooper expressly states in his declaration, Plan 5 was created with the purpose of keeping communities intact. It only splits three communities — Woodlawn, Reisterstown, and Essex — far fewer community divisions than exist in the redistricting plan adopted by the County.

9. The County fails to address Mr. Cooper's observation that the map adopted by the County also splits up communities of interest — but in the County's map the split communities are majority-Black communities. As adopted, Bill 103-21 "cracks" each of the majority-Black communities of Randallstown, Milford Mill, Owings Mills, and Lochearn between District 2 and District 4. By comparison, the Plaintiffs' Proposed Plan 5 keeps those communities intact: District 2 encompasses all of Lochearn and Milford Mill, while District 4 includes all of Owings Mills and Randallstown. Even though the Plaintiffs provided the County with Proposed Plan 5 during early stages of the redistricting process, the County rejected the Plaintiffs' proposal and instead kept those communities divided. The County did so even after the Council heard from numerous Black community members expressing their strong preference to keep their communities together at the Council hearings discussing mapping options and possibilities.

10. The Plaintiffs' Proposed Plan 1, although it divides a few communities, was created to keep other communities of interest united. I have been told by constituents from Catonsville and other older communities inside the western part of the Beltway that they routinely feel disregarded by the County. Residents in these communities have told me they feel the County ignores their interests and acts as if their neighborhoods are part of the City rather than the County. Plaintiffs'

3

Proposed Plan 1 would unite those communities with other similar communities along the City border (including all of the communities inside the Beltway on the west side of the County), giving them a stronger coalition with similar interests to more effectively advocate for their needs.

11. The County's claimed concerns about communities being shifted from one district into another also ignore its own prior redistricting actions. For example, during the 2011 redistricting process, the County moved the communities of Woodlawn from then-District 4 to then-District 1.

12. When district lines are drawn, some communities will inevitably be split. This is necessitated by the requirements of the Constitution and Voting Rights Act in order to ensure equally populous and racially fair districts. In this case, however, it appears that Defendants are willing to fight to keep white communities together but unwilling to offer the same treatment to Black communities, in violation of their civil rights.

13. Additionally, the County's map does a disservice to its westside residents by packing an excessively high percentage of Baltimore County's Black population into a single district, District 4. As drawn, almost 75% of District 4's voting age population is Black. The County argues that such packing is necessary to ensure that Black-preferred candidates will get elected in the district. However, in my experience, this is unwarranted and instead serves to dilute Black voters' electoral power. In 2014 and 2018, I was elected to the Maryland House of Delegates from a district on the west and southwest side of Baltimore County that was 53% Black when it was created based on the 2010 census. My ability to win in that district demonstrates that the County's plan to pack District 4 with a Black voting age population of almost 75% is excessive and unnecessary for Black voters to elect a candidate of their choice. My new Senate district under the 2022 State Legislative Redistricting Plan is only 43% Black (although 60% non-white), yet I

am still optimistic that my chances of reelection to the State Senate are reasonable and fair. Based on my experience as a candidate and my knowledge of County voting patterns, I am confidant Black candidates of choice can win election to the Baltimore County Council in districts with far less than a 75% Black voting age population – i.e., with a Black percentage far closer to 50% – as long as the district is sufficiently diverse and non-white.

14. The County's plan creates one majority-Black district (District 4) and *six majority-white districts* (technically five that are majority-white and one that is 49.5% white but only 29.7% Black). As Mr. Cooper has demonstrated through his declaration and redistricting plans, and as I believe based on my experience as a candidate, none of the County's other districts have a sufficiently diverse population to allow a Black or non-white candidate a fair and realistic opportunity to succeed in an election, given existing patterns in the County of racially polarized voting. Instead, in each of the other six districts, the white population outnumbers the Black population by at least 19%.

15. What the County should do instead and what Plaintiffs advocate for, given the significant size and reasonable compactness of Baltimore County's Black population, is to create two majority-Black districts and allow its Black residents the opportunity to elect their candidates of choice outside of just District 4.

16. My personal experience also shows the patterns of racially polarized voting and bloc voting that exist in Baltimore County. During the 2014 and 2018 Democratic primaries in which I ran for the House of Delegates, Black candidates, including myself, consistently did much better in majority-Black precincts like 001-003, 001-004, 002-001 and 002-002 in 2014 and 2018 than in majority-white precincts like 001-007, 001-008 and 001-011, and our success generally correlated to the predominant race of the precinct.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on February 5, 2022

_____
Charles E. Sydnor III