**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

---

|  |  |
|---|---|
| BALTIMORE COUNTY BRANCH OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, *et al.*, | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| BALTIMORE COUNTY, MARYLAND, *et al.*, | ) ) ) |
| Defendants. | ) ) |

Civil Action No. 21-cv-03232-LKG

Dated: February 22, 2022

---

## MEMORANDUM OPINION AND ORDER

### I.     INTRODUCTION

This case involves a challenge to Baltimore County's 2021 redistricting plan brought by Black citizens of Baltimore County ("the County") and several civil rights organizations, pursuant to Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.  *See generally* Compl., ECF No. 1.

On January 19, 2022, plaintiffs filed a motion for a preliminary injunction, pursuant to Fed. R. Civ. P. 65, requesting that the Court enjoin implementation of the County's 2021 redistricting plan and require the County to adopt a map with two majority-Black districts.  *See* Pl. Mot., ECF No. 28; Pl. Mem., ECF No. 28-1.  Plaintiffs argue that the County's plan dilutes the vote of Black County voters and that these voters will suffer irreparable harm through the violation of their fundamental right to vote, absent relief from the Court.  *See generally* Pl. Mem.

The Court held an evidentiary hearing on plaintiffs' motion on February 15, 2022.[1]  *See generally* Feb. 15, 2022 Hearing Transcript ("Tr."), ECF No. 54.  Based upon a careful review of

---

[1] The Court has received the following evidence in this case.  From the plaintiffs:  Plaintiffs' Proposed Redistricting Plans 1 and 5; the Declaration of William S. Cooper; the Declaration of Matthew A. Barreto; the Declaration of Anthony S. Fugett; the Declaration of Lawrence T. Brown; the 2nd

the evidentiary record in this case, and for the reasons set forth below, the Court **GRANTS**
plaintiffs' motion for a preliminary injunction.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   Factual Background

#### 1.   The Demographics Of Baltimore County

As background, Baltimore County is a large, densely populated, and rapidly diversifying
community. *See* Pl. Mot. Ex. A, Decl. of William S. Cooper ("Cooper Decl.") at ¶¶ 22, 25, ECF
No. 28-2.  The parties agree that the County's Black population has grown over the last ten
years.  Compl. at ¶ 3; Def. Resp. at 5, ECF No. 34.  But, they disagree somewhat about how this
growth has occurred.  Pl. Mem. at 2-3; Def. Resp. at 5-6.

According to census data, the Black, Indigenous, People of Color ("BIPOC") population
of the County has increased from 27% in 2000 to 48% in 2020, and the Black population in the
County has increased from 20% to 32% over the same period.  Cooper Decl. at ¶ 26.  Between
2000 and 2020, the County's non-Hispanic White population declined by 20%. *Id.* at ¶ 27.  The
Black population increased over this same time period by 75.9%. *Id.*  And so, the total BIPOC
population (including Black, Latinx, Asian, and multi-racial populations) in the County increased
from 200,402 persons in 2000 to 411,272 persons in 2020, or by 105%. *Id.*

It is undisputed that the Black population in the County is concentrated in the western
side of the County, with some significant BIPOC population also located in the northeast on the
border with Baltimore City. *See id.* at ¶ 28; *see also* Def. Resp. at 5-6.  But, defendants argue

---

Declaration of Matthew A. Barreto; the 2nd Declaration of William S. Cooper; the Declaration of Cheryl
Pasteur; the Declaration of Senator Charles E. Sydnor III; and the Declaration of Charles M. Hill.

From defendants:  The County's 2021 Redistricting Plan and Population and Demographic Summary; a
letter from the Baltimore County Chapter of the NAACP, dated October 25, 2001; a map of Baltimore
County's 2002 Council Districts and a chart of the racial demographics of those districts; a letter from the
Pikesville-Greenspring Community Coalition, Inc., dated October 25, 2021; a letter from the Greater
Arbutus Business Association, dated December 15, 2021; a letter from Paula W. Wolf, dated December
14, 2021; the Declaration of James Gimpel; Redistricting Commission Meeting Minutes, dated August
24, 2021; the County's Redistricting Manual; the Declaration of Troy Williams, Chief Diversity and
Inclusion Officer for the County; the Declaration of Councilmember Tom Quirk; the Declaration of
Councilmember Izzy Patoka; and the Declaration of Councilmember Julian Jones.

During the evidentiary hearing held in this matter on February 15, 2022, the Court also heard testimony
from the following witnesses:  Matthew A. Barreto and James Gimpel.

that the most recent population growth among Black residents is concentrated in the eastern side of Baltimore County.[2]  Def. Resp. at 5.

### 2.    The Baltimore County Council Election System

The County is divided into seven single-member districts, which elect one County councilmember each.  *See* Cooper Decl. at ¶ 33.[3]  Before 2002, no Black candidate had been elected to the Baltimore County Council (the "Council").  Pl. Mot. Ex. C, Decl. of Anthony S. Fugett ("Fugett Decl.") at ¶ 9, ECF No. 28-4.  In 2002, the Council created District 4—a majority-Black district—and this District elected the first Black councilmember in County history in that year.  *Id.* at ¶¶ 18-19.  Since then, the voters in District 4 have elected a Black councilmember to represent them.  Compl. at ¶ 20.  The other six Districts in the County are majority-White districts, and the voters in these districts have elected only White councilmembers.  *See id.*

In his Declaration in support of the plaintiffs' motion for a preliminary injunction, political scientist Dr. Matthew Barreto opines that Black voters in the County have demonstrated "strong cohesion" in voting over a decade of elections.  *See* Pl. Mot. Ex. B, Decl. of Matthew A. Barreto ("Barreto Decl.") at ¶ 11, ECF No. 28-3.  In this regard, Dr. Barreto opines that his analysis of voting patterns in the County shows that White voters generally oppose the election of Black candidates and vote as a bloc against Black-preferred candidates.  *Id.*  Dr. Barreto also opines that high levels of White bloc voting has occurred in the County when White candidates run against the candidates whom Black voters cohesively support.  *Id.*  And so, plaintiffs

---

[2] Defendants argue that the Black population in the County has increased by "just 3.88%" between 2010 and 2020.  Def. Resp. at 5.  They also argue that the Black population in District 4 has increased by 1.76% since 2010.  *Id.* at 6.  Defendants also maintain that the Black population in District 1 decreased by 1.61% between 2010 and 2020.  *See id.*; *see also Report of Maryland Precinct Data*, 2020 Census, Md. Dep't of Planning (Sept. 2021), https://planning.maryland.gov/Redistricting/Documents/2020data/GreenReport.pdf; *Report of Maryland Precinct Data*, 2010 Census, Md. Dep't Of Planning (May 2011), https://planning.maryland.gov/Redistricting/Documents/2010data/GreenReport_web.pdf.

[3] Mr. Cooper has an extensive background in preparing election plains for Section 2 Voting Rights cases and he has prepared redistricting maps for approximately 750 jurisdictions in connection with Voting Rights Act litigation.  *See generally* Cooper Decl.

maintain that Black candidates who are the candidates of choice for Black County voters will lose elections in County districts that do not have a majority of Black voters.  Pl. Mem. at 18.

Anthony S. Fugett, a Black registered voter in the County and a plaintiff in this action, has also submitted a Declaration in support of plaintiffs' motion.  *See generally* Fugett Decl.  Mr. Fugett states that Black County voters have not been able to elect candidates of their choice in Council districts where the Black population is not the majority of the voting age population, due to differences in voter preferences among Black and White County voters.  *Id.* at ¶¶ 9-14, 16-17. In this regard, Mr. Fugett observes that numerous Black candidates have stepped forward to run in District 4, resulting in the uninterrupted election of Black councilmembers in that District since its creation.  *Id.* at ¶ 20.  But, he also observes that, on the single occasion when a Black candidate challenged a White candidate for County Council in the 1990 election, the White candidate won easily, with White voters voting as a bloc against Black County voters' candidate of choice.  *Id.* at ¶ 9.

### 3.   The County's 2021 Redistricting Plan

On December 20, 2021, the Council unanimously adopted Bill 103-21, the County's 2021 redistricting plan.  Compl. at ¶ 45.  The County's 2021 Redistricting Map is shown below:



Cooper Decl. at ¶ 39, Figure 7.

The County's plan preserves six districts in the County as majority-White districts and preserves the County's one majority-Black district, District 4.  Compl. at ¶ 45.  Before adopting

the redistricting plan, the Council received and considered proposals from plaintiffs for redistricting maps that would create a second majority-Black district in the County, as well as letters from members of the community opposing such a plan. *Id.* at ¶¶ 43-44. Two of plaintiffs' proposals for creating two majority-Black districts in the County are shown in the figures below:



**Plaintiffs' Proposed Map 1**



**Plaintiffs' Proposed Map 5**



Pl. Mem. at 10; *see also* Cooper Decl. at ¶ 46, Figure 8; ¶ 53, Figure 10. As shown, plaintiffs propose creating two majority-Black districts on the western side of the County, by fashioning a new majority-Black district and reconfiguring District 4. *See* Pl. Mem. at 10. Plaintiffs maintain that these two districts will ensure that Black County voters can elect their candidates of choice

to the Council.  *Id.* at 9.

By comparison, plaintiffs contend that the County's 2021 redistricting plan packs an excessively high share of Black County residents into District 4 and divides the County's other majority-Black communities among Districts 1, 2, and 4.  Cooper Decl. at ¶¶ 37-41.  Plaintiffs also contend that the County's redistricting plan results in District 4's voting age population being almost 75% Black, while no other County district's voting age population is more than 32% Black.  *Id.* at ¶¶ 38, 41.

In addition, plaintiffs argue that the County's plan consolidates the White voting age population in every other district, so that this population outnumbers the Black voting age population by at least 19 percentage points.  *Id.* at ¶ 41.  In this regard, plaintiffs observe that the County's plan unites the adjacent majority-White community of Pikesville (67.3 % White) into District 2.  *Id.*  And so, plaintiffs maintain that, by failing to create a second majority-Black district in the County, the Council has adopted a redistricting plan that is likely to elect at least six White candidates out of seven councilmembers, resulting in 85% of the Council seats being held by White-preferred candidates, although the County's population is 52% White.  Pl. Mem. at 8.

**B.    Procedural History**

Plaintiffs commenced this action on December 21, 2021.  *See* Compl.  On January 18, 2022, plaintiffs filed a motion for a preliminary injunction and a memorandum in support thereof.  *See* Pl. Mot.; Pl. Mem.

On January 31, 2022, defendants filed a response in opposition to plaintiffs' motion.  *See* Def. Resp.  On February 8, 2022, plaintiffs filed a reply in support of their motion for a preliminary injunction.  *See* Pl. Reply, ECF No. 39.

On February 15, 2022, the Court held an evidentiary hearing on plaintiffs' motion for a preliminary injunction, where it received testimony from several witnesses.  *See* Tr.

Plaintiffs' motion for a preliminary injunction having been fully briefed, the Court resolves the pending motion.

### III.    LEGAL STANDARDS

#### A.    Preliminary Injunction

A preliminary injunction is an "extraordinary remed[y] involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances." *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (citation omitted).  In determining whether to issue a preliminary injunction, the Court follows the test set forth by the Supreme Court in *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008), which requires a showing that:  (1) the movant is likely to succeed on the merits; (2) the movant is likely to suffer irreparable harm absent preliminary relief; (3) the balance of equities favors the movant; and (4) that an injunction is in the public interest.  *See Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020); *League of Women Voters of N.C. v. N.C.*, 769 F.3d 224, 236 (4th Cir. 2014).

The movant must show more than a "grave or serious question for litigation;" instead, the movant bears the "heavy burden" of making a "clear showing that [it] is likely to succeed at trial on the merits." *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir. 2009), *vacated*, 559 U.S. 1089 (2010); *Int'l Bhd. of Teamsters v. Airgas, Inc.*, 239 F. Supp. 3d 906, 912 (D. Md. 2017) ("Because a preliminary injunction is 'an extraordinary remedy,' it 'may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'") (quoting *Winter*, 555 U.S. at 22).  And so, the United States Court of Appeals for the Fourth Circuit has recognized that injunctive relief "is not granted as a matter of course" and "whether to grant the injunction still remains in the equitable discretion of the [district] court even when a plaintiff has made the requisite showing." *Bethesda Softworks, L.L.C. v. Interplay Entm't Corp.*, 452 F. App'x 351, 353 (4th Cir. 2011) (brackets in original) (internal citations omitted).

#### B.    Section 2 Of The Voting Rights Act

Section 2 of the Voting Rights Act prohibits any "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . ." 52 U.S.C. § 10301(a).  The Supreme Court has held that districts violate Section 2 when they "dilute the voting strength of politically cohesive minority group members, whether by fragmenting the minority voters among several districts where a bloc-voting majority can routinely outvote them, or by packing them into one or a small number of districts to minimize their influence in the districts next door." *Johnson v. De Grandy*, 512 U.S.

997, 1007 (1994).  And so, "Section 2 prohibits either sort of line-drawing where its result, interact[ing] with social and historical conditions, impairs the ability of a protected class to elect its candidate of choice on an equal basis with other voters."  *Id.*  (citations omitted).

To prevail in a Section 2 case, plaintiffs must show:  (1) the minority group is "sufficiently large and geographically compact to constitute a majority in a single-member district;" (2) the minority group "is politically cohesive;" and (3) "the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate."  *Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986).  If plaintiffs are successful in establishing the *Gingles* preconditions, the Court will also consider "the totality of the circumstances"—including the factors identified in the Senate Report accompanying the 1982 amendments to the Voting Rights Act—to determine whether, as a result of the districts, "the political processes leading to nomination or election in the State or political subdivision are not equally open to participation" by members of the minority group.  *Id.* at 36 (quoting 52 U.S.C. § 10301(b)).

Such factors include:  (1) whether there is a history in the state or political subdivision of official voting-related discrimination against the minority group; (2) the extent of racial polarization in the elections of the state or political subdivision; (3) the extent to which the state or political subdivision has used voting practices or procedures that enhanced the opportunity for discrimination against the minority group; (4) the exclusion of minority group members from the candidate slating processes; (5) the extent to which past discrimination in areas such as education, employment, and health hinder the ability of members of the minority group to participate effectively in the political processes; (6) the use of racial appeals in political campaigns; (7) the extent to which minority group members have been elected to public office in the relevant jurisdiction; (8) whether elected officials exhibit a significant lack of responsiveness to the particularized needs of minority group members; and (9) whether the policies offered to justify the challenged voting practice are tenuous.  *See Cane v. Worcester Cty.*, 35 F.3d 921, 925 (4th Cir. 1994) (citing *Gingles*, 478 U.S. at 44-45).

In addition, the Fourth Circuit has recognized that "Section 2 prohibits any election procedure which operates to deny to minorities an equal opportunity to elect those candidates whom they prefer, *whether or not those candidates are themselves of the minority race*."  *Lewis v. Alamance Cty.*, 99 F.3d 600, 606 (4th Cir. 1996) (emphasis in original).  Given this, the Fourth

Circuit has held that "both elections in which the candidates are of the same race and elections in which the candidates are of different races must be considered in order to determine whether white bloc voting usually defeats the minority-preferred candidate." *Id*. at 607. And so, the Court "must consider, at a minimum, a representative cross-section of elections, and not merely those in which a minority candidate appeared on the ballot," when assessing plaintiffs' showing under *Gingles* precondition three. *Id.* at 608.

## IV.  ANALYSIS

Plaintiffs have moved for a preliminary injunction enjoining the County from implementing its 2021 redistricting plan and requiring the County to adopt a map with two majority-Black districts. *See generally* Pl. Mot.; Pl. Mem. In this regard, plaintiffs argue that the County's redistricting plan dilutes the County's Black vote, in violation of Black County voters' fundamental right to vote. Pl. Mem. at 12-30. Plaintiffs also argue that they will suffer irreparable harm if the Court does not grant this injunctive relief, and that the balance of the equities and public interest weigh in favor of granting such relief in this case. *Id.* at 30-34.

Defendants counter that plaintiffs have failed to make the required showing under *Gingles* to support their claim that the 2021 redistricting plan violates Section 2 of the Voting Rights Act. *See* Def. Resp. at 7-8. Specifically, defendants argue that plaintiffs do not: (1) provide a compact alternative district that could accommodate a sufficiently large minority population; (2) show that Black voters in Districts 1 and 2 are politically cohesive; (3) show that racially-polarized voting exists in the County; or (4) demonstrate that the totality of the circumstances shows that the 2021 redistricting plan dilutes the Black vote in the County. *See id.* at 7-29. In addition, defendants argue that the balance of the equities and public interest weigh against granting the requested injunctive relief, because of the uncertainty that would result from enjoining the 2021 redistricting plan with regards to the County's 2022 election cycle. *Id.* at 29-31. And so, they request that the Court deny plaintiffs' motion. *Id.* at 31.

For the reasons that follow, plaintiffs have shown that they have a substantial likelihood of success on the merits of their Section 2 claim, because they can demonstrate that: (1) the group of Black County voters located on the western side of the County is sufficiently large and geographically compact to create more than one reasonably compact majority-Black district; (2) the group of Black County voters "is politically cohesive;" (3) the White majority in the County

votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidates; and (4) the totality of the circumstances, including the factors that the Supreme Court has instructed the Court to consider, show that Black County voters have less opportunity than White County voters to elect candidates of their choice to the Council.

In addition, plaintiffs have demonstrated that they will suffer irreparable harm in the absence of preliminary injunctive relief, and that the balance of the equities and the public interest weigh in favor of granting such extraordinary relief in this case. And so, the Court **GRANTS** plaintiffs' motion for a preliminary injunction.

### A.     Plaintiffs Have Shown A Substantial Likelihood Of Success On The Merits

To prevail in this Section 2 case, plaintiffs must establish three preconditions: (1) the minority group is "sufficiently large and geographically compact to constitute a majority in a single-member district;" (2) the minority group "is politically cohesive;" and (3) "the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 50-51. Once these *Gingles* "preconditions" are established, the Court will also consider "the totality of the circumstances"—including the factors identified in the Senate Report accompanying the 1982 amendments to the Voting Rights Act—to determine whether, as a result of the County's redistricting plan, "the political processes leading to nomination or election in the State or political subdivision are not equally open to participation" by members of the minority group. *Id.* at 36 (quoting 52 U.S.C. § 10301(b)).

At this preliminary stage, the Court need not resolve plaintiffs' Section 2 claim on the merits. But, plaintiffs must show, among other things, that they have a substantial likelihood of succeeding on the merits of their Section 2 claim, to obtain emergency injunctive relief. *Winter*, 555 U.S. at 20. Plaintiffs have met their burden.

### 1.     Plaintiffs Can Satisfy *Gingles* Precondition One

As an initial matter, plaintiffs have shown that they can satisfy *Gingles* precondition one—that the group of Black County voters located on the western side of the County is sufficiently large and geographically compact to create more than the existing number of districts with a sufficiently large minority population to elect candidates of its choice. *Gingles,* 478 U.S. at 50; *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 430 (2006). To satisfy this

precondition, plaintiffs must demonstrate that the Black County population "make[s] up more than 50 percent of the voting-age population in the relevant geographic area." *Bartlett v. Strickland*, 556 U.S. 1, 18 (2009).

They have done so. The parties agree that the Black population in the County, which is 32% of the total population, is sufficiently large to comprise more than 50% of the voting age population in two districts. Pl. Mem. at 8; Def. Resp. at 5, 9; *see also* Cooper Decl. at ¶¶ 25, 28.

Plaintiffs have also shown that the Black population on the County's western side is sufficiently geographically compact to create two majority-Black districts. *See* Def. Resp. at 11-12. In this regard, the Court looks to "traditional districting principles such as maintaining communities of interest and traditional boundaries," when considering the question of compactness. *Abrams v. Johnson*, 521 U.S. 74, 92 (1997) (citation omitted). The Court's inquiry "refers to the compactness of the minority population, not to the compactness of the contested district." *League of United Latin Am. Citizens*, 548 U.S. at 433. And so, the Court considers whether plaintiffs' proposals demonstrate that a geographically compact majority-Black district could be drawn in this case. *See Johnson*, 512 U.S. at 1024; *see also Houston v. Lafayette Cty., Miss.*, 56 F.3d 606, 611 (5th Cir. 1995) ("[T]he question is not whether the plaintiff residents' proposed district was oddly shaped, but whether the proposal demonstrated that a geographically compact district could be drawn.") (emphasis removed).

In his Declaration in support of plaintiffs' motion for a preliminary injunction, demographic and redistricting consultant William S. Cooper shows that two majority-Black districts can be drawn on the western side of the County. *See generally* Cooper Decl. Specifically, Mr. Cooper explains that the two proposals advanced by plaintiffs to create two majority-Black districts in the County fall within the normal range for assessing compactness and adhere to traditional districting principles. *See id.* at ¶¶ 61-65.

Notably, Mr. Cooper uses the Reock and Polsby-Popper measures, two generally-accepted measures, to show the geographic compactness of the proposed majority-Black districts. *Id.* at ¶ 61, Figure 12. This analysis finds that the "mean compactness scores" for the two proposed majority-Black districts are .36 and .33 and .39 and .37, respectively. *Id.* Given this, Mr. Cooper opines that the compactness scores for plaintiffs' proposals are "clearly within the normal range for compactness." *Id.* at ¶ 62. Defendants do not dispute this finding. *See* Def.

Resp. at 8-13 (not disputing that the mean compactness scores for plaintiffs' proposed majority-Black districts within the normal range for compactness). And so, the Court is satisfied that Mr. Cooper's analysis shows that the group of Black County voters is sufficiently geographically compact to create more than one majority-Black district in the County.

Defendants' arguments that plaintiffs cannot demonstrate compactness are also unpersuasive. First, defendants argue that plaintiffs fail to satisfy the first *Gingles* precondition, because the County's redistricting plan scores higher for compactness than plaintiffs' proposals. *See* Def. Resp. at 12; *see also* Decl. of James Gimpel ("Gimpel Decl.") at ¶¶ 8-11, ECF No. 34-7). Defendants correctly observe that Mr. Cooper's analysis found that the County's redistricting plan has mean compactness scores of .45 and .42, respectively, which are indeed higher than the compactness scores for plaintiffs' proposals. Def. Resp. at 10; *see also* Cooper Decl. at ¶ 61, Figure 12. But, the superiority of the County's compactness score is not the relevant inquiry. Rather, the proper question is whether plaintiffs' proposals fall within the normal range for compactness. *See Bush v. Vera*, 517 U.S. 952, 977-78 (1996). Because Mr. Cooper's analysis makes clear that they do so, defendants' argument lacks merit.

Defendants' argument that plaintiffs fail to satisfy the first *Gingles* precondition because the shape of the proposed majority-Black districts is "irregular" is equally unavailing. Def. Resp. at 10; Gimpel Decl. at ¶ 11. A careful review of plaintiffs' proposals makes clear that these proposals do not contain the signs of obvious gerrymandering that courts have found problematic in the past. *Cane v. Worcester Cty.*, 840 F. Supp. 1081, 1086-87 (D. Md. 1994), *aff'd*, 35 F.3d 921 (4th Cir. 1994). Notably, neither proposal includes "tentacle" like corridors that reach out across long distances to include communities that would otherwise fall in other districts. *See* Pl. Mem. at 10. And so, the district lines in plaintiffs' proposals are not "unreasonably irregular, bizarre or uncouth as to approach obvious gerrymandering." *See Cane*, 840 F. Supp. at 1087.

Defendants are, however, correct in noting that plaintiffs' proposed Plan 1 would split existing communities. Def. Resp. at 13; *see also* Pl. Reply at 10-11. But, defendants acknowledge that plaintiffs' proposed Plan 5 would not split any existing communities. *See* Pl. Reply at 11; *see also* Tr. At 19:05—19:07; Gimpel Decl. at ¶ 36.

Given this, plaintiffs have shown that they can establish that the Black population located on the western side of the County is sufficiently large and geographically compact to create two majority-Black districts.

### 2.    Plaintiffs Can Satisfy *Gingles* Precondition Two

Plaintiffs have also shown a substantial likelihood of success in demonstrating that the Black voting age population of the County is politically cohesive. *Gingles*, 478 U.S. at 51 (stating that the second precondition requires plaintiffs to demonstrate that the Black voters in the County are "politically cohesive").

Plaintiffs can satisfy this second *Gingles* precondition by "showing that a significant number of minority group members usually vote for the same candidates." *Id.* at 56. Plaintiffs persuasively argue that they can meet this standard here, by showing that racially-polarized voting occurs in the County.

Plaintiffs rely upon the Declaration of Dr. Matthew A. Barreto, a professor of political science and Chicano studies at the University of California, Los Angeles, who provides an ecological inference analysis of the County's election data from 2010 to 2020. *See* Pl. Mem. at 14-18; *see generally* Barreto Decl.; Barreto 2nd Decl., ECF No. 39-1. Dr. Barreto explains in his Declaration that an ecological inference analysis "take[s] ecological data in the aggregate—such as precinct vote totals and racial demographics—and use[s] . . . statistical methods to find voting patterns by regressing candidate choice against racial demographics within the aggregate precinct."[4] Barreto Decl. at ¶ 12.

The results of this analysis show that there is racially-polarized voting in the County—a finding that defendants do not persuasively dispute. *See id.* at ¶¶ 13-21; Def. Resp. at 17-23. Specifically, Dr. Barreto's analysis of the 2014 Maryland gubernatorial election and the 2016 Democratic Senate primary election shows that voting in the County is racially-polarized. *See* Barreto Decl. at ¶¶ 13-21.

---

[4] Courts have referred to ecological inference analysis as the "gold standard" for racially polarized voting analysis. *See Ala. State Conf. of NAACP v. Ala.*, No. 16-731, 2020 WL 583803, at *29 n.27 (M.D. Ala. Feb. 5, 2020) (citation omitted).

With regards to the 2014 gubernatorial election between Governor Larry Hogan (White) and Anthony Brown (Black), Dr. Barreto finds that "Whites and minorities voted in opposite directions in the 2014 gubernatorial election." *Id.* at ¶ 14.  Notably, his analysis shows that, as the percentage of White population increases in a given precinct, the support for Governor Hogan increases, while support for Mr. Brown similarly increases as the percentage of Black population increases in a precinct. *Id.* at Figure 1A.  Dr. Barreto's analysis also shows that this phenomenon of racially-polarized voting remains true when analyzing only the western portion of the County, where the Black population is concentrated.  *Id.* at Figure 1B.

Dr. Barreto's analysis of the 2016 Democratic primary election between then-Congressman Chris Van Hollen (White) and Congresswoman Donna Edwards (Black) offers similar results.  *Id.* at ¶ 18.  Dr. Barreto states that his analysis "shows a very clear pattern in which Black voters strongly preferred Edwards while White voters strongly preferred Van Hollen," and that this trend remains when isolating the western portion of the County.  *Id.*; *see also id.* at Figures 3A, 3B.

In addition, Dr. Barreto states that, when given the chance to vote for a Black candidate, Black County voters overwhelmingly support that candidate.  *Id.* at ¶ 20, Table 2.  The Supreme Court has recognized that such "[b]loc voting by [B]lacks tends to prove that the [B]lack community is politically cohesive," as "it shows that [B]lacks prefer certain candidates whom they could elect in a single-member, [B]lack majority district."  *Gingles*, 478 U.S. at 68.

Dr. Barreto's conclusions are also largely supported by defendants' expert, Dr. James Gimpel.  Dr. Gimpel does not dispute that the County has a history of racially-polarized voting.  *See* Gimpel Decl. at ¶ 15 ("[T]he County Council has been mindful of the fact that there has been sufficient racial bloc voting in the County's past.").  Nor does Dr. Gimpel dispute that the County's Black population generally supports Black candidates when they appear on the ballot, while the White population generally favors White candidates.  *Id.* at ¶ 20 ("To be sure, there is a tendency for Black populations to favor Black candidates and white populations to prefer white ones.").  Given this, the evidentiary record before the Court shows that plaintiffs can meet their burden to show that Black voters in the County are politically cohesive.

Defendants' arguments to the contrary are again unpersuasive.  Defendants argue that plaintiffs overly rely upon statewide elections to show political cohesion.  Def. Resp. at 16-17.

But, as plaintiffs correctly observe, there are very few countywide elections where a White candidate has run against a Black candidate.  Pl. Mem. at 18-19 (noting that there is a dearth of minority candidates running for local elections outside of District 4).  Given this, plaintiffs' reliance upon statewide election data is both understandable and appropriate.  *Cane*, 840 F. Supp. at 1089-90 (recognizing that the most probative evidence in Section 2 cases consists of elections in which a minority candidate appears on the ballot); *see also* Gimpel Decl. at ¶ 21 ("[N]o African American candidate has run for County Council in any district outside of District 4."); *Gingles*, 478 U.S. at 57 n.25 ("Where a minority group has never been able to sponsor a candidate, courts must rely on other factors that tend to prove unequal access to the electoral process."); *Cane*, 840 F. Supp. at 1089 ("When considering the limited number of endogenous elections, it is also appropriate to consider exogenous elections to prove racially polarized voting.").

Defendants' reliance upon the 2018 Democratic gubernatorial primary election to show that voting in the County is not racially polarized is also not persuasive.  Def. Resp. at 17 (arguing that Black voting is not cohesive because Mr. Jealous, who is Black, did not win the primary election by "overwhelming" margins).  It is undisputed that this primary election involved multiple minority candidates.  *Id.*; *see also* Pl. Reply at 12-14 (not disputing that the 2018 Democratic gubernatorial primary involved multiple minority candidates).  Given this, it is perhaps not surprising that no single Black candidate received an overwhelming majority of the Black vote during that primary.[5]

The results of the general election for the 2018 gubernatorial race, which involved a single Black candidate (Jealous) running against a White candidate (Hogan), also make clear that Black and White voters had different preferences in that election.  Mr. Jealous received approximately 70% of the vote in District 4, while he received approximately 42% and 45% of the vote in the two other County districts with a significant concentration of Black voters.  Pl. Reply at 17; *see also* Barreto 2nd Decl. at ¶¶ 13, 15.

---

[5] The election data for this election shows that the combined vote totals for Mr. Jealous and Mr. Baker, who are both Black, in the Majority-Black communities within Districts 1, 2 and 4 exceeded 58% of the vote for the 2018 Democratic gubernatorial primary.  *See* Def. PowerPoint at 14, ECF No. 52.

The election data provided by defendants for the 2014 Democratic gubernatorial primary election in Districts 1 and 2 similarly shows that Anthony Brown, who is Black, received a significantly higher percentage of the vote in the precincts in those districts with the highest concentration of Black voters, than in the Districts overall.  Gimpel Decl. at ¶ 25.   Defendants' election data also shows that, in the 2016 Senate Democratic primary, former Congresswoman Donna Edwards received a significantly higher percentage of the vote in the precincts in Districts 1 and 2 that had the highest concentration of Black voters, than in the Districts overall.  Def. PowerPoint at 22.

Given this evidence, plaintiffs have a substantial likelihood of meeting their burden under *Gingles* precondition two.

### 3.      Plaintiffs Can Satisfy *Gingles* Precondition Three

Plaintiffs have similarly shown a substantial likelihood of satisfying *Gingles* precondition three—that the White majority in the County votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate.  The Court's analysis here requires a review of the extent to which White voters "bloc vote" for candidates of their choice, and an assessment of whether this pattern has the effect of minimizing the opportunities of minorities to participate in the electoral process.  *Gingles*, 478 U.S. at 51.

Plaintiffs have shown that White bloc voting occurs to defeat Black candidates, when they appear on the ballot in the County.  In this regard, Dr. Barreto provides a statistical analysis of White and Black voters in the County as a whole, which shows that White voters, on average, give less than 15% of their vote to Black candidates.  Barreto Decl. at ¶ 20, Table 2.  For example, in the 2014 gubernatorial election, Mr. Brown, who is Black, won 94.3% of the Black vote and only 5.7% of the White vote, while Governor Hogan, who is White, won 85.7% of the White vote and only 5.7% of the Black vote.  *Id.*  This trend holds true for the 2018 gubernatorial election and the 2016 Democratic primary, with Mr. Jealous and Congresswoman Edwards (who are Black) winning 86.4% and 74.6% of the Black vote, respectively, while their White opponents, Governor Hogan and then-Congressman Van Hollen, won 86.9% and 92% of the White vote, respectively.  *Id.*

By comparison, Governor Hogan and then-Congressman Van Hollen won only 13.6% and 25.4% of the Black vote, respectively, in these elections.  *Id.*  Dr. Barreto explains that this

trend holds when isolating the vote in Districts 1, 2 and 4, where there are large numbers of Black voters. *See id.* at ¶ 21, Table 3 (showing that Brown, Jealous and Edwards received 97.3%, 85.7% and 74.4% of the Black vote, respectively, when limiting analysis to Districts 1, 2 and 4 only).

In addition, Dr. Barreto explains that, "[h]ad the districts been drawn as shown under plaintiffs' proposed [P]lan 1, Brown, Edwards, and Jealous would have won in the proposed Black-majority District 1 and continued to win in District 4," while all three candidates would lose in District 1 under the County's 2021 redistricting plan. Barreto 2nd. Decl. at ¶¶ 28-29. In addition, "[w]ith the districts drawn as proposed under [p]laintiffs' [proposed] Plan 5, Brown and Jealous would have won in the Black-majority District 2, while Edwards would vastly improve her chances of electoral success," while all three candidates continue to win in District 4. *Id.* at ¶¶ 28, 30. And so, Dr. Barreto concludes that his analysis shows that "drawing a second Black-majority district [in the County] would give Black voters the opportunity to elect their candidates of choice, in spite of significant White bloc-voting." *Id.* at ¶ 28.

Dr. Barreto's analysis is left essentially unrebutted by defendants. As discussed above, Dr. Gimpel does not dispute that the County has a history of racially polarized voting. *See* Gimpel Decl. at ¶ 15 ("[T]he County Council has been mindful of the fact that there has been sufficient racial bloc voting in the County's past . . . ."). Rather, defendants point to the 2018 election of Cheryl Pasteur, a Black candidate who ran against a White candidate for the County School Board in District 2, to "suggest[] that there is no pronounced racial polarization in County elections." *Id.* at ¶ 21. But, Ms. Pasteur states in her Declaration to the Court that her election to the County School Board was unique for several reasons: (1) her opponent did not fundraise or spend any money on his campaign; (2) her opponent did not participate in most of the candidate events; and (3) her opponent did not receive any endorsements in the race. *See generally* Decl. of Cheryl Pasteur ("Pasteur Decl."), ECF No. 39-3. And so, Ms. Pasteur's Declaration indicates that, while this election was technically contested, the White candidate did not mount a serious campaign. *Id.*

"Because loss of political power through vote dilution is distinct from the mere inability to win a particular election . . . [the Supreme Court has recognized that] a pattern of racial bloc voting that extends over a period of time is more probative of a claim that a district experiences

2a7c1cf1cf12f649

legally significant polarization than are the results of a single election." *Gingles*, 478 U.S. at 57. Given this, Ms. Pasteur's important, but singular, victory does not negate the significant evidence before the Court demonstrating racially-polarized voting in the County.

Lastly, it is important to recognize that the Court must also consider other elections in the County that do not include a Black candidate on the ballot. *See Lewis*, 99 F.3d at 608 (the Court must "consider, at a minimum, a representative cross-section of elections, and not merely those in which a minority candidate appeared on the ballot," when analyzing whether White bloc voting usually defeats the minority-preferred candidate). In this regard, defendants point to the elections of County councilmembers Tom Quirk and Izzy Patoka, who are White, in Districts 1 and 2, to show that these councilmembers have been preferred candidates for Black voters. Def. Resp. at 19-20. The Court agrees with defendants that the elections involving councilmembers Quirk and Patoka show that the Black County voters in these districts have voted for White candidates. But, these elections do not effectively rebut plaintiffs' argument that, *when* a Black candidate appears on the ballot, that candidate is preferred by the County's Black voters and that this candidate is usually defeated by White bloc voting.[6] *See* Barreto Decl. at ¶ 20, Table 2.

And so, plaintiffs have demonstrated a substantial likelihood of success in meeting their burden under *Gingles* precondition three.

### 4.    The Totality Of The Circumstances Show That Voting Will Not Be Equally Open To Participation By Black County Voters

Because the Court concludes that plaintiffs can satisfy all three *Gingles* preconditions, the Court next considers whether the totality of the circumstances supports a finding of a Section 2 violation in this case.

When considering the totality of the circumstances in connection with a Section 2 challenge, the Court examines the factors set forth in the Senate Judiciary Committee Report accompanying the legislation that amended Section 2, including the following factors:

(1)    whether there is a history in the state or political subdivision of

---

[6] During the February 15, 2022 hearing, defendants also cited the election of former Governor Martin O'Malley, as supportive of their argument that non-minority candidates are often the minority-preferred candidate. *See* Tr. at 48-15–48-19; *see also* Def. PowerPoint at 19. But, this election does not rebut plaintiffs' showing that Black candidates are defeated by White-bloc voting when they appear on the ballot. *See* Tr. At 48-15–48-19.

official voting-related discrimination against the minority group;

(2)     the extent of racial polarization in the elections of the state or
        political subdivision;

(3)     the extent to which the state or political subdivision has used voting
        practices or procedures that enhanced the opportunity for
        discrimination against the minority group;

(4)     the exclusion of minority group members from the candidate slating
        processes;

(5)     the extent to which past discrimination in areas such as education,
        employment, and health hinder the ability of members of the
        minority group to participate effectively in the political processes;

(6)     the use of racial appeals in political campaigns;

(7)     the extent to which minority group members have been elected to
        public office in the relevant jurisdiction;

(8)     whether elected officials exhibit a significant lack of responsiveness
        to the particularized needs of minority group members; and

(9)     whether the policies offered to justify the challenged voting practice
        are tenuous.

*See Cane*, 35 F.3d at 925  (citing *Gingles*, 478 U.S. at 44-45).  While each of these factors may be probative, no single factor or combination of factors is dispositive, nor exclusive.  *Id.*

        In this case, defendants persuasively argue that the policies offered by the County to justify its 2021 redistricting plan are not tenuous and that there is no recent evidence of the use of racial appeals in political campaigns in the County.  *See* Def. Resp. at 28-29.  Notably, the evidence before the Court shows that the County conducted its work to adopt the 2021 redistricting plan in a transparent manner.  *See id.*; *see also* Compl. at ¶ 27; Pl. Mem. at 8-9.  Plaintiffs also point to no recent examples where racial appeals have been used in a County election.  *See generally* Pl. Mem.; Pl. Reply.  Given this evidence, there can be no genuine dispute that the County does not exhibit the kind of racial animus that courts have highlighted in other Section 2 cases.  *See, e.g.*, *Caster v. Merrill*, No. 21-1536, 2022 WL 264819, at *33-34 (N.D. Ala. Jan. 24, 2022) (noting the racial appeals used in recent political campaigns in the State of Alabama).

Nonetheless, several other factors that the Court considers when assessing the totality of the circumstances weigh in favor of finding that a Section 2 violation has occurred in this case. As discussed above, the evidence before the Court establishes that a significantly high level of racially-polarized voting occurs in County elections.  It is also undisputed that no Black candidate has ever been elected to County-wide office and that no Black candidate had ever been elected to the County Council before 2002, when the County Council created District 4.  Pl. Mem. at 23; *see generally* Def. Resp.

In addition, while the County has made important strides to remedy past discrimination in housing, education, and employment, there can be no genuine dispute that past discrimination in these areas continues to hinder the ability of Black County voters to participate effectively in the political processes.[7]  The Declaration of Lawrence T. Brown, Ph.D., a community research scientist at the Center for Urban Health Equity at Morgan State University, explains that, while racial discrimination in housing in the County dates back to the 1950s, civil rights organizations have filed administrative actions against the County alleging extensive violations of, among other things, the Fair Housing Act, as recently as 2011.  *See* Pl. Mot. Ex. D, Decl. of Lawrence T. Brown ("Brown Decl.") at ¶¶ 2, 8-29.  Plaintiffs also provided compelling evidence that racial disparities in education and employment still exist in the County today.  Dr. Brown observes— and defendants do not dispute—that the County's school districts remain some of the most segregated in the State of Maryland.  *Id.* at ¶ 32; *see generally* Def. Resp.

Dr. Brown also describes a 2019 lawsuit brought by the United States Department of Justice against the County for racial discrimination in its employment practices, which resulted in a court-supervised agreement requiring the County to pay damages and to alter its hiring practices.  Brown Decl. at ¶ 36.  Defendants do not refute this evidence.  *See generally* Def.

---

[7] Defendants have submitted the Declaration of Troy Williams, the Chief Diversity and Inclusion Officer for the County, to show the County's "genuine efforts to diversify and become more inclusive in its executive leadership, hiring and employment, community education and engagement, legislation and policies, as well as housing and social services."  *See* Def. Resp. Ex. 10, Decl. of Troy Williams ("Williams Decl.") at ¶ 4, ECF No. 34-10.  Mr. Williams states that the County has undertaken efforts to address disparities in housing and social services, including establishing "programs to address the housing needs of low-income families such as the Housing Choice Voucher Program, the Veterans Affairs Supportive Housing Program, and the Family Self-Sufficiency Program."  *Id.* at ¶ 27.

Resp.

The Court is also mindful that "it will be only the very unusual case" in which plaintiffs can establish the existence of the three *Gingles* preconditions, as they do here, but will have failed to similarly establish a violation of Section 2 under the totality of the circumstances. *Georgia State Conf. of the NAACP*, 775 F.3d at 1342.  Given this, the Court concludes that the County's 2021 redistricting plan prevents Black County voters from having "an equal opportunity to participate in the political processes and to elect candidates of their choice." *Gingles*, 478 U.S. at 44 (quoting S. Rep. No. 97-417, at 28 (1982)).

### B.    The Equitable Considerations Weigh In Favor Of Granting Injunctive Relief

Having determined that plaintiffs have a substantial likelihood of success on the merits of their Section 2 claim, the Court next considers whether plaintiffs have shown that they will suffer irreparable harm absent the injunctive relief that they seek, and whether the balance of the equities and public interest weigh in favor of granting such relief.  *Winter*, 555 U.S. at 20. Again, plaintiffs have met their burden for several reasons.

First, plaintiffs have shown that they will be irreparably harmed by the implementation of the County's 2021 redistricting plan, because, as the Fourth Circuit has explained, "[c]ourts routinely deem restrictions on fundamental voting rights irreparable injury."  *League of Women Voters of N.C.*, 769 F.3d at 247.

Second, the balance of the equities and the public interest favor granting the preliminary injunctive relief that plaintiffs seek.  *See, e.g.*, *Roe*, 947 F.3d at 230 (noting that courts consider these factors together when the government is the party opposing injunctive relief).  As plaintiffs argue, any harm to the County resulting from the injunction of its redistricting plan could not be as significant as the harm caused by the dilution of the votes of Black County voters.  Pl. Mem. at 32.  Defendants understandably counter that granting injunctive relief in this case would undermine the public interest in conducting "orderly elections," because it could result in a "chaotic and disruptive effect upon the electoral process."  Def. Resp. at 30-31.  To be sure, there are circumstances in which the Court should allow an election to be held, even under a scheme that violates federal law, "such as where an impending election is imminent and a State's election machinery is already in progress."  *Reynolds v. Sims*, 377 U.S. 533, 585 (1964).  But, such circumstances are not present in this case.

The County's next primary election will not occur until June 28, 2022, more than four months from the date of this Memorandum Opinion and Order.  *See* Md. Code Ann., Elec. Law § 8-201.  The general election in the County will also not occur until November 8, 2022, more than eight months from now.  *See id.* at § 8-301.  And so, no election is imminent in this case. [8]  *See Reynolds*, 377 U.S. at 585 ("[O]nce a State's legislative apportionment scheme has been found to be unconstitutional, it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan.").

The County has ample time to revise its redistricting plan to comply with the Voting Rights Act.  This task will be made easier and less time-consuming, because plaintiffs have already provided two viable options for creating two majority-Black districts in the County.

The Court is also concerned that denying preliminary injunctive relief in this case, simply because an election is scheduled to be held in four months, would, in effect, foreclose any meaningful challenge to the County's redistricting plan until after the first election is held to the detriment of Black County voters.  Such an approach to this case would also provide the County an incentive to delay the adoption of its redistricting plans in the future, in the hopes of avoiding an immediate challenge under the Voting Rights Act.

## C.    Remedy

Given these considerations, the Court must consider as a final matter the appropriate remedy in this case.  Under the Voting Rights Act and Supreme Court precedent, the proper remedy is to create a County redistricting plan that includes either an additional majority-Black

---

[8] The Court is mindful of the Supreme Court's recent decision in *Merrill v. Milligan* to stay a preliminary injunction order issued by the United States District Court for the Northern District of Alabama in that Section 2 case, and Justice Kavanaugh's concurring opinion observing that *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam), mandates a stay of the lower court's injunction because of the close proximity in time to the election.  *See Merrill v. Milligan*, No. 21-1086, 2022 WL 354467, at *3 (U.S. Feb. 7, 2022) (J. Kavanaugh, concurring) ("In short, the *Purcell* principle requires that we stay the District Court's injunction with respect to the 2022 elections."); *see also Caster*, 2022 WL 264819, at *84.  The Court also observes that the Court of Appeals of Maryland has recently extended the deadline for certificates of candidacy for Maryland's 2022 primary election to March 22, 2022.  *See* Order, *In re 2022 Legislative Districting of the State*, Md. Misc. Nos. 21, 24, 25, 26, 27 (Md. Feb. 11, 2022), available at https://www.courts.state.md.us/sites/default/files/import/coappeals/highlightedcases/2022districting/20220211consolidationorder.pdf.

County District, or an additional County District in which Black voters otherwise have an opportunity to elect a representative of their choice. *See, e.g.*, *Bartlett*, 556 U.S. at 19-24 ; *Cooper v. Harris*, 137 S. Ct. 1455, 1470, 1472 (2017). Supreme Court precedent also dictates that the Council should have the first opportunity to draw such a plan. *See, e.g.*, *N.C. v. Covington*, 138 S. Ct. 2548, 2554-55 (2018); *White v. Weiser*, 412 U.S. 783, 794-95 (1973); *see also McGhee v. Granville Cty.,* 860 F.2d 110, 115 (4th Cir. 1988).

## V.    CONCLUSION

And so, for the foregoing reasons, the Court:

1.   **GRANTS** plaintiffs' motion for a preliminary injunction;

2.   **PRELIMINARILY ENJOINS** defendants from conducting future elections in the County under the County's 2021 redistricting plan;

3.   **DIRECTS** the County to adopt a redistricting map that either includes two reasonably compact majority-Black Districts for the election of County councilmembers, or an additional County District in which Black voters otherwise have an opportunity to elect a representative of their choice and that comports with the requirements of the Voting Rights Act, 52 U.S.C. § 10301, and any other relevant constitutional and statutory requirements, by **March 8, 2022**;

4.   **ORDERS** defendants to **FILE** the new redistricting map, on or before **March 8, 2022**.

In addition, the parties shall **FILE** a joint status report setting forth their respective views on how this matter should proceed, on or before **March 8, 2022**.

**IT IS SO ORDERED**.

s/ Lydia Kay Griggsby
LYDIA KAY GRIGGSBY
United States District Judge