IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | |
|---|---|
| BALTIMORE COUNTY BRANCH OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, *et al.*,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>BALTIMORE COUNTY, MARYLAND, *et al.*,<br><br>　　　　Defendants. | Civil Action No. 1:21-cv-03232-LKG |

**DEFENDANT BALTIMORE COUNTY'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR APPROVAL OF PROPOSED REDISTRICTING MAP <u>AND TO MODIFY PRELIMINARY INJUNCTION</u>**

Defendant Baltimore County, Maryland ("Baltimore County" or the "County"), in accordance with the Court's Memorandum Opinion and Order (ECF 55), hereby submits this Memorandum of Law in Support of its Motion for Approval of Proposed Redistricting Map and to Modify Preliminary Injunction, and for cause states:

**BACKGROUND**

**I.     The Proposed Redistricting Map**

In its February 22, 2022 Memorandum Opinion and Order, the Court granted the Plaintiffs' Motion for a Preliminary Injunction, preliminarily enjoining the County from conducting elections pursuant to its adopted redistricting map set forth in Bill 103-21, and directing the County to adopt and file a new redistricting map including either two reasonably compact majority-Black councilmanic Districts, or an additional County District in which Black voters otherwise have an opportunity to elect a representative of their choice and that comports with the requirements of the

1

Voting Rights Act, 52 U.S.C. § 10301, and any other relevant constitutional and statutory requirements.

In accordance with this directive, the seven members of the Baltimore County Council have prepared a new proposed redistricting map that strengthens District 2, which was already a coalition district, into a crossover or coalition district that enhances the chances of the Black voting age population electing its candidates of choice, including Black candidates of choice, while keeping District 4 as a "safe" majority-Black district.  *See* **Exhibit A**, Draft Redistricting Bill; **Exhibit B**, Proposed Redistricting Map; **Exhibit C**, Population Summary; **Exhibit D**, J. Jones Decl. ¶¶ 6-11.[2]

This new proposed redistricting map is the culmination of work by the Councilmanic Redistricting Commission and the Baltimore County Council, which began in March 2021, including the appointment of the five-member bipartisan Councilmanic Redistricting Commission, multiple public hearings, and review of written testimony by concerned citizens.  *See* County Council Redistricting Process Information, Baltimore County Legislative Branch, https://www.baltimorecountymd.gov/countycouncil/redistricting.html (last visited March 8, 2022).  Indeed, Council Chairman Julian E. Jones, Jr. conducted two town hall meetings and spoke to five community groups during the redistricting process outside of the Commission's proceedings.  (ECF 45-3 ¶ 6.)

As the attached new proposed redistricting map reflects and the Supplemental Declaration of Dr. James G. Gimpel ("Suppl. Gimpel Decl.") explains, the new District 2 would contain a

---

[2] In submitting a draft redistricting bill and new proposed redistricting map to the Court, the County does not concede that the redistricting plan set forth in Bill 103-21 violates Section 2 of the Voting Rights Act.  The County maintains that Black voters in Districts 1, 2, and 4 have the opportunity to elect representatives of their choice.

Black voting age population percentage of 41.2%.  **Exhibit E**, Suppl. Gimpel Decl. ¶ 11.  And the total minority voting age population percentage in the new District 2 would be 54.2% (see Table 2).  *Id.*  District 2 would therefore be a solid majority-minority district.

Along with enhancing District 2 as a crossover district in which Black voters will be able to elect their candidates of choice, including minority candidates preferred by the Black voting age population, the proposed redistricting map retains District 4 as a "safe" majority-Black district at 61%.  *Voinovich v. Quilter*, 507 U.S. 146, 154 (1993).

The proposed redistricting map also comports with traditional redistricting principles, including compactness and contiguity.  This map thus reflects the considered policy choices of the Council's seven members in seeking both to comply with the Court's Memorandum and Order to create an additional district that affords Black voters an "opportunity to elect a representative of their choice and that comports with the requirements of the Voting Rights Act, 52 U.S.C. § 10301, and any other relevant constitutional and statutory requirements" and otherwise carry out their legislative judgments as to how best to craft the councilmanic districts.

**II.**   **The County's Legislative Process**

To enact this redrawn map into law, the County must follow the procedures set forth by the County Charter and state law, as outlined in the Supplemental Declaration of Julian E. Jones, Jr.  **Exhibit D**, J. Jones Decl. ¶¶ 6-11.  Under the Baltimore County Charter, the Council can introduce the bill and the new redistricting map at one of its two regular Council Legislative Sessions each month, the next of which will be March 21, 2022.  *Id.* ¶ 6.  Bills typically proceed through a "monthly" legislative cycle--meaning, for example, that if a bill is introduced at the first Monday Legislative Session in one month, the bill is voted on the first Monday Legislative Session of the following month.  *Id.*  One week before the vote, the Council will hold a committee meeting, known as the Work Session, on the Tuesday before the scheduled Legislative Session vote.  *Id.*

Although the Council normally meets on the first and third Monday of each month to introduce and pass legislation, under Section 208(e) of the Baltimore County Charter, the Baltimore County Council "may be called into emergency session for the purpose of enacting legislation either by the county executive or by a majority plus one of the total number of county council members established by this Charter, provided, however, that before any bill shall be passed at such an emergency session, it shall require the affirmative vote of a majority plus one of the total number of county council members established by this Charter." *Id*. ¶ 7 (citing Baltimore County Charter § 208(e)).  Five Councilmembers could thus call an emergency session to enact the bill instead of waiting for one of its usual legislative sessions.

Section 308(e) of the Charter requires publication of the bill for two successive weeks for public comment and input before the Baltimore County Council may vote on it. *Id*. ¶ 9.  This requirement is modeled after Article XI-A, Section 3 of the Maryland Constitution. *See Schaeffer v. Anne Arundel County, et al.*, 338 Md. 75 (1995) (requiring 14 days between the first published notice and the date of the meeting in which final approval occurs).  The Baltimore County Charter requires five (5) votes in favor of a bill in order for it to become law. *Id*. ¶ 9.

For the purpose of setting the bill's effective date, the Baltimore County Council may declare the bill an emergency measure under Section 308(f) of the Charter, in which case the bill, following passage by the Council, can be effective as soon as the date of enactment (which is the date it is signed by the County Executive). *Id*. ¶ 11.

## **ARGUMENT**

The Court should approve Baltimore County's proposed redistricting map and modify the Preliminary Injunction to both allow the County to follow its legislative process according to the

rules set out above and reflect that the County may conduct its upcoming elections under the draft redistricting bill and new proposed redistricting map.

**I.     The County's New Proposed Redistricting Map Is Entitled To Deference.**

"Where, as here, a court has properly given the appropriate legislative body the first opportunity to devise an acceptable remedial plan, the court's ensuing review and remedial powers are largely dictated by the legislative body's response." *McGhee v. Granville Cty., N.C.*, 860 F.2d 110, 115 (4th Cir. 1988).  If the new proposed redistricting map meets the standards of the Voting Rights Act, the "reviewing court must then accord great deference to legislative judgments about the exact nature and scope of the proposed remedy, reflecting as it will a variety of political judgments about the dynamics of an overall electoral process that rightly pertain to the legislative prerogative of the state and its subdivisions." *Id.*; *see also United States v. Vill. of Port Chester*, 704 F. Supp. 2d 411, 453 (S.D.N.Y. 2010) (explaining that a Court must defer to the defendant's remedial plan and evaluate only whether it is legally acceptable); *United States v. Euclid City Sch. Bd.*, 632 F. Supp. 2d 740, 750 (N.D. Ohio 2009) ("When evaluating a defendant's proposal, a court is not to inquire whether the defendants have proposed the very best available remedy, or even whether the defendants have proposed an appealing one."); *Goosby v. Town Bd. of Town of Hempstead, N.Y.*, 981 F. Supp. 751, 755 (E.D.N.Y. 1997), *aff'd*, 180 F.3d 476 (2d Cir. 1999) (a legislative plan is one that reflects the considered policy choices and legislative judgment of a body and warrants greater deference than a judicial plan).

The County's new proposed redistricting map, which reflects the considered policy choices of the Council and its seven members, comports with the Court's directives and the Voting Rights Act.  The Court should also modify the Preliminary Injunction to require that elections be conducted according to the remedial map going forward.  *See J.O.P. v. U.S. Dep't of Homeland*

*Sec.*, 338 F.R.D. 33, 58 (D. Md. 2020) ("[A] district court retains the power to reconsider and modify its interlocutory judgments at any time before final judgment."); *see also* Fed. R. Civ. P. 54(b).

II. **The New Proposed Redistricting Map Comports With The Voting Rights Act Because It Strengthens District 2 As A Crossover Or Coalition District While Maintaining A "Safe" District 4.**

The Supreme Court has held that Section 2 "allows States to choose their own method of complying with the Voting Rights Act, and [the Court has said] that may include drawing crossover districts." *Bartlett v. Strickland*, 556 U.S. 1, 23 (2009) (citing *Georgia v. Ashcroft*, 539 U.S. 461, 480-83 (2003)). Indeed, even the dissent in *Bartlett* agreed with this point:

> [A] crossover district is better [than a numerical majority-minority district]. Recognizing crossover districts has the value of giving States greater flexibility to draw districting plans with a fair number of minority-opportunity districts, and this in turn allows for a beneficent reduction in the number of majority-minority districts with their "quintessentially race-conscious calculus" . . . ***A crossover is thus superior to a majority-minority district precisely because it requires polarized factions to break out of the mold and form the coalitions that discourage racial divisions***.

*Bartlett*, 556 U.S. at 31 (emphasis added) (Souter, J., dissenting).

The Court ordered the County to create a new map with a second district that will give Black voters "an opportunity to elect a representative of their choice and that comports with the requirements of the Voting Rights Act, 52 U.S.C. § 10301." ECF 55 at 23. The new proposed redistricting map does exactly that. Under the new proposed redistricting map, District 2, which was already a crossover district, will function as an even stronger one in which members of the majority help a 'large enough' minority to elect its candidate of choice." *Cooper v. Harris*, 137 S. Ct. 1455, 1470 (2017); *see also id.* at 1472 (a legislature need not create a majority-Black district "if a crossover district would also allow the minority group to elect its favored candidates"); *Johnson v. De Grandy*, 512 U.S. 997, 1020 (1994) ("[T]here are communities in which minority

citizens are able to form coalitions with voters from other racial and ethnic groups, having no need to be a majority within a single district in order to elect candidates of their choice.").

Indeed, the majority of voters in the redrawn District 2 will be minorities and 41.2% will be Black. **Exhibit E**, Suppl. Gimpel Decl. ¶ 18.  This percentage is much higher than the total percentage of Black voters in the entire County, which is currently 28.62%. *See De Grandy*, 512 U.S. at 1013 (districts drawn "in substantial proportion to the minority's share of voting-age population" weigh against finding of vote dilution). White voters will only constitute 45.9% of the District's voting age population even though they represent 55.12% of the County's total voting age population.  **Exhibit E**, Suppl. Gimpel Decl. at 10, Table 2.

Given these changes, the substantial Black voting age population in District 2 would be able to elect its candidates of choice, including Black candidates of choice, with crossover support from other minority voters, as well as from white, primarily Jewish, Democrats. *Id.* ¶ 18.  Indeed, Black candidates have recently been elected to state assembly seats in districts with Black populations as low as 21% (District 12, Delegate Terri L. Hill) and 30% (District 8, Delegate Carl W. Jackson), and in adjacent Howard County, 26% (District 13, Delegate Frank Turner retired in 2018 after 24 years). *Id.*  The Black population in the redrawn District 2 far exceeds these numbers. *Id.*  And the non-Black minority population alone would enable the Black voting age population to elect its candidates of choice by giving minority voters a significant majority in District 2. *Id.* White voters, especially the many Democrats in the District, would also cross over to support Black-preferred candidates, *id.*, as they did for former school board member Cheryl Pasteur.

The new proposed redistricting map accomplishes this aim while also preserving Black voting strength in District 4, which was designated as a super-majority Black district following the 1990 census at the urging of the very same Plaintiffs here.  *See United Jewish Orgs. of*

*Williamsburgh, Inc. v. Carey*, 430 U.S. 144, 164 (1977) (explaining that a substantial nonwhite population majority in the vicinity of 65% would be required to achieve a nonwhite majority of eligible voters); *Ketchum v. Byrne*, 740 F.2d 1398, 1408 n.7 (7th Cir. 1984) (explaining that 65%–70% is the percentage considered necessary to ensure a Black super-majority district); *cf. Thornburg v. Gingles*, 478 U.S. 30, 46 n. 11 (1986) (explaining that vote dilution "may be caused by the dispersal of blacks into districts in which they constitute an ineffective minority of voters").

It is evident from Plaintiffs' Status Report filed today that they will not accept anything less than a second majority-Black district. But the Court's Memorandum and Order clearly authorized the County to create a crossover district. *See* ECF 55 at 23. And Plaintiffs' insistence on creating a numerical majority-Black district simply because the numbers permit it risks creating an Equal Protection violation by requiring the County to maximize majority-Black districts at the expense of all other considerations. *See De Grandy*, 512 U.S. at 1016-17 ("[R]eading § 2 to define dilution as any failure to maximize tends to obscure the very object of the statute and to run counter to its textually stated purpose . . . Failure to maximize cannot be the measure of § 2" because doing so may lead to impermissible race-based redistricting); *Shaw v. Hunt*, 517 U.S. 899, 904 (1996) ("The constitutional wrong occurs when race becomes the 'dominant and controlling' consideration. This is true whether or not the reason for the racial classification is benign or the purpose remedial."); *Miller v. Johnson*, 515 U.S. 900, 925 (1995) ("In utilizing § 5 to require States to create majority-minority districts wherever possible, the Department of Justice expanded its authority under the statute beyond what Congress intended and we have upheld."). Similarly misplaced is Plaintiffs' insistence that only elections in which Black candidates run are probative in the Section 2 analysis. *See Lewis v. Alamance Cty., N.C.*, 99 F.3d 600, (4th Cir. 1996) (to

assume that only Black candidates can be Black-preferred candidates is to engage in "invidious discrimination of the kind the Voting Rights Act was enacted to eradicate").

The new proposed redistricting map balances the tension between the Equal Protection concerns set forth in *Shaw* and *Miller* on the one hand, and the creation of a District 2 with a majority-minority voting population and sufficient Black voting population to create a crossover district on the other hand. At the same time, the new proposed redistricting map maintains the Black voting strength in District 4.

**III.     The New Proposed Redistricting Map Comports With The Voting Rights Act Because It Adheres To Traditional Redistricting Principles.**

The new proposed redistricting map maintains traditional redistricting principles and follows the mandates of the Baltimore County Charter, such as providing equality of population between districts, compactness, contiguity, and due regard for existing community boundaries.

The new proposed redistricting map would bring population deviation well below the 10 percent threshold courts usually enforce as a standard for state and local government districts. **Exhibit E**, Suppl. Gimpel Decl. ¶ 8. District 2 would have a deviation of 3.7% and District 4 would have a deviation of 1.9%. *Id.* Additionally, the new proposed redistricting map has similar compactness scores to the original map. *Id.* ¶ 25.

The new proposed redistricting map also reflects the need to preserve neighborhoods and localities. *Id.* ¶ 22. The number of split precincts would be held to just six, and the number of split census places would be reduced to twelve. *Id.* Catonsville and Arbutus would remain together in District 1, which Plaintiffs' have proposed splitting in NAACP-proposed Map 1. *Id.* And in all instances where communities and precincts are divided, it is along natural geographic lines and well-defined landmarks. *Id.*

Lastly, the new proposed redistricting map's core retention, or the carryover of constituents from the 2010 map to the new map, would average 82 percent. *Id.* ¶ 23. District 2 would maintain an estimated 82% of its previous constituents and District 4 would maintain 84% of its previous constituents. *Id.* The remaining districts would remain largely consistent with the retention figures they would have had under the original map. *Id.*

The new proposed redistricting map thus complies with all applicable requirements and reflects the Council's legislative judgment as to how best to redraw the map. The Court should approve it.

## CONCLUSION

WHEREFORE, for these reasons, the Court should grant the County's Motion and issue an Order:

1. Approving the new proposed redistricting map;

2. Extending the deadline for the Council to adopt a final redistricting plan since Section 207(c) of the Baltimore County Charter required the Council to do so by January 31, 2022, and that date has now passed;

3. Modifying the Preliminary Injunction to allow the Council to follow the requirements of the Baltimore County Charter to pass the Draft Redistricting Bill, thus allowing the new proposed redistricting map to be enacted into law; and

4. Further modifying the Preliminary Injunction to allow the County to conduct the 2022 election cycle and those following it pursuant to the passed redistricting bill.

[*signatures on following page*]

Dated: March 8, 2022	Respectfully submitted,

/s/ *Ava E. Lias-Booker*
Ava E. Lias-Booker (Fed. Bar No. 05022)
Melissa O. Martinez (Fed. Bar No. 28975)
MCGUIREWOODS LLP
500 E. Pratt Street, Suite 1000
Baltimore, Maryland 21202-3169
(410) 659-4400
(410) 659-4599 Fax
alias-booker@mcguirewoods.com
mmartinez@mcguirewoods.com

Kathryn M. Barber (Admitted Pro Hac Vice)
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219-3916
(804) 775-1000
(804) 775-1061 Fax
kbarber@mcguirewoods.com

*Counsel for Defendant Baltimore County, Maryland*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 8th day of March, 2022, a copy of the foregoing Motion for Approval of Proposed Redistricting Map and to Modify Preliminary Injunction, Memorandum of Law in Support, accompanying Exhibits, and Proposed Order were served via the Court's CM/ECF system upon all counsel of record.

                                                  */s/ Melissa O. Martinez*
                                                  Melissa O. Martinez