UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
(Northern Division)

| | |
|---|---|
| BALTIMORE COUNTY BRANCH OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>BALTIMORE COUNTY, MARYLAND, *et al.*,<br><br>Defendants. | Civil Action No. LKG-21-03232 |

**PLAINTIFFS' STATUS REPORT PURSUANT TO ECF 59**

Pursuant to the Court's March 9, 2022, Order directing Plaintiffs to file "a status report stating their views on whether the County's proposed map complies with Section 2 of the Voting Rights Act" (ECF 59), Plaintiffs explain below why the County's new proposed map fails to comply with Section 2 for many of the same reasons as the enjoined map. In particular, the proposed map includes neither "two reasonably compact majority-Black Districts" nor "an additional County District in which Black voters otherwise have an opportunity to elect a representative of their choice . . ." as required by the Court's February 22, 2022, Order. ECF 55.

The proposed map indisputably fails to include two majority-Black districts: Not only do Black voters comprise a minority of the newly-drawn District 2, they do not even comprise a *plurality*. As discussed in the Declaration of William Cooper (Ex. A), District 2's white citizen voting age population is 52.1% while the Black citizen voting age population is 41.7%. And as discussed below and in the attached expert analysis of Matthew Barreto (Ex. B), the proposed map still fails to remedy the deprivation of Black citizens' right to have "an equal opportunity to

participate in the political processes and to elect candidates of their choice." *Thornburg v. Gingles*, 478 U.S. 30, 44 (1986) (quoting S. Rep. No. 97-417, at 28 (1982)).

**I.    THE COUNTY'S NEW MAP UNLAWFULLY DILUTES THE BLACK VOTE**

    **A.    Binding and long-standing Section 2 law should be applied to the new map in the same manner as it was applied to the enjoined map.**

    1.    The legal standards under Section 2 are undisputed and were applied by the Court in its February 22, 2022, Memorandum Opinion and Order:

> To prevail in a Section 2 case, plaintiffs must show: (1) the minority group is "sufficiently large and geographically compact to constitute a majority in a single-member district;" (2) the minority group "is politically cohesive;" and (3) "the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986). If plaintiffs are successful in establishing the *Gingles* preconditions, the Court will also consider "the totality of the circumstances"—including the factors identified in the Senate Report accompanying the 1982 amendments to the Voting Rights Act—to determine whether, as a result of the districts, "the political processes leading to nomination or election in the State or political subdivision are not equally open to participation" by members of the minority group. *Id.* at 36 (quoting 52 U.S.C. § 10301(b)).

ECF 55 at 8.

    2.    The Court found Plaintiffs had shown a strong likelihood of success on the merits when measured against these standards:

> [P]laintiffs have shown that they have a substantial likelihood of success on the merits of their Section 2 claim, because they can demonstrate that: (1) the group of Black County voters located on the western side of the County is sufficiently large and geographically compact to create more than one reasonably compact majority-Black district; (2) the group of Black County voters "is politically cohesive;" (3) the White majority in the County votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidates; and (4) the totality of the circumstances, including the factors that the Supreme Court has instructed the Court to consider, show that Black County voters have less opportunity than White County voters to elect candidates of their choice to the Council.

*Id.* at 9-10.

    3.    The County's latest proposed redistricting map fails this Section 2 analysis for the same reasons as its prior map. Measured against the same standards and in light of the same

evidence, the County's new proposed map again fails to overcome Plaintiffs' proof of vote dilution through the three *Gingles* preconditions. In particular:

- Nothing about the newly proposed map has changed the County's demographics or voting history.
- Black voters in Baltimore County are sufficiently large and geographically compact to constitute a majority in ***two*** single-member districts. *See* ECF 55 at 10-13.
- Black voters are politically cohesive in the County. *Id* at 13-16.
- Data confirm that white-bloc voting in the County is routinely effective in defeating minority preferred candidates. *Id.* at 16-18.
- The "totality of the circumstances" in Baltimore County also have not changed. *Id.* at 18-21.

4.  The County's proposed map continues to "pack" a large number of Black voters into a single district (District 4), which now would be 64.1% Black in voting-age population, and 66.0% Black in general population. Cooper Decl. ¶ 4. The remaining six districts retain a majority of white citizen voting age population. *Id.* and Ex. 1 thereto. And the County's proposed map achieves this result by continuing to "crack" majority-Black communities, including Woodlawn, Milford Mill, Randallstown, and Owings Mills. Cooper Decl. ¶ 5. Thus, on the identical basis articulated in the Court's prior decision, the County's latest councilmanic map (once again limited to a single majority-Black district) violates Section 2.

**B.  The County's new map does not present Black voters with a fair and realistic opportunity to elect candidates of their choice.**

5.  With its proposed map, the County has asserted that it can comply with Section 2 by increasing the Black citizen voting age population in District 2 from 31.2% to 41.7%, and by reducing the white citizen voting age population from 55.5% to 52.1%. Cooper Decl. ¶ 2. This amounts to making the violation of Section 2 a little less egregious but not curing it, then asking the Court to overlook the violation because it's not as bad as the violation originally proposed. There is no legal authority for such an approach.

3

6. The County presents no statistical or other analysis that the newly configured District 2 will present Black voters with "an opportunity to elect a representative of their choice." In particular, the County has not presented any performance data demonstrating that the new district would allow Black voters in the district to successfully form coalitions to successfully elect candidates of their choice. To the contrary, the racial polarization and white-bloc voting that exists in Baltimore County indicates that even a marginal numerical advantage of eligible white voters over Black voters would allow white-bloc voting to defeat Black-preferred candidates in District 2. Even if this were not so, however, it is not enough to look at demographics alone, particularly when assessing the fairness of a non-majority Black district. Careful, expert analysis must explore whether the County's new plan *performs* for Black voters, *i.e.*, whether the amalgamation of precincts rearranged into District 2 will vote to elect Black voters' candidates of choice.[1]

7. Plaintiffs' expert Dr. Barreto conducted a performance analysis of the newly proposed District 2 by taking the shapefiles of the new map, extracting the demographic and voting history, and running an analysis to see how the new districts would perform (*i.e.*, how they would vote) across the elections featuring Black candidates of choice. Here is a summary of his findings:

---

[1] Dr. Gimpel's report includes no such analysis. Ignoring the Court's findings with respect to the illegality of the County's prior map, it concludes, without presenting any statistical analysis or other evidence, that District 2 "would become an even stronger crossover or coalition district in which Black voters could elect their candidates of choice, including Black candidates, with crossover support from both other minority voters and White voters." ECF 57-6 ¶ 3.

**Table 1: Performance analysis of elections with Black-preferred candidates**

|  | D1 | D2 | D4 |
|---|---|---|---|
| Hogan | 55.0% | 45.0% | 32.5% |
| Brown | 42.4% | 53.3% | 65.8% |
|  |  |  |  |
| Van Hollen | 51.6% | 57.2% | 36.9% |
| Edwards | 39.4% | 37.4% | 57.0% |
|  |  |  |  |
| Hogan | 54.6% | 50.2% | 36.3% |
| Jealous | 44.1% | 49.0% | 62.7% |

Barreto Decl. at ¶ 7 .

8. As the data establishes, the new proposed District 2 is not "an additional County District in which Black voters otherwise have an opportunity to elect a representative of their choice." As explained by Dr. Barreto's previous analysis and testimony, Black voters overwhelmingly preferred Anthony Brown over Larry Hogan, Donna Edwards over Chris Van Hollen, and Ben Jealous over Larry Hogan. But as currently configured under the County's new proposed map, only Mr. Brown would have won in District 2. White bloc voting would have prevented Black voters from electing their candidate of choice in two of those three elections.

9. Plaintiffs do not deny that elections under the new proposed plan would be more competitive than under the County's initial, enjoined plan, because some Black voters were shifted from District 4 to District 2. But that is not enough. The data show that Black voters would still frequently be denied the opportunity to elect a representative of their choice, sometimes badly. *See Gingles*, 478 U.S. at 76 ("The relative lack of minority electoral success under a challenged plan, when compared with the success that would be predicted under the measure of undiluted

minority voting strength the court is employing, can constitute powerful evidence of vote dilution"). In other words, the County went from an egregious plan, where the County's white population (52% of the total County population) controlled 86% of council districts, to a slightly less egregious plan where the same white population still controls 86% of council districts.

10. Contrary to Baltimore County's argument (ECF 57-1 at 8-9), Plaintiffs properly emphasize the three elections featuring Black candidates as especially probative in the Section 2 analysis. *Lewis* did not reject reliance on Black-white elections in determining whether a proposed election district would perform for Black voters. In that case, the Fourth Circuit criticized the district court for refusing even to consider white vs. white elections, but it found that mistake to be harmless error and affirmed the district court's findings. *Lewis v. Alamance County, N.C.*, 99 F.3d 600, 606 (4th Cir. 1996). Here, both Plaintiffs and the Court considered elections involving only white candidates,[2] but, as Dr. Barreto testified, Black-white elections are more probative in assessing whether *Gingles* preconditions 2 and 3 have been met.[3]

### C. The County's "crossover" district is not new, nor does it cure the Section 2 violation.

11. The County argues that it complies with this Court's order "to create an additional district that affords Black voters an 'opportunity to elect a representative of their choice….'" ECF

---

[2] *See* Barreto Reply Decl., ECF 39-1 ¶¶ 15-17 & Fig. 1 (showing strong racial polarization in voting even in white v. white elections); ECF 53 at 29 (slide of Plaintiffs' preliminary injunction hearing presentation showing strong racial polarization in voting even in white v. white elections).

[3] Dr. Barreto's approach is consistent with how courts weigh relative value of Black-white and white-white elections, following the Supreme Court's lead in *Gingles*. *See, e.g., U.S. v. Charleston County, S.C.,* 365 F.3d 341, 350 (4th Cir. 2004) (recognizing that election contests between Black and white candidates are most probative of racially polarized voting); *LULAC v. Clements,* 999 F.2d 831, 864 (5th Cir. 1993) ("This court has consistently held that elections between white candidates are generally less probative in examining the success of minority-preferred candidates, generally on grounds that such elections do not provide minority voters with the choice of a minority candidate.") (collecting cases).

57-1 at 3. It bears emphasis that the County concedes that District 2, which it proposes as a crossover district, "was already a crossover district" in its earlier district map. ECF 57-1 at 6. The earlier map did not comply with the Voting Rights Act; the minor changes the County has proposed to District 2 do not bring it into compliance. Moreover, the County's argument as to the permissibility of crossover districts distorts and misapplies the law. Here, the County's proposed crossover district is not an acceptable or legal alternative to a second majority-Black council district under the circumstances present in this case.

12. While the Supreme Court has recognized that, in some settings, legislatures may employ crossover districts without a majority-minority population in order to improve the prospects that minority voters can elect candidates of their choice, that approach is valid only where the third *Gingles* precondition is not established, *i.e., where white-bloc voting does not work to defeat Black candidates*. Thus, the Supreme Court has explained that, while a crossover district might be used to address concerns like those to which Section 2 responds, the issue is whether there is a demonstration of "effective white-bloc voting." *Cooper v. Harris*, 137 S. Ct. 1455, 1472 (2017). If not, then the third *Gingles* precondition will not be established "and so 'majority-minority districts would not be required,'" and a crossover district could suffice. *Id.* The Court in *Cooper* thus found that racial considerations in district line drawing did not withstand strict scrutiny because the legislature made a legally incorrect assumption that a majority-minority district was required where there was no evidence of "effective white-bloc voting" in districts created without race-based considerations (i.e., districts that were not majority-minority). *Id.*

13. Here, however, this Court recognized that "Plaintiffs have similarly shown a substantial likelihood of satisfying *Gingles* precondition three—that the White majority in the County votes sufficiently as a bloc to enable it usually to defeat the minority's preferred

candidate." ECF 55 at 16. The Court reviewed Plaintiffs' evidence in detail, noting that it was "essentially unrebutted by defendants." *Id.* at 17. Under these circumstances, Section 2 compliance cannot be achieved merely by minor adjustments to district lines that purport to increase the potential viability of one district as a "crossover" district where white and Black voters could potentially join forces to elect Black-preferred candidates.

14. To support its position, the County misreads and misapplies a number of Supreme Court decisions, most importantly the decision in *Bartlett v. Strickland*, 556 U.S. 1 (2009). In *Strickland*, the question was whether a proposed district could be treated as "effectively" a majority-minority district, for purposes of applying the first *Gingles* precondition, by combining less than a majority of Black voters with white voters who could be persuaded to cross over and join with them to elect the minority population's candidate of choice. The Court rejected that argument, ruling that Section 2 is not designed to promote district line drawing "for the purposes of forging an advantageous political alliance." *Id.* at 14-15 (quoting *Hall v. Virginia*, 385 F.3d 421, 431 (4th Cir 2004)). *Strickland*'s **exclusive** holding is that Section 2 cannot be invoked to require creation of a crossover district. The Supreme Court has **never** held that a Section 2 violation can be cured by using racially-based district line drawing to create a crossover district.

15. The County's argument turns the teachings of *Strickland* on their head. There, the Court warned *against* trying to assess whether racial considerations could be used to design a crossover district where minority voters would have sufficient white voter support to elect their preferred candidates. The Court viewed such an undertaking as not only problematic in terms of predicting electoral outcomes, but contrary to Constitutional limits on race-based districting. Those limits are overcome under the Voting Rights Act's straightforward demographic assessment

of the minority population's size and compactness. It was just such concerns that led the Court to reject any requirement for crossover districts under Section 2:

> We find support for the majority-minority requirement in the need for workable standards and sound judicial and legislative administration. The rule draws clear lines for courts and legislatures alike. The same cannot be said of a less exacting standard that would mandate crossover districts under § 2. Determining whether a § 2 claim would lie —*i.e.,* determining whether potential districts could function as crossover districts—would place courts in the untenable position of predicting many political variables and tying them to race-based assumptions. The Judiciary would be directed to make predictions or adopt premises that even experienced polling analysts and political experts could not assess with certainty, particularly over the long term. For example, courts would be required to pursue these inquiries: What percentage of white voters supported minority-preferred candidates in the past? How reliable would the crossover votes be in future elections? What types of candidates have white and minority voters supported together in the past and will those trends continue? Were past crossover votes based on incumbency and did that depend on race? What are the historical turnout rates among white and minority voters and will they stay the same? Those questions are speculative, and the answers (if they could be supposed) would prove elusive. A requirement to draw election districts on answers to these and like inquiries ought not to be inferred from the text or purpose of § 2. Though courts are capable of making refined and exacting factual inquiries, they "are inherently ill-equipped" to "make decisions based on highly political judgments" of the sort that crossover-district claims would require. *Holder,* 512 U.S., at 894, 114 S.Ct. 2581 THOMAS, J., concurring in judgment). There is an underlying principle of fundamental importance: We must be most cautious before interpreting a statute to require courts to make inquiries based on racial classifications and race-based predictions. The statutory mandate petitioners urge us to find in § 2 raises serious constitutional questions.

556 U.S. at 17.

16. Identical considerations dictate that the County's proposed crossover district be rejected as a remedy for the County's initial enactment of a redistricting plan that violated the Voting Rights Act. The County's arguments (based on nothing more than Dr. Gimpel's data-free speculation) that its modifications to the racial make-up of District 2 will provide Black voters sufficient electoral opportunity, provided they can attract enough crossover white voters, has no grounding in the Voting Rights Act's text or the precedents interpreting it. Read correctly, Supreme Court precedent establishes that a second majority-Black district is the appropriate cure

to the Section 2 violation here, in light of demonstrated white-bloc voting patterns in the County that satisfy the third *Gingles* precondition.[4]

17.    The County notably quotes from the *dissenting* opinion in *Strickland*, but this Court's February 22 Opinion and Order instead cited Justice Thomas' more instructive concurrence.[5] The guidance from that opinion does not indicate that a new or improved crossover district will cure the Section 2 issues here.  To the contrary, Justice Thomas observed that "[t]he special significance, in the democratic process, of a majority means ***it is a special wrong when a minority group has 50 percent or more of the voting population and could constitute a compact voting majority but, despite racially polarized bloc voting, that group is not put into a district***." *Id.* at 19 (emphasis added).  Although the County correctly quotes his observation that crossover districts can coexist with Section 2 (ECF 57-1 at 6), the County omits the most critical limitation on this practice in the Section 2 context:

> States that wish to draw crossover districts are free to do so **where no other prohibition exists**. Majority-minority districts are only **required** if all three *Gingles* factors are met and if § 2 applies based on a totality of the circumstances. In areas with substantial crossover voting it is unlikely that the plaintiffs would be able to establish the third *Gingles* precondition—bloc voting by majority voters. In those areas majority-minority districts would not be required in the first place; and in the exercise of lawful discretion States could draw crossover districts as they deemed appropriate.

---

[4]    The County also cites *Voinovich v. Quilter*, 507 U.S. 146, 154 (1993) as endorsing the "safe" majority-Black district 4.  ECF 57-1 at 3.  While that case surely recognizes that majority-Black districts are appropriate in response to Section 2 claims, the Supreme Court has noted that "in *Voinovich,* the Court stated that the first *Gingles* requirement 'would have to be modified or eliminated' to allow crossover-district claims." 556 U.S. at 15 (quoting *Voinovich,* 507 U.S., at 158.)

[5]    The County claims that the February 22 Opinion and Order "clearly authorized the County to create a crossover district."  ECF 57-1 at 8.  Actually, the Court merely cited to and quoted from Supreme Court precedents, none of which stand for the proposition that a crossover district will overcome a Section 2 violation.

555 U.S. at 24 (emphasis added). As this Court has found, the evidence here demonstrates that all three *Gingles* factors (including the third precondition) are met and Section 2 applies based on a totality of the circumstances, making a second majority-Black district the appropriate remedy.

18. In Baltimore County, the evidence establishes that the third *Gingles* precondition is satisfied, i.e., that white-bloc voting precludes a mere crossover district as an effective means to comply with Section 2. Indeed, the County contends that District 2, which it proposes as a crossover district to cure Section 2 concerns, "was already a crossover district" in its earlier district map. ECF 57-1 at 6. The County's approach of simply making it a "better" crossover district does not eliminate the Section 2 violation.

### D. Requiring a second majority-Black district does not implicate the Equal Protection Clause.

19. The County's suggestion that requiring a second majority-Black council district raises Equal Protection concerns similarly distorts controlling precedent. The County cites *Johnson v. De Grandy*, 512 U.S. 997 (1994), as warning against reading Section 2 as requiring the "maximum" possible number of majority-Black districts, but that is not what Plaintiffs advocate (nor what this Court directed). Instead, the issue here is whether, applying the *Gingles* criteria, a second majority-Black district is necessary to avoid a Section 2 violation. A second such district would be proportional to the county's Black population, which the *De Grandy* decision recognized as an appropriate consideration when assessing minority vote dilution. 512 U.S. at 1000, 1014-15.[6]

---

[6] Similarly unavailing are the County's references to *Shaw v. Hunt*, 517 U.S. 899 (1996), and *Miller v. Johnson*, 515 U.S. 900 (1995), with allusions to constitutional Equal Protection concerns about racial considerations when drawing district lines. ECF 57-1 at 8. Voting Rights Act compliance has been long recognized as a sufficiently compelling interest to permit racial considerations when defining legislative voting districts, provided legal requirements are followed. *See e.g. Bush v. Vera,* 517 U.S. 952, 977 (1996) (compliance with VRA Section 2 considered a compelling state interest overcoming equal protection concerns).

**E.    The new map does not get a free pass because it is the County's second bite at the apple or because it has delayed curing its Section 2 violation.**

20.    This Court has found a likely violation. The proposed remedy has to actually cure the violation. If it does not cure the violation, then it is not an adequate remedy, and should be rejected.

21.    In *McGhee v. Granville Cnty., N.C.*, the Fourth Circuit considered what to do when a legislative body was given an opportunity to devise an acceptable remedial plan:

> If the legislative body fails to respond or responds with a legally unacceptable remedy, "the responsibility falls on the District Court," *Chapman v. Meier*, 420 U.S. 1, 27, 95 S.Ct. 751, 766, 42 L.Ed.2d 766 (1975) (reapportionment case) to exercise its discretion in fashioning a "near optimal" plan. *Seastrunk v. Burns*, 772 F.2d 143, 151 (5th Cir.1985) (same).

860 F.2d 110, 115 (4th Cir. 1988). The path here is clear: the County has presented a legally unacceptable remedy and this Court should exercise its discretion to adopt a plan that fully remedies the violation.

22.    As has been clear for *months*, and as demonstrated by Plaintiffs' proposed alternative maps 1 and 5, it is not difficult to draw a map that includes either "two reasonably compact majority-Black Districts" or "an additional County District in which Black voters otherwise have an opportunity to elect a representative of their choice." Now, with the assistance of their nationally renowned expert in demography, Plaintiffs are introducing an additional alternative that complies with the Voting Rights Act *and* accounts for the boundaries in the County's proposed new map. Cooper Decl. ¶ 7. By taking the County's new map and shifting a few precincts between Districts 4 and 2, this slightly revised version of the County's proposal demonstrates how readily the County could comply with the Voting Rights Act while still maintaining some discretion over how the boundaries are drawn. (It took Mr. Cooper an afternoon to complete Plaintiffs' new proposed alternative.) Given the County's legally unacceptable

12

remedial plan, "the responsibility falls on the District Court to exercise its discretion in fashioning a near-optimal plan." *McGhee*, 860 F.2d at 115 (cleaned up). Plaintiffs have provided multiple examples to assist the Court in that responsibility.

23. Finally, Baltimore County's pleas about how the Court must immediately act to accept its plan contrasts with its unhurried response to the Court's preliminary injunction. If Baltimore County wanted more time for its county council to effectuate whatever procedural steps it must, the new proposed map would not have been filed at the literal eleventh hour. The County provides no explanation for why the new proposed map, and the data and shapefiles necessary to analyze it, could not have been provided earlier. Yet, Baltimore County waited until 11:00 pm on the evening of March 8, 2022, to submit its new proposed map despite having had it available well in advance. Given this conduct, the County cannot equitably claim that the Court has no choice but to disregard the proper analysis under the Voting Rights Act because an emergency legislative session must be initiated immediately to adopt another illegal map. Plaintiffs do not want any disruption to the election deadlines currently in place; that is why we proposed alternative maps during the pre-suit redistricting process, filed suit the day after the now-enjoined map was adopted, filed a motion for preliminary injunction the afternoon leave was granted, and conducted expert analysis on the barely-improved new map within 36 hours of its filing. If timing is an issue, then it is a product of Baltimore County's dilatory tactics, which seem calculated to foreclose judicial review of its unlawful redistricting.

## II.  THE COURT SHOULD ORDER THAT THE UPCOMING COUNCILMANIC ELECTION BE CONDUCTED UNDER PLAINTIFFS' PROPOSED PLAN 1, PLAN 5, OR THE PLAN SUBMITTED WITH THIS STATUS REPORT

24. As the Court knows, March 22 is the deadline for candidates to file to run in the June 28, 2022, primary election. To give candidates time to determine whether they wish to run in

the districts established for this election, a final map should be in place by March 15 (unless the County moves the filing date).

25. Accordingly, this Court has the responsibility to fashion a new map that complies with the Voting Rights Act. *See McGhee v. Granville Cnty.*, 860 F.2d 110, 115 (4th Cir. 1988), supra at ¶ 21. In order that the 2022 County Council election may be conducted under a map that complies with the Voting Rights Act, the Court should order that either Plaintiffs' Plan 1, Plan 5, or the plan submitted with this status report, or such other map as the Court deems appropriate, be used by the County for the 2022 election.

Respectfully submitted,

/s/ *Deborah A. Jeon*
Deborah A. Jeon (Bar #06905)
Tierney Peprah (Bar # 21986)
AMERICAN CIVIL LIBERTIES UNION OF MARYLAND
Clipper Mill Road Suite 350
Baltimore, MD  21211
(410) 889-8555
jeon@aclu-md.org

/s/ *Andrew D. Freeman*
Andrew D. Freeman (Bar #03867)
BROWN GOLDSTEIN & LEVY LLP
120 E. Baltimore Street, Suite 2500
Baltimore, MD  21202-6701
(410) 962-1030
adf@browngold.com

/s/ *John A. Freedman*
John A. Freedman (Bar #20276)
Mark D. Colley (Bar #16281)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave, N.W.3600
Washington, D.C.  20001
(202) 942-5000
john.freedman@arnoldporter.com

Michael Mazzullo (pro hac vice pending)
ARNOLD & PORTER KAYE SCHOLER LLP
250 W. 55th Street
New York, NY 10019
(212) 836-8000
michael.mazzullo@arnoldporter.com

*Counsel for Plaintiffs*

Dated: March 10, 2022