**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

|   |   |
|---|---|
| BALTIMORE COUNTY BRANCH OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, *et al.*,<br><br>    Plaintiffs,<br><br>v.<br><br>BALTIMORE COUNTY, MARYLAND, *et al.*,<br><br>    Defendants. | Civil Action No. 21-cv-03232-LKG<br><br>Dated:  March 25, 2022 |

**MEMORANDUM OPINION AND
ORDER APPROVING REDISTRICTING MAP AND GRANTING
DEFENDANTS' MOTION TO MODIFY PRELIMINARY INJUNCTION**

**I.    INTRODUCTION**

This case involves a challenge to Baltimore County's 2021 redistricting plan brought by Black citizens of Baltimore County ("the County") and several civil rights organizations, pursuant to Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.  *See generally* Compl., ECF No. 1.

On March 8, 2022, the County submitted a proposed redistricting map (the "County Map"), pursuant to the Court's February 22, 2022, Memorandum Opinion and Order directing the County to adopt and to file, by March 8, 2022, "a redistricting map that either includes two reasonably compact majority-Black Districts for the election of County councilmembers, or an additional County District in which Black voters otherwise have an opportunity to elect a representative of their choice and that comports with the requirements of the Voting Rights Act, 52 U.S.C. § 10301, and any other relevant constitutional and statutory requirements."  *See* Def. Mot. Ex. B, ECF No. 57-3; *see also* Feb. 22, 2022, Mem. Op. and Order, ECF No. 55.  The County has moved for the Court to approve the County Map and to modify the preliminary injunction entered in this case to allow the Baltimore County Council to enact the County Map

into law and to allow the County to conduct future elections pursuant to the County Map. *See* Def. Mot., ECF No. 57; Def. Mem., ECF No. 57-1.

Plaintiffs object to the County Map and they propose an alternative redistricting map (the "Alternative Map"). *See* Pl. Status Report, ECF No. 60; Cooper Decl. Ex. 2B (the "Cooper Map"), ECF No. 60-1. On March 17, 2022, the parties submitted supplemental briefs on the issue of whether the County Map and the Alternative Map provide an additional County District in which Black voters otherwise have an opportunity to elect a representative of their choice and that comports with the requirements of the Voting Rights Act and any other relevant constitutional and statutory requirements. *See* Def. Supp. Br., ECF No. 67; Pl. Supp. Br., ECF No. 68. The parties have also submitted several declarations and other evidence regarding the two proposed redistricting maps.[1]

The Court held an evidentiary hearing on this matter on March 21, 2022. On March 24, 2022, the Court issued an oral ruling on the County's motion and now issues a written opinion consistent with that oral ruling. For the reasons that follow, the Court: (1) **APPROVES** the County Map and (2) **GRANTS** the County's motion for approval of the proposed redistricting map and to modify the preliminary injunction.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background

A detailed factual background for this Voting Rights Act case can be found in the Court's February 22, 2022, Memorandum Opinion and Order. *See* Feb. 22, 2022, Mem. Op. and Order

---

[1] The Court has received the following evidence regarding the County Map and the Alternative Map: From defendants—Declaration of Julian E. Jones, Jr., Chairman of the Baltimore County Council ("Jones Decl."), ECF No. 57-5; Supplemental Declaration of Dr. James G. Gimpel ("Supp. Gimpel Decl."), ECF No. 57-6; Second Declaration of Julian E. Jones, Jr. ("2d Jones Decl."), ECF No. 67-1; Second Supplemental Declaration of Dr. James G. Gimpel ("2d Supp. Gimpel Decl."), ECF No. 72-1; Supplemental Declaration of Councilmember Izzy Patoka ("Supp. Patoka Decl."), ECF No. 74-1; Third Supplemental Declaration of Dr. James G. Gimpel ("3d Supp. Gimpel Decl."), ECF No. 74-2. From plaintiffs—Third Declaration of William S. Cooper ("3d Cooper Decl."), ECF No. 60-1; Third Declaration of Dr. Matt Barreto ("3d Barreto Decl."), ECF No. 60-2; Fourth Declaration of William S. Cooper ("4th Cooper Decl."), ECF No. 68-1; Fourth Declaration of Dr. Matt Barreto ("4th Barreto Decl."), ECF No. 68-2; Fifth Declaration of Dr. Matt Barreto ("5th Barreto Decl."), ECF No. 75-1. In addition, the Court heard testimony from the following witnesses during the March 21, 2022, evidentiary hearing: Dr. James G. Gimpel; Julian E. Jones, Jr.; William S. Cooper; Dr. Matt Barreto; Senator Charles E. Sydnor III. ECF No. 73.

at 2-6.  Relevant here, on February 22, 2022, the Court enjoined the County's 2021 redistricting plan, pursuant to Section 2 of the Voting Rights Act and Fed. R. Civ. P. 65, and directed the County to adopt and to file a redistricting map that either includes two reasonably compact majority-Black Districts for the election of County councilmembers, or an additional County district in which Black voters otherwise have an opportunity to elect a representative of their choice and that otherwise comports with the requirements of the Voting Rights Act and any other relevant constitutional and statutory requirements.  *Id.* at 23.

On March 8, 2022, the County submitted a proposed redistricting map pursuant to the Court's February 22, 2022, Memorandum Opinion and Order.  *See* Def. Mot. Ex. B.  As shown below, the County Map reconfigures District 2 to contain a Black voting age population of 41.2%; a total minority voting age population of 54.2%; and a White voting age population of 45.9%, while maintaining District 4 as a majority-Black District.  Def. Mem. at 3, 7; *see also* Supp. Gimpel Decl. at ¶ 18.



The County states that its new redistricting map is the culmination of work by the Baltimore County Councilmanic Redistricting Commission and the Baltimore County Council, which began in March 2021, and included the appointment of the five-member bipartisan Councilmanic Redistricting Commission, multiple public hearings, and a review of written testimony by concerned citizens.  *See* Def. Mem. at 2-4; *see also* Jones Decl.; *County Council Redistricting Process Information*, Baltimore County Legislative Branch, available at https://www.baltimorecountymd.gov/countycouncil/redistricting.html (last visited Mar. 22, 2022).

The County argues that the proposed new District 2 contained in the County Map would be "a stronger crossover district," as well as a coalition district, and that the County Map "also removes any threat of a white bloc voting that may defeat Black voters' candidates of choice." Def. Supp. Br. at 3. In this regard, the County argues that Black County voters in District 2 "will be further bolstered by increased cross-over voting." *Id.* In addition, the County contends that the proposed redistricting map retains District 4 as a "safe" majority-Black district—where Black County voters will make up 61% of the voting age population in that district—and that the remedial map comports with traditional redistricting principles. *Id.* at 3-4, 16-17. And so, the County argues that the County Map "reflects the considered policy choices of the Council's seven members in seeking both to comply with the Court's Order to create an additional district that affords Black voters an 'opportunity to elect a representative of their choice and that comports with the requirements of the Voting Rights Act.'" *Id.* at 4 (citation omitted).

Plaintiffs object to the County Map and they argue, among other things, that the County Map fails to remedy the Section 2 violation in this case, because it does not provide Black County voters with a meaningful opportunity to elect candidates of their choice. *See* Pl. Supp. Br. at 5-18. And so, they request that the Court reject the County Map and keep the preliminary injunction in this case in place, and they also propose an alternative redistricting map. *Id.* at 18-23; *see also* 3d Cooper Decl.; 3d Barreto Decl. As shown below, plaintiffs' Alternative Map reconfigures District 2 to have a Black voting age population of 53.77% and reconfigures District 4 to have a 53.18% Black voting age population. *See* Pl. Supp. Br. at 18; 3d Cooper Decl. Ex. 2C.[2] And so, plaintiffs' Alternative Map would create a second majority-Black district on the western side of the County. *See* Cooper Map; *see also* 3d Cooper Decl. at ¶ 7.

---

[2] Plaintiffs' Alternative Map retains the County Map's proposed Districts 1, 5, 6, and 7, and shifts one precinct out of District 3. 3d Cooper Decl. at ¶ 7.

4



### III. STANDARDS OF DECISION

In *McGhee v. Granville County, N.C.*, the United States Court of Appeals for the Fourth Circuit addressed "the controlling principles respecting judicial review of legislative plans submitted, in obedience to court decrees, to remedy judicially established violations of § 2 of the Voting Rights Act."  860 F.2d 110, 115 (4th Cir. 1988).  Pursuant to these principles, when the Court has "properly given the appropriate legislative body the first opportunity to devise an acceptable remedial plan, . . . the [C]ourt's ensuing review and remedial powers are largely dictated by the legislative body's response."  *Id.* (citation omitted).

If the legislative body fails to respond, or responds with a legally unacceptable remedy, "the responsibility falls on the District Court" to exercise its discretion in fashioning a "near optimal" plan.  *Id.* (quoting *Chapman v. Meier*, 420 U.S. 1, 27 (1975) (reapportionment case); *Seastrunk v. Burns*, 772 F.2d 143, 151 (5th Cir. 1985) (same)).  But, if the legislative body does respond with a proposed remedy, the Court may not substitute its judgment regarding a more equitable remedy for that of the legislative body.  *Id.*

Rather, the Court "may only consider whether the proffered remedial plan is legally unacceptable because it violates anew constitutional or statutory voting rights—that is, whether it fails to meet the same standards applicable to an original challenge of a legislative plan in place." *Id.* (citing *Upham v. Seamon*, 456 U.S. 37, 42 (1982)).  And so, if the remedial plan meets the standards under the Voting Rights Act, the Court must "accord great deference to legislative judgments about the exact nature and scope of the proposed remedy . . . ."  *Id.* (recognizing that a legislative remedy reflects a variety of political judgments about the dynamics of an overall electoral process that rightly pertain to the legislative prerogative of the state and its subdivisions); *see also N.C. v. Covington*, 138 S. Ct. 2548, 2554-55 (2018) (legislative body

should have the first opportunity to draw a remedial redistricting plan); *White v. Weiser*, 412 U.S. 783, 794-95 (1973).

## IV.   ANALYSIS

Applying the above principles to this case, the Court is satisfied that the County's proposed remedial plan meets the relevant standards and complies with Section 2 of the Voting Rights Act.  And so, for the reasons discussed below, the Court:  (1) APPROVES the County Map and (2) GRANTS the County's motion for approval of its proposed redistricting map and to modify the preliminary injunction.

As an initial matter, it is important to recognize that the Court's review of the County's remedial redistricting plan is limited to determining whether the County Map is legally acceptable—that is, whether the map violates the Voting Rights Act.  *See McGhee*, 860 F.2d at 115.  And so, if the County can show that the County Map complies with the Voting Rights Act, and other relevant constitutional and statutory requirements, the Court may not substitute its judgment for that of the Baltimore County Council to fashion another remedy in this case.  *Id.*

The County has made such a showing here for several reasons.

First, the County has shown that the County Map creates an additional County district in which Black voters otherwise have an opportunity to elect a representative of their choice, because the County Map increases the percentage of Black County voters in District 2.  Under the County's proposed remedial plan, a reconfigured District 2 will increase the Black voting age population in that district to 41.2%, and also increase the total minority voting age population in District 2 to 54.2%, thereby making District 2 a majority-minority district.[3]  *See* Def. Mem. at 7; Supp. Gimpel Decl. at ¶ 18.  And so, the Black voting age population in District 2 will increase by approximately 10%, when compared to the County's  2021 redistricting plan.  *Compare* Def. Mem. at 7, and Supp. Gimpel Decl. at ¶ 18 (showing that the Black voting age population in the proposed District 2 will be 41.2%), *with* Pl. Mot. Prelim. Inj. Ex. A at Figure 6, ECF No. 28-2 (showing that the Black voting age population in the prior District 2 was 31.18%).

---

[3] The parties disagree about whether voting age population or citizen voting age population data should be used to analyze the County Map.  *See* Def. Supp. Br. at 9-14; Pl. Supp. Br. at 8-9.

Second, the County has shown that there will be sufficient cross-over voting by White County voters in District 2, to allow the Black County voters in this district to elect their candidates of choice. A cross-over district is a district in which "the minority population, at least potentially, is large enough to elect the candidate of its choice with help from voters who are members of the majority and who cross over to support the minority's preferred candidate." *Bartlett v. Strickland*, 556 U.S. 1, 13 (2009) (citation omitted). During the evidentiary hearing held in this matter on March 21, 2022, the County argued that the demographics for District 2 include a significant White Jewish population that has historically voted with the Black County voters in that district to elect their shared candidates of choice. *See, e.g.*, Mar. 21, 2022, Hr'g Tr. at 16:16-18, 19:2-5, 20:17-22.[4] For example, the County points to the Declaration of Baltimore County Councilman Izzy Patoka, in which he states that his 2018 election as the councilmember for District 2 shows that the Black and Jewish communities located in District 2 "typically vote in tandem for like-minded candidates." *See* Supp. Patoka Decl. at ¶ 16.

The evidence before the Court supports Councilmember Patoka's views and shows that he was the candidate of choice by an overwhelming margin in the five precincts within District 2 that have the highest percentage of Black voters (Old Court Middle Cafeteria (west), Winand, Sudbrook, Old Court Middle Cafeteria (east), and Milbrook Elementary), as well as the candidate of choice for White voters in District 2 (North Oaks Retirement Community, Pikesville Middle (former Armory), Pikesville Middle Cafeteria, Pikesville High Cafeteria, Summit Park Elem Cafeteria (north), Summit Park Elem Gym (south), Fort Garrison Elem MP Room (south), Woodholme Elem Gym (east), Fort Garrison Elem MP Room (north), Woodholme Elem Rec (west), and Har Sinai Social Hall). *Id.* at ¶¶ 11, 14-15 (showing that Councilmember Patoka was elected by between 86% and 95% of the Black vote, while also carrying the precincts that contain the highest percentage of Jewish voters with between 58% and 80% of the vote); *see also* 3d Supp. Gimpel Decl. at ¶ 5. And so, this evidence lends credence to the County's argument that cross-over voting by White Jewish voters will work to allow Black-preferred candidates to win in District 2.

---

[4] The citations to the March 21, 2022, evidentiary hearing transcript are to the uncertified transcript of that proceeding.

The evidence before the Court regarding the 2014 election of District 2 Councilmember Vicki Almond (White) and 2018 election of Cheryl Pasteur (Black) also indicate that at least some cross-over voting occurs within District 2. Dr. Gimpel opines in his Third Supplemental Declaration that Councilmember Almond and Ms. Pasteur were the preferred candidates in the precincts within District 2 that have the highest percentages of Black voters (Old Court Middle Cafeteria (west), Winand, Sudbrook, Old Court Middle Cafeteria (east), and Milbrook Elementary), while also winning sufficient votes in the precincts in District 2 that have the highest percentages of Jewish voters (North Oaks Retirement Community, Pikesville Armory Drill Floor, Pikesville Middle Cafeteria, Pikesville High Cafeteria, Summit Park Elem Cafeteria (north), Summit Park Elem Gym (south), Fort Garrison Elem MP Room (south), Woodholme Elem Gym (east), Fort Garrison Elem MP Room (north), Woodholme Elem Rec (west), and Har Sinai Social Hall). 3d Supp. Gimpel Decl. at ¶¶ 7, 9-10. Dr. Gimpel explains that Councilmember Almond won her election with 67.3% of the vote and that she carried 26 out of 35 precincts—the same number of precincts that Councilmember Patoka carried in 2018. *Id.* at ¶¶ 4-5. Dr. Gimpel also explains that Ms. Pasteur won her election with 66.1% of the vote and that she carried 35 out of 35 precincts in District 2.[5] *Id.* at ¶ 6. And so, this evidence also supports the County's argument that White voters in District 2 will often join with Black voters in that district to elect Black-preferred candidates.

The performance analysis conducted by plaintiff's expert, Dr. Mathew Barreto, also suggests that the County's proposed District 2 can perform for Black County voters. In his performance analysis of District 2, Dr. Barreto analyzes the 2014 gubernatorial election between Governor Larry Hogan (White) and Anthony Brown (Black); the 2016 Democratic Senate primary election between then-Congressman Chris Van Hollen (White) and Congresswoman Donna Edwards (Black); and the 2018 gubernatorial election between Governor Hogan (White) and Ben Jealous (Black). *See* 3d Barreto Decl. at ¶ 8, Table 1; *see also* Def. Supp. Br. at 15. This performance analysis finds that, under the County Map, Mr. Brown would have won the proposed District 2 by a 53% to 45% margin, again, indicating that cross-over voting would

---

[5] While the evidence shows that cross-over voting occurred during the Pasteur election, the Court previously found that Ms. Pasteur's election was "unique," because her White opponent "did not mount a serious campaign." *See* Feb. 22, 2022, Mem. Op. and Order at 17; *see also* Decl. of Cheryl Pasteur, ECF No. 39-3.

occur in this district. *See* 3d Barreto Decl. at ¶ 8, Table 1. Dr. Barreto's performance analysis also shows that, while Congresswoman Edwards and Mr. Jealous would still lose their elections in the proposed District 2, both candidates would increase their overall vote percentages by approximately 10 percentage points. *See* 3d Barreto Decl. at ¶ 8, Table 1; *see also* Def. Supp. Br. at 15.

Dr. Gimpel also observes in his Second Supplemental Declaration to the Court that the "political performance" of the new District 2 proposed under both the County Map and plaintiffs' Alternative Map "do not reveal striking differences." 2d Supp. Gimpel Decl. at ¶ 12. Dr. Gimpel further explains that the reason for the similarity in election outcomes under both parties' proposals is largely due to the significant Democratic-party affiliation by both Black and White County voters on the western side of the County, including in District 2. *Id*.

The Court recognizes that the Black-preferred candidate does not *always* win in the County's proposed District 2, a point that plaintiffs correctly make. *See* 3d Barreto Decl. at ¶ 8, Table 1. But, there can be no genuine dispute that the Black-preferred candidate's chance of winning in District 2 improves considerably under the County Map, when compared to the actual election results. Given this, the evidence before the Court shows that the County's proposed District 2 can perform for Black County voters.

The parties also agree that the County's remedial redistricting plan will maintain District 4 as a majority-Black district. Def. Supp. Br. at 15-16; Pl. Supp. Br. at 17; *see also* Supp. Gimpel Decl. at ¶ 20. Notably, the Black voting age population in District 4 will be 61.1% of the population under the County Map. *See* Supp. Gimpel Decl. at ¶ 11. And so, the County Map will allow the Black County voters in District 4 to continue to elect the candidates of their choice.

A careful review of the County Map also makes clear that this remedial redistricting plan adheres to traditional redistricting principles by: (1) keeping the population deviation below 10%; (2) maintaining similar compactness scores as the County's 2021 redistricting plan; (3) splitting just six precincts and 12 census places; and (4) having a core retention rate average of 82%. *See* Def. Mem. at 9-10; *see also* Supp. Gimpel Decl. at ¶¶ 8, 22-23, 25, Table 4; *see also* Pl. Supp. Br. (not disputing that the County Map adheres to traditional redistricting principles).

And so, for all of these reasons, the County has shown that the County Map will create an additional County district in which Black voters otherwise have an opportunity to elect a representative of their choice, in compliance with Section 2 of the Voting Rights Act and the Court's February 22, 2022, Memorandum Opinion and Order.  *See, e.g.*, *Bartlett*, 556 U.S. at 14-15 (reasoning that a Section 2 claim cannot be established in a cross-over district, because "[i]t is difficult to see how the majority-bloc-voting requirement could be met in a district where, by definition, white voters join in sufficient numbers with minority voters to elect the minority's preferred candidate").

As a final matter, the Court has carefully considered the arguments put forward by plaintiffs to show that the County Map is not a proper remedy for the Section 2 Voting Rights Act violation found in this case.  *See generally* Pl. Supp. Br.  The Court agrees with plaintiffs that creating a second majority-Black district in the County could remedy such a violation and comply with the Court's February 22, 2022, Memorandum Opinion and Order.  But, as the Court's Memorandum Opinion and Order makes clear, the County may also remedy this violation by proposing a remedial redistricting plan that provides for an additional County district in which Black County voters otherwise have an opportunity to elect a representative of their choice and that comports with the requirements of the Voting Rights Act.  *See* Feb. 22, 2022, Mem. Op. and Order at 23; *see also McGhee*, 860 F.2d. at 115 (stating that the Court shall give the "appropriate legislative body the first opportunity to devise an acceptable remedial plan"); *Cooper v. Harris*, 137 S. Ct. 1455, 1471-72 (2017) (finding unpersuasive plaintiffs' argument that "whenever a legislature *can* draw a majority-minority district, it *must* do so—even if a crossover district would also allow the minority group to elect its favored candidates," because a Section 2 vote dilution claim cannot be established in a cross-over district) (emphasis in original).  Because the County has done so here, the Court accords great deference to the County Council's legislative judgments about the exact nature and scope of the proposed remedy in this case.  *McGhee*, 860 F.2d. at 115.

## V.     CONCLUSION

And so, for the foregoing reasons, the Court:

1. **APPROVES** the County's proposed redistricting map, *see* ECF No. 57-3;

2. **GRANTS** the County's motion for approval of its proposed redistricting map and

to modify the preliminary injunction, ECF No. 57; and

3. **MODIFIES** the February 22, 2022, preliminary injunction to allow (1) the Council to pass a redistricting bill to enact the proposed redistricting map, including the invocation of Section 208(e) of the Baltimore County Charter to call an emergency legislative session and excusing the publication period set forth in Section 308(e) of the Charter, thus allowing the new proposed redistricting map to be enacted into law as soon as practicable, and (2) the County to conduct the 2022 election cycle and those following it pursuant to the passed redistricting bill.

The parties shall **FILE** a joint status report setting forth their respective views on whether the Court should dismiss this matter, or, if warranted, proposing a schedule for further proceedings, on or before **April 29, 2022**.

**IT IS SO ORDERED**.

s/ Lydia Kay Griggsby
LYDIA KAY GRIGGSBY
United States District Judge